# In the United States Court of Federal Claims

### No. 14-1024C
### Filed: February 20, 2023

```
*  *  *  *  *  *  *  *  *  *  *  *  *        *
                                            *
PETRO MEX, LLC,                             *
                                            *
            Plaintiff,                      *
      v.                                    *
                                            *
UNITED STATES,                              *
                                            *
            Defendant.                      *
                                            *
*  *  *  *  *  *  *  *  *  *  *  *  *        *
```

**Douglas J. Reynolds**, The Reynolds Law Group, Durango, CO. With him was **Michelle Der Ohanesian**, The Reynolds Law Group, Durango, CO.

**Kara M. Westercamp**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. With her were **Allison Kidd-Miller**, Trial Attorney, Commercial Litigation Branch, **Tara K. Hogan,** Assistant Director, Commercial Litigation Branch; **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brian M. Boynton**, Principal Deputy Attorney General, Civil Division. **Philip C. Lowe**, Solicitor's Office, United States Department of the Interior, Lakewood, CO, of counsel.

**O P I N I O N**

<u>**HORN, J.**</u>

In the above-captioned case, plaintiff Petro Mex, LLC (Petro Mex) filed its complaint in the United States Court of Federal Claims alleging that defendant breached its lease agreement for oil and gas mining. Plaintiff seeks more than $5,000,000.00 in damages, including expectations damages, reliance damages, interest and fees. Specifically, plaintiff "seeks damages for the approximately two-year period in which it was prevented from producing and selling oil and gas and for damage to the wells on the Lease that were caused by the extended shut-in period." The above captioned case was originally assigned to Judge Nancy B. Firestone. The above captioned case was subsequently reassigned to Judge Robert H. Hodges, before ultimately being reassigned to the undersigned. The undersigned held a trial on plaintiff's breach of contract claims and defendant's offset claims.

**FINDINGS OF FACT**

<u>The Garfield Lease</u>

The parties have stipulated that "[e]ffective March 1, 1965, Celeste C. Grynberg and the DOI [United States Department of Interior] entered into oil and gas lease number COC-0124705A (Garfield Lease) on public land," and "[t]hrough a series of assignments, Petro Mex acquired record title to the Garfield Lease effective October 1, 2004. At all times relevant to this case, Petro Mex was the owner and the operator of the Garfield Lease."[1] (alterations in original). Additionally, the parties stipulated that "[a]t all times relevant to this case, Jesus Villalobos was the owner and president of Petro Mex." Mr. Villalobos testified at trial that he is the sole owner of Petro Mex. Mr. Villalobos explained that he founded Petro Mex

> [b]ecause I get a chance to come into the -- since I've been in the oilfield business all my life -- I used to have a friend that -- his name was John Durham and he come over and talk to me to buy oil wells in Colorado. Well, he's trying to buy those wells, but he said he can't come up with the money. So he asked me if I can buy them. So that's when I started Petro Mex.

(alteration added).

The Garfield Lease began with a series of "Lease Terms." Section 1 of the Garfield Lease states:

---

[1] As noted by defendant, although there were also "references to Lease COC-088586 (Mesa Lease) and Lease COC-60770 (Esmerelda [sic] Lease) throughout the trial, the Garfield Lease is the only lease at issue." (alteration added). Plaintiff's counsel stated at the trial that the Mesa Lease "is not at issue in this matter for ownership reasons." Plaintiff did not contest defendant's statement that the Esmeralda Lease is not at issue in this case. The court notes that the Esmeralda Lease was referenced in a June 16, 2009 letter to Petro Mex, discussed below. The June 16, 2009 letter stated, in part:

**Lease COC-60770**

The status of COC-60770 has been difficult to track for the past several years. The Esmeralda 1-2 was spud on July 4, 2007 and a lease extension was earned by drilling over the lease expiration date. As of today the well has not been completed. In addition, the location for the Esmeralda 2-2 has been built and Petro Mex will be responsible for restoration. The APD [Application for Permit to Drill] for the 2-2 well has expired. We have consulted with the Minerals Management Service and our State Office and have determined that the subject lease terminated due to failure to pay the lease yearly rental. Find attached a notice of the lease termination (Enclosure 6).

(emphasis in original; alteration added).

SECTION 1. *Rights of Lessee.* — The lessee is granted the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and gas deposits, except helium gas, in the lands leased, together with the right to construct and maintain thereupon, all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment thereof, for a period of 10 years, and so long thereafter as oil or gas is produced in paying quantities; subject to any unit agreement heretofore or hereafter approved by the Secretary of the Interior, the provisions of said agreement to govern the lands subject thereto where inconsistent with the terms of the lease.

(capitalization and emphasis in original).

Section 2(g) of the Garfield Lease provides: "*Statements, plats and reports.*— At such times and in such forms that the lessor may prescribe, to furnish detailed statements showing the amounts and quality of all products removed and sold from the lease, the proceeds therefrom and the amount used for production purposes or unavoidably lost[.]" (alteration added; emphasis in original).[2] Section 7 of the Garfield Lease provides:

SEC. 7. *Proceedings in case of default.* — If the lessee shall not comply with any of the provisions of the act or the regulations thereunder or of the lease, or make default in the performance or observance of any of the terms hereof (except that of payment of annual rental which results in the automatic termination of the lease), and such default shall continue for a period of 30 days after service of written notice thereof by the lessor, this lease may be cancelled by the Secretary of the Interior in accordance with section 31 of the act, except that if this lease covers lands known to contain

---

[2] Pursuant to the operative version of 43 C.F.R. § 3162.4-1(a) (2007) during the period at issue in this litigation, an operator "shall keep accurate and complete records with respect to all lease operations including, but not limited to, production facilities and equipment, drilling, producing, redrilling, deepening, repairing, plugging back, and abandonment operations, and other matters pertaining to operations." Id. The current version provides:

(a) The operator must keep accurate and complete records with respect to:
(1) All lease operations, including, but not limited to, drilling, producing, redrilling, repairing, plugging back, and abandonment operations;
(2) Production facilities and equipment (including schematic diagrams as required by applicable orders and notices); and
(3) Determining and verifying the quantity, quality, and disposition of production from or allocable to Federal or Indian leases (including source records).

43 C.F.R. § 3162.4-1(a) (2022).

valuable deposits of oil or gas, the lease may be cancelled only by judicial proceedings in the manner provided in section 31 of the act, but this provision shall not be construed to prevent the exercise by the lessor of any legal or equitable remedy which the lessor might otherwise have. Upon cancellation of this lease, any casing material, or equipment determined by the lessor to be necessary for use in plugging or preserving any well drilled on the leased land shall become the property of the lessor. A waiver of any particular cause of forfeiture shall not prevent the cancellation and forfeiture of this lease for any other cause of forfeiture, or for the same cause occurring at any other time.

(capitalization and emphasis in original).

After the "Lease Terms," the Garfield Lease included an "OFFER TO LEASE AND LEASE FOR OIL AND GAS," (capitalization in original), from the Department of the Interior (DOI), Bureau of Land Management (BLM), which stated:

The undersigned hereby offers to lease all or any of the lands described in item 2 [meets and bounds description] that are available for lease, pursuant and subject to the terms and provisions of the Act of February 25, 1920 (41 Stat. 437, 30 U.S.C. sec. 181),[3] as amended, hereinafter referred to as the act, and to all reasonable regulations of the Secretary of the Interior now or hereafter in force, when not inconsistent with any express and specific provisions herein, which are made a part hereof.

(alterations added).

The parties stipulated that "[a]t all times relevant to this case, there have been three operational natural gas wells on the Garfield Lease: Federal 15-9; 6-9-8-101; and Government 5."[4] The parties further stipulated that "[t]he 'minimum royalty' for the Garfield

---

[3] As noted in defendant's post-trial brief:

The Mineral Leasing Act of 1920, ch. 65, 41 Stat. 437 (1920) (codified, as amended, at 30 U.S.C. § 181 *et seq.*) (1981), authorizes and governs the leasing of public lands, *i.e.*, lands "owned by the United States," for developing deposits of certain minerals, including oil and gas. As the principal administrator of the Mineral Leasing Act for onshore minerals owned by the United States, Interior issues oil and gas leases authorizing mineral exploration and development activities by private entities.

[4] The court notes that at trial, the parties and the witnesses did not refer to the names or number of the wells operated by Petro Mex with consistency. By way of example, Linn Wilson, a Petro Mex employee, had the following exchange with plaintiff's counsel at trial:

Q. How many wells are on that lease?

lease was $1,080. The 'royalty on production' for the Garfield lease was 12.5 percent on production removed or sold from the leased land." The royalties were to be paid to the lessor, the BLM.

In an exchange with plaintiff's counsel, Mr. Villalobos testified at trial regarding the operations of Petro Mex and its wells:

[Question by plaintiff's counsel of record Douglas Reynolds] What is it that Petro Mex does? What is the business that Petro Mex is in?

[Answer by Mr. Villalobos] Petro Mex owns leases in Colorado and now we own leases in New Mexico and Utah right now.

Q. Okay. And you're saying they own leases. You're referring to oil and gas leases, right?

A. That's correct, yes, sir.

Q. And does Petro Mex operate those leases as well?

A. Yes, sir.

Q. Okay. And you were here for the testimony yesterday or at least you observed the testimony from Mr. Wilson, Linn Wilson, yesterday, correct?
A. Yes.

Q. And are you familiar with the lease that we were discussing, the Garfield lease?

A. Yes, sir.

Q. Okay. When did Petro Mex purchase that lease?

_____

A. There is [sic] four wells on that lease.

Q. And what are those wells called? What are the names --

A. There is the 15-9, the 6-9, the Government 6, and the Government 5.

(alteration added). During Mr. Villalobos' direct testimony in response to the question: "You said that the lease -- the wells that were in place were the 15-9, the 6 and the 2. Yesterday, we also heard discussion of a Government 5 well," Mr. Villalobos confirmed: "Yes, sir." To add further confusion, in a April 1, 2009 letter to Petro Mex from the BLM, discussed below, the BLM indicated: "There are five wells on the lease and all are operated by Petro Mex, LLC," "Federal 15-9 Government 9 Government 5 Government 6 Federal 6-9."

A. 2003. 2002 or 2003.

Q. Okay. Well, you said that Petro Mex was formed in 2002 or 2003. Did Petro Mex buy that lease essentially right after it was formed?

A. Yes. That's the reason I formed Petro Mex.

Q. Was to buy that lease?

A. Yes, sir.

Q. And there's another lease as well, right?

A. Yes, sir.

Q. In Colorado?

A. Garfield County and Mesa County.

Q. Okay. So there's another lease that Petro Mex owned or operated and that's called the Mesa lease. Is that correct?

A. Yes, sir.

Q. Was there a third lease at that point in time as well?

A. Yeah, we had another lease in Section 2.

Q. Okay.

A. That was terminated.

Q. Okay. When you purchased the Garfield lease, was there a well already in place on the lease?

A. Yeah, that was [sic] three wells in place already, yes.

Q. Okay. Which wells were in place?

A. The 15-9, the number 6 and then number 2.

Q. Okay. And were those wells productive when the lease was purchased?

A. The [sic] was making some gas, yes.

Q. Okay. Were they making enough gas to cover royalties and expenses?

A. Yes, but I had to lay 15 miles of pipeline to be able to produce more.

· · ·

Q. Okay. You said that the lease -- the wells that were in place were the 15-9, the 6 and the 2. Yesterday, we also heard discussion of a Government 5 well.

A. Yes, sir.

Q. Was that a well you drilled after you purchased the lease?

A. Already -- that well was already drilled. It wasn't hooked up. So I have to do -- redrill it and hook it up to the other system.

Q. Okay. Do those wells produce oil as well, Mr. Villalobos?

A. The only one that produce oil is the 15-9.

Q. Okay. And does it produce very much oil?

A. Not very much.

Q. It's primarily a natural gas oil well?

A. Most -- gas, yes.

Q. Okay. What employee handled most of the day-to-day operations of the wells back in 2007 and 2008?

A. Mr. Linn Wilson.

Q. Okay. Did you do much on a day-to-day basis with regard to those wells?

A. I was doing some of it. I do -- I was doing some work, and I didn't do that much paperwork because I don't know how to do it.

(alterations added). Mr. Wilson, the Operations Manager of Petro Mex, testified at trial that after 2005, the Garfield Lease was consistently productive.

<u>Well Inspection and Notices of Incidents of Noncompliance</u>

The parties agree that the "lease at issue in this matter was, at all times relevant to this case, subject to the jurisdiction of BLM's Grand Junction (Colorado) Field Office

(Field Office)." (capitalization in original). As noted by defendant: "Because all gas produced from a Federal lease is subject to royalty payments, 30 C.F.R. §§ 1202.150(a), (b)(1), operators must submit production reports in order to verify and calculate the royalty payments due to the United States. 30 C.F.R. § 1210.101(a)." (internal reference omitted). Related to the required reports for the Garfield Lease, a BLM employee Mr. Robert Hartman, a petroleum engineer in the Field Office with the BLM, sent Petro Mex a letter on March 14, 2007, which stated, in part:

> Please refer to our letter dated August 11, 2006 that requested information concerning wells operated by Petro-Mex. To date, none of the information requested has been received. Petro-mex's [sic] failure to provide this information is an Incident of Non Compliance.
>
> **The following is an order of the authorized officer.** In accordance with 43 CFR 3163.1(a), please submit the above indicated reports to this office no later than twenty (20) days from the receipt of this letter to correct the violations. If you fail to submit the required reports in the time specified, you will be liable for an assessment of $250.00 under 43 CFR 3163.1(a)(2). For clarity we repeat our request for information in the following bolded italicized text.
>
> ***We are lacking several reports for wells operated by Petro-Mex Resources. The listed items cover different wells and areas of concern.***
>
> ***Lease COC088586, Well 1-15-8-101, NW¼, NW¼ Section 15, T8S, R101W***
> ***Lease COC0124705A, Well 6-9-8-101, SE¼ SW¼, Section 9, T8S, R101W***
>
> ***Form 3160-5, Spud Notification: two copies due of written confirmation of verbal spud notification. We have no record of the spudding of these wells.***
>
> ***Form 3160-4, Well Completion Report and Log: two copies due within 30 days after well is completed (Onshore Order No. 1, Section VIII).***
>
> ***Geologic Logs: two copies due within 30 days after well is completed. (43 CFR 3162.4-1b requires duplicate copies of all types of wire line logs, sample logs, drilling time logs and other well surveys).***
>
> ***Lease COC0124705A, Well 5, SW¼ SW¼, Section 9, T8S, R101W***
>
> ***First Production Notification: Notification to the BLM is required within 5 days of first production. The COGCC website indicates the subject***

*well began producing in January 2006 after being shut in for several years.*

*Form 3160-4, Well Completion Report and Log: two copies due within 30 days after well is completed (Onshore Order No. 1, Section VIII). Please update status of recompletion as requested in your sundry of August 2004 which involved pulling the existing casing and running new strings.*

*Lease COC088586, Well 2, NW ¼ NW ¼, Section 15, T8S, R101W*

*First Production Notification: Notification to the BLM is required within 5 days of first production. The COGCC website indicates the subject well began producing in July 2004 after being shut in for several years.*

*The Minerals Management Service is responsible for the collection of production reports for all federal leases and agreements. Their database shows that Petro-Mex has not reported for several years. Please indicate in your response to this letter [sic] status in updating the production reporting for all of the wells listed in Attachment 1.*

(emphasis in original; alterations added). At the trial, defendant's counsel and Mr. Hartman had the following exchange about the March 14, 2007 letter at trial.

[Question by defendant's counsel of record Kara Westercamp] [B]eneath the first production notification, there is a reference to a Form 3160-4, Well Completion Report and Log. Why were you asking for that?

[Answer by Mr. Hartman] I believe we did not have any record of that well being completed. Again, I'm not sure if Petro Mex was the -- drilled the well or not, but we didn't have a copy of it, so I was just asking for that. And that's due within 30 days of the well being completed.

Q. And considering that there's a reference to a sundry of August 2004, and now we know we're at least past August 2006, was that something that Petro Mex should have provided?

A. Yes.

(alterations added).

Regarding the reference in the March 14, 2007 letter to the Minerals Management Service, defendant's counsel asked Mr. Hartman

just going to the last paragraph, a reference to MMS [Minerals Management Service], and it looks like you state that their [Minerals Management Service]

9

database shows that Petro Mex has not reported for several years. Why -- why were you asking about -- about the MMS database?

A. Well, we were sort of shooting blind. We didn't know for sure what was going on. We didn't have any production reports from Petro Mex, so we were asking for them to update the MMS so that we would know more.

(alterations added).

Previous to the March 14, 2007 letter sent by Mr. Hartman, on November 30, 2006, Edward Fancher, a petroleum engineering technician with the BLM, sent a letter to Petro Mex indicating that Petro Mex's "leases and wells have been selected by the Grand Junction Field Office (GJFO) for a production inspection." The testimony developed at trial demonstrated that Mr. Fancher was the BLM employee who had the most direct contact with Petro Mex and visited the site most often during the time period at issue in this above captioned case.

The November 30, 2006 letter from Mr. Fancher continued:

In accordance with 43 CFR 3162.7-5(b)(6), you shall submit the following documents to the GJFO by January 15, 2007:

1. (a) OGOR [Oil and Gas Operations Report] reports submitted to MMS [Minerals Management Service[5]] for each well during the inspection times.

(b) Gas purchase statements, Quarterly Meter Calibration Reports, Configuration Report, and Chart Integration Volume Statements (Daily Chart Integration Audit Reports) for each well.

(c) Gas Chromatography Analysis showing BTU content and Specific Gravity.

(d) Methods used to estimate volumes of gas Flared, Vented, or otherwise Lost.

(d)[sic] Methods used to estimate volumes of gas Used on Lease; list equipment on the lease that uses gas, by well location.

(e) Manufacturer's MCF use rating of production equipment.

2. (a) Fluid Transporter

---

[5] Defendant notes that "Interior reorganized the former MMS [Minerals Management Service] in 2011, and the section relevant to gas production and royalty payments is now called the Office of Natural Resources Revenue (ONRR)." (alteration added).

10

(b) Run tickets for oil sold, or water hauled for each facility.

(c) Tank number(s), tank size(s) and tank strapping for each storage facilities.

(d) Daily pumper's reports for period showing produced water and gas.

(h) [sic] Pipeline run statements for the period.

(alterations added). The November 30, 2006 letter concluded:

> All documents shall be properly identified by federal case/lease and well number and include the information requested above. Failure to comply with these instructions may result in the issuance of a "Notice of Incident of Noncompliance". You have the right to request a review of these instructions per 43 CFR 3165.3 and to appeal per 43 CFR 3165.4.

Mr. Fancher testified that, at that time, "[m]y primary job duties was [sic] production accountability, which is production inspections, field inspections." (alterations added). direct examination with defendant's counsel, Mr. Fancher had the following exchange:

[Q.] [W]hat is production accountability?

A. That's comparing the two databases against each other for accuracy. It also includes requesting documentation from the operator and comparing that data with what they say they've produced and what they actually reported that they produced.

Q. And what is the purpose of a production accountability inspection?

A. Just to ensure that everything that is harvested out of the -- the minerals and stuff that is harvested, that we have some kind of accurate way of tracking it.

Q. And why is it important that you be able to track production?

A. To make sure that it's getting reported, of course, and then -- and then the royalty concern that comes out of that, and that's taken care of by the ONRR [Office of Natural Resource Revenue] people.

Q. Okay. And you mentioned you used two databases when you do the production accountability work. Could you tell us what those were, please?

A. Yes. One is our OGOR [Oil and Gas Operations Report] statements, our oil and gas statements that we get from our AAFMS database, American Automated Fluid -- Automatic Fluid Measurement System. And then I look

at, like, Colorado, their oil and gas website, and I would compare those figures, what they reported there. They should be the same. If their [sic] not, then we may ask the operator to send me a copy of their -- their reporting to see where the difference is at.

(alterations added). Additionally, defendant's counsel asked Mr. Fancher about "site security:"

[Q.] could you tell us what the -- what are some of the major areas that you are inspecting as part of site security?

A. We're concerned with any bypasses around any gas meters, and we're also concerned about any sealing of oil tanks. So every tank has to have a -- a seal. If it's dealing with oil, it needs to be properly sealed, and site security is how we would -- the activity we would be doing when we inspect those things.

Q. Okay. And could you explain more about why you look for proper seals? Why is that important?

A. Well, it affects the royalty income and the production accountability. If the seals aren't in place properly, then the fluids -- the oil, water, whatever -- can be removed from the location without anybody ever knowing where it goes to, and we like to have an idea where all the production fluids go, water and oil.

Q. Okay. And you said one of the other things that you inspect for during a site security inspection is any bypasses around gas meters. What could that -- if you found such a thing, what could that mean?

A. That would mean that the -- the operator could be filtering off gas, taking the gas meter out of line and just totally going around it. So there would be no measurement of that gas, and if that's the case, then that would affect royalty income.

Q. Okay. In addition to -- are there any inspections that you do in addition to production accountability and site security inspections?

A. Yes. We also do, like, meter calibrations and chart verifications, which they're kind of similar in a way. If I'm doing a meter calibration, then I'm witnessing someone calibrate the gas meter to ensure that it's accurate according to regulations, and if I'm doing a CV, is what we call the chart verification, then we are looking to see how well the operator's or the mechanic's electronics are doing as far as the accuracy of the meter.

(alteration added).

Regarding the November 30, 2006 letter from Mr. Fancher to Petro Mex, defendant's counsel asked Mr. Fancher, "why did you decide to request these particular documents [referenced above, including the OGOR reports, the Quarterly Meter Calibration reports, the Configuration reports gas purchase statements, the Daily Chart Integration Audit reports, and the gas purchase statements] from Petro Mex?" (alteration added) Mr. Fancher testified:

> Well, I wanted to verify their -- their reporting. So the OGOR statements, I wanted a copy of those. I wanted a copy of their gas purchase statements, calibration reports, and I look through all these to ensure that the meters are being calibrated when they're supposed to be, the frequency they're calibrated, that the reporting is really flawless, you know, we want to make sure they're -- what they're producing is what they're reporting, and that would include, like to see the gas chromatography, we like to know that, too, for our calculations, and it's not too often anybody flares or vents gas. We don't really particularly care for that very much, but if they did, I wanted to verify all their records with that that I would get from MMS.

(alteration added). On March 1, 2007, Mr. Fancher contacted Linn Wilson at Petro Mex about the November 30, 2006 letter and Mr. Fancher testified:

> I called him to find out the status of their audit that I requested for the 2007, and I -- I mentioned I gave an extension, but I still haven't received anything. So they had -- and we talked about -- I mentioned that the material -- he said that the material was in Trudy [Grubilnick[6]]'s hands, that he'd call her,

---

[6] Mr. Wilson testified that Trudy Grubilnick was Petro Mex's former bookkeeper. Plaintiff's counsel and Mr. Wilson had the following exchange at trial regarding Ms. Grubilnick:

> [Q.] Is she [Ms. Grubilnick] still with Petro Mex?
>
> A. No.
>
> Q. Was she eventually terminated by Petro Mex?
>
> A. Yes, she was.
>
> Q. Do you remember when she was terminated?
>
> A. I believe it was in 2008, but I'm not --I can't remember exactly when.
>
> Q. And do you know why she was terminated? Did you terminate her?
>
> A. No, I did not. Jesus did.

so kind of like basically saying he didn't really know what happened. Trudy was supposed to take care of all that.

(alteration added). Defendant's counsel subsequently asked Mr. Fancher: "So as of 7/3/2007, had Petro Mex provided the information that you had requested for the fiscal year 2007 production accountability inspection?" to which Mr. Fancher testified: "No." Mr. Fancher testified that he followed up with Petro Mex in July 2007 about the missing documents. In response to defendant's counsel question at trial, "did Petro Mex provide any explanation for its failure to give you the information you had requested?" Mr. Fancher responded: "No."

Mr. Fancher also testified about his authority as an inspector. Defendant's counsel and Mr. Fancher had the following exchange during his direct testimony:

[Q.] [A]s a petroleum engineer, technician, and an inspector, do you have the authority to take enforcement actions against lessees and operators?

A. Yes, I do.

Q. Okay. I'd like to talk about the different enforcement actions that were available to you in 2007 to 2010. What was the lowest level of enforcement action that was possible for you to take if you found some problem during an inspection?

---

Q. Okay. Do you know why she was terminated?

A. Because she was not filing the records and the reports as she should have been, and the royalties was not getting paid.

(alterations added). Mr. Villalobos, on his direct testimony, clarified with plaintiff's counsel about the timeframe for Ms. Grubilnick's employment with Petro Mex:

[Q.] Do you remember when you hired her?

A. Like 2007, 2006.

Q. Okay. And when did you terminate her?

A. I think that was at the end of 2007.

Q. Okay.

A. Or early 2008.

Q. Okay.

14

A. Well, if I found just a problem, that's something that's not characterized as a violation of regulation, I would take a -- make a written order and have that signed at that time by the authorized officer, which would be like the building manager or whoever he designated, and I would pursue it that way. That would be my first step, would be that written order in that particular case.

Q. Okay. Is that a -- does BLM call that an order of an authorized officer?

A. Yes.

Q. Okay. And as a petroleum engineer/technician, were you an authorized officer who could give such orders?

A. Yes. I could -- I could -- now we can't sign them for sure. Back then, I think they liked our -- our field office -- kind of a field office delegation for those at that time.

Q. And could you give us an example of a situation when an order of the authorized officer would be appropriate?

A. Say if there was a -- a lot of weeds, noxious weeds or something like that growing or some rilling[7] off of the pad which would cause erosion. That wold [sic] be a good reason to use a -- because it's not really against the regs could have -- to have that natural erosion happening, but to have it corrected, we would have to use what -- some kind of instrument to communicate that to the operator, and written orders would be used first.

Q. Okay. And earlier you drew a distinction between a problem and a violation. So if you find a violation -- what does a violation mean to you?

A. A violation is something that's specifically addressed in the on-shore orders or the 43 CFRs, and with that -- or a violation of a condition of approval or a violation of a written order, and I can issue a [sic] incident of noncompliance and giving a date and request them to repair their fix to make whatever change is necessary to be in compliance.

Q. Okay. And I noticed you said "written order." Are you using that interchangeably with "order of the authorized officer"?

A. Yes, yes. It is an interchangeable thing. You might consider one might be a written form. I had a regular form in my database for written orders, and we could do, like, one of those forms, or you can do a -- a letter form.

---

[7] Although not defined by Mr. Fancher at the trial, "rilling" refers to rill erosion, which can occur if runoff water forms small channels as it concentrates down a slope.

(alterations added). Regarding different kinds of enforcement actions, Mr. Fancher explained to defendant's counsel at trial:

Q. If you found a violation on a lease, what was the lowest level of enforcement action available to you?

A. I would write an incident of noncompliance.

Q. Okay. Is there anything that is less serious than an incident of noncompliance?

A. Yes, there is. There's some things that, according to the reg, doesn't -- doesn't have enough weight to be a major -- it's a minor violation -- they have two gravities, minor and major. A minor violation, the time to repair it -- so like a -- a sign wasn't correct, then I would write an incident of noncompliance and have them correct their sign.

Q. And just -- I just want to make sure this doesn't get confused, but I'm asking about if there's something lesser than an incident of noncompliance.

A. Oh, I'm sorry.

Q. And, if so, if you could tell us what that is, please.

A. That would be like -- less than that would be the written order of the authorized officer. That would be -- yeah.

Q. Okay. Are there any kind of verbal warnings?

A. At that time, there was [sic] verbal warnings, but even a verbal warning had to be documented, and a copy of the documented verbal warning would have to be sent to the operator within 15 days.

Q. Could you give us -- well, did you ever issue any verbal warnings?

A. I have, yes.

Q. Could you give us a sense of the situation where a verbal warning might be appropriate?

A. If I was on location, say, where an operator was or a hand or somebody and, like, even the -- the sign, if I couldn't read the sign correctly or a lease number had changed perhaps and it was incorrect, then I would request them to correct that sign, something they could possibly do immediately right there.

Q. Okay. And I believe you explained, but I want to make sure we've got it clear for the record, even though it's called a verbal warning, was there still an element in writing?

A. Oh, yes. Yes, everything had to be documented for the verbal warnings, too.

Q. And now could you tell us about a minor incident of noncompliance? We're going to talk in more detail about incidences of noncompliance, but could you just start out by telling generally what that is.

A. We have a -- a set of standards and regs put forward through CFRs [Code of Federal Regulations] and the on-shore orders, and like I said, the conditions of approval, if something is violated because it's written down, you know, and an incident of noncompliance would be the way to correct that. It would be like the sign issue, could be a tank number, safety signs, things like that.

Q. And what does the word "minor" mean in this context?

A. It means that it doesn't quite have the gravity to be a major. So that would be, like, does it really pose an immediate threat or adverse condition to health and safety, for production accountability, for oil and gas safety, things like that. I don't know all the jargon for that.

. . .

[Q.] Could you describe for us, please, what a major incidence [sic] of noncompliance?

A. A major incidence [sic] of noncompliance is something that would create an adverse immediate danger to health and safety, starting something without approval, something that would have an effect on really the health and safety, production accountability, royalties, and there's a couple more. I don't remember what they are.

Q. After a major incident of noncompliance, what is the next level of enforcement action available to you?

A. Then that would be an assessment.

Q. What is an assessment?

A. An assessment for a major would be a -- a $500 fine per day until the incident was corrected. It's a little different than maybe a -- a minor, whereas

we -- if we need to make a reasonable effort to contact the producer, the operator, and in doing that, then, we would close the initial incident of noncompliance, issue the major incident of compliance with the assessment. That would be the ongoing document at that time. And then from there, then it would go obviously to civil penalties or. . .

Q. Okay. And could you give us an example of -- well, let me ask, in what situations do you issue civil penalties? You've just described the escalation from INCs [Incidents of Noncompliance] to assessments to civil penalties, but are there ever times where you -- the civil penalty would be the first enforcement action you took for some issue?

A. Not the first one, no. It always has to start at the lowest level, and then if it's not complied with, whatever the error was, then we would build on the -- the assessment, and then from there, if they still refused to do it after a certain time, then we would go on into the civil penalty aspect of it, and I can't really quote a lot of that. I don't remember everything about that. It's just like you've really got to look at the directions behind it.

Q. Okay. After a -- so let me -- we talked about major incidents of noncompliance and how those could go to assessments or civil penalties, but let's go back to major incidents of noncompliance now, and I want to ask you, is there a next level of enforcement action available to you for a violation, a next level higher than a major incident of noncompliance, other than what we've already talked about?

A. Yes. There's a -- there's other avenues when you get to that level, too, I suppose, to the civil penalties. Depending on the violation, it can go as far as shutting in the operator, if there's just continued noncompliance issues. That's – that's one step. I could hire someone to -- go through the motions of hiring somebody to complete the work, and they would be billed for it. That doesn't happen very often at all.

Q. And we'll talk a lot more about shut-in orders but at this point, generally, what is a shut-in order? What does it require of the operator?

A. It would require the operator to abide by the directions of the shut-in order, which means he would need to potentially shut down their operation, shuttering their wells and tanks and everything until whatever was corrected that was outstanding.

Q. Okay. And, again, still focusing on that 2007 to 2010 time period, what kind of discretion, if any, did you have as an inspector in deciding what kind of enforcement action to take?

A. I had full discretion.

Q. And could you give us an example of a time where you might have to make a decision between -- you might have to exercise that discretion between different options?

A. Yeah. Sometimes when something is just not completed, not completed right, you can't communicate with the operator, we can't get something fixed that needs to be dealt with immediately, then -- or something to secure the tanks, then -- then I have a discretion to halt their operation until they get in compliance. Other issues like a serious leak or something could be a reason to ask them to shut everything in, still followed up by the documentation.

(alterations added).

Between August 15, 2007 and May 29, 2008, Mr. Fancher inspected the wells at Petro Mex's site related to the Garfield Lease and issued a total of eleven Notices of Incidents of Noncompliance. Seven of the Notices of Incidents of Noncompliance were for minor violations, including ineffectively sealing sales valves, failing to identify storage tanks by a unique number, a leaking bull plug, insufficient water storage pit and full steel tank, and the failure to notify the Field Office prior to oil sales. Four of the Notices of Incidents of Noncompliance were for major violations, for unsealed sales valves and for an underground leak.

On August 15, 2007, Mr. Fancher inspected wells related to the Garfield Lease and issued three Notices of Incidents of Noncompliance, all related to the Federal 15-9 well. Two of the Notices of Incidents of Noncompliance were for minor violations, Notice of Incident of Noncompliance No. EF007056 was for the tank valves "ineffectively sealed to minimum standards," and Notice of Incident of Noncompliance No. EF007057 was for the failure to clearly identify the storage tank by a unique number. The third Notice of Incident of Noncompliance was for a major violation, Notice of Incident of Noncompliance No. EF007055, which stated: "The sales valves on your tank found to be ineffectively sealed to minimum standards. US GOV BLMI seal No. 0286 was placed on the [sic] sales valve. You must obtain prior approval to remove this seal. After approval, install your seal to obtain compliance." (capitalization in original; alteration added). Regarding the Notices of Incidents of Noncompliance issued on August 15, 2007, the Operations Manager of Petro Mex, Mr. Wilson, had the following exchange with plaintiff's counsel:

[Q.] So do you have any recollection of what happened, what Petro Mex did in response to these notices of incidents of noncompliance?

A. I am the one that fixed all of these incidents of noncompliance. On the sales valve and the B&W valve, I bought what they call darts that go through the locking mechanism of the valve, so you can put a seal on it, and that way it can't be tampered with. And on the third one, I had signs made and installed on the production tank.

Q. Okay. Do you know if Petro Mex ever signed these violations and returned the notice once the violations were corrected?

A. I believe I did. Yes.

Q. Okay. Did that always happen when you corrected an incident of noncompliance, a notice of incident of noncompliance?

A. No. There could be instances where they were not signed.

Q. And were you ever -- maybe "punished" isn't the right word. Did the field office ever take action against Petro Mex for failing to actually return a signed copy?

A. Not to my knowledge.

Q. Okay. So if you didn't sign one of these, how would you usually let Mr. Fancher know that the issue had been corrected?

A. I would call him on the phone and tell him that everything had been corrected.

Q. Okay. Would he remind you to send in a signed copy or not?

A. No. Usually not.

Q. Did he ever indicate that it was necessary there would be some kind of assessment or fine if you didn't actually send a signed copy?

A. I don't remember him ever saying that to me.

(alteration added).

On October 9, 2007, Mr. Fancher, inspected wells on the Garfield Lease and issued two additional Notices of Incidents of Noncompliance for the Federal 15-9 well – one minor violation and one major violation. Notice of Incident of Noncompliance No. EF08004 was for the minor violation and stated: "Drain valves are 'appropriate valves' and shall be 'effectively sealed' using the dart system, during the production and sales phases or combination of production and sales phases" by October 21, 2007. Notice of Incident of Noncompliance No. EF08003 was the Notice of Incident of Noncompliance for the major violation and stated: "Sales valves are 'appropriate valves' and shall be 'effectively sealed' using the dart system, during the production and sales phases or combination of production and sales phases" by October 21, 2007. Regarding the two Notices of Incidents of Noncompliance issued on October 9, 2007, Linn Wilson had the following exchange with plaintiff's counsel:

[Q.] Do you recognize these documents?

A. Yes.

Q. Okay. Why don't you tell us what these are.

A. It is telling me that the incident of noncompliance is sales valves are appropriate valves and should be effectively sealed, using the dart system during the production and sales phases or combination of production and sales phases by the date indicated.

Q. Okay. So let's back up here. Are these two different notices of incidents of noncompliance than the ones we just looked at [the three Notices of Incidents of Noncompliance issued on August 15, 2007]?

A. Yes, they are.

Q. When are these dated?

A. These are dated 10/9 of 2007.

Q. Okay. Are these the same violations that we just looked at in Exhibit 9 [Notices of Incidents of Noncompliance issued on August 15, 2007]?

A. They are the -- they are the same violation, just worded differently.

Q. Okay. So the sale [sic] valve violation on 10/9/07 was the same sales valve violation from the previous exhibit?

A. Yes.

. . .

Q. So is that the same sales valve violation as the violation that was in Joint Exhibit 9 [Notices of Incidents of Noncompliance issued on August 15, 2007]–

A. Yes.

Q. -- Mr. Wilson?

A. Yes.

Q. And then what is the violation in the second notice of incidents of noncompliance in this exhibit [Joint Exhibit 10]? That would be trial page 32[8].

A. It is the drain valve.

Q. Okay.

A. And it says the same thing, that it has to be effectively sealed by the dart system during production.

Q. So -- and, again, is that the same violation that was cited in the notice of incidents of noncompliance in the previous exhibit, JX-9?

A. Yes.

Q. Okay. So those two had not been fixed by this point in time. Is that fair to say?

A. That's fair to say. Yes.

Q. Okay. And this is about two months later. Correct?

A. Yes.

Q. Okay. And are either one of these notices of incidents of noncompliance signed by a BLM representative?

A. No.

Q. Okay. And did these come from Mr. Fancher as well?

A. Yes.

Q. Okay. And again on these, you did testify earlier that these violations were eventually fixed. Correct?

A. Correct.

Q. And, again, do you know if you ever signed the violation and returned it once it was corrected?

---

8 Each page of the joint trial exhibits was sequentially numbered, so plaintiff's counsel's reference to "trial page 32," was the 32nd page of the trial exhibits, and part of Joint Exhibit 10.

A. I feel confident that I did sign these and return them when it was fixed.

Q. Okay. Do you have any idea when it was fixed?

A. I cannot say with certainty what date.

Q. Do you know -- do you remember these violations from -- and I recognize that this is from September of 2007. Do you remember these, Mr. Wilson?

A. I remember receiving a violation about the tank valves. Yes.

Q. Okay. Did Mr. Fancher ever give you a call about these?

A. I don't recall if he did or not.

(alterations and footnote added).

The parties have stipulated that "[t]he Garfield Lease produced gas during the months of January through May 2008, until it was shut-in on or around May 29, 2008 following inspection and re-inspection." (alteration added). The joint stipulated facts stated that "[a]s of April 2008, BLM records indicated that Petro Mex had not submitted any production reports for the Garfield lease since July 2007," and "[a]s of April 2008, BLM records indicated that Petro Mex had not made any royalty payments on production from the Garfield lease since July 2007." (alterations added).

On April 25, 2008, Mr. Fancher inspected the wells on the Garfield Lease and issued five additional Notices of Incidents of Noncompliance, all of which were delivered to Petro Mex by certified mail. One Notice of Incident of Noncompliance, Notice of Incident of Noncompliance No. EF08016, related to the Government 5 well and was a minor violation for "a leaking bull plug." The other four of the Notices of Incidents of Noncompliance all related to the Federal 15-9 well. One of the Notices of Incidents of Noncompliance, No. EF08017, was a major violation for "unsealed sales valves." The other three Notices of Incidents of Noncompliance were for minor violations. Notice of Incident of Noncompliance No. EF08018, was a minor violation for "storage tanks lacking clearly identifiable unique numbers;" Notice of Incident of Noncompliance No. EF08020, was a minor violation for "insufficient water storage pit and full steel tank;" and Notice of Incident of Noncompliance No. EF08021, was a minor violation for the "failure to notify the Field Office prior to oil sales."

The parties further stipulated: "Each Notice of Incidents of Noncompliance[9] had text stating 'WARNING' and further stated that '[e]ach violation must be corrected within

---

[9] The parties' joint stipulations and filings are inconsistent in referring to the Notice of Incident of Noncompliance. The court's review of the BLM documents reveals similar inconsistencies. The court refers to a single notice as a Notice of Incident of Noncompliance and refers to multiple notices as Notices of Incidents of Noncompliance.

the prescribed time from receipt of this Notice and reported to the [BLM] office.'" (first alteration added; footnote added; capitalization in original). The Notices of Incidents of Noncompliance listed different dates for compliance, with compliance for all five Notices to be completed by June 2, 2008.

On cross-examination, defendant's counsel asked Mr. Villalobos about the Notices of Incidents of Noncompliance:

[Q.] From that same 2007 to 2009 time frame, do you recall correcting some of the violations on incidents of noncompliance?

A. I remember, yes.

Q. And so you would go -- once you corrected whatever was on the incidents of noncompliance, you would go -- you would tell Linn Wilson that you had fixed the violation, correct?

A. That's correct. That what I do and then I told -- after that, Linn have to do the paperwork or whatever he have to do. That's his department.

Q. Right. And so you don't know when Mr. Wilson would send that incidents of noncompliance back to BLM, right?

A. No.

Q. And then when -- did you ever -- so was it Petro Mex's policy, again during that 2007 to 2009 time frame, to keep a copy of an incidents of noncompliance or, I guess, to make a copy of it for the records?

A. I don't know if they -- Linn [Wilson] or Susan [Wilson] or Trudy [Grubilnick] keep copies. I don't know that.

(alterations added). Regarding Notices of Incidents of Noncompliance, Mr. Villalobos also testified "when it come in to paperwork, I'm not doing any paperwork. I don't know how to do it." Similarly, on cross-examination, defendant's counsel asked Mr. Wilson about Petro Mex's policies:

Q. Did Petro Mex have any policies on recordkeeping?

A. No.

Q. Did Petro Mex have any policy on how to handle important emails?

A. At that time, no.

---

The court, however, leaves quotations unchanged.

Q. Did Petro Mex have any policy on what to do following important phone calls?

A. No. Not any policy. No.

Q. Did Petro Mex have any policy on how to address incidents of noncompliance?

A. The only -- it wasn't really a policy. The only thing was as soon as you got one, you needed to get it fixed as soon as possible.

Q. Did Petro Mex have a process for tracking whether it had corrected violations from incidents of noncompliance?

A. No, not really. It was -- once we got them and we got them completed and we signed them and sent it back, whenever they sent us one, we would have two copies, one for us and one that we had to sign and send back to the BLM. And I would try to put our copy in the well file.

In a May 16, 2008 memorandum to the Colorado BLM State Director, Mr. Hartman noted that:

Petro-Mex has a history of failing to comply with Orders of the Authorized Officer and Incidents of Non Compliance with resulting assessments being issued. In the past two years this office has issued 31 incidents of non compliance. Petro Mex's failure to correct three of the INCs has resulted in the assessments of $750. To date, one of the assessments has not been paid and the corresponding INC [Incidents of Noncompliance] has not been corrected. By the end of May we may be forced to proceed to civil penalties for Petro Mex's failure to correct these non compliance issues. Applicable examples of the past and current non compliance issues include:

    Failure to notify this office of oil sales per written request
    Failure to provide tank gauging reports
    Hydrocarbon accumulation on pits
    Leaking well head equipment
    Failure to provide adequate free board on produced water and
    drilling reserve pits – Multiple incidents and one assessment
    Inadequate sealing of oil sales tanks - multiple incidents and
    one assessment

(alteration added).

The parties' joint stipulated facts indicate that "[o]n May 27, 2008, Mr. Fancher re-inspected the three wells on the Garfield Lease," and "Mr. Fancher observed that Petro

Mex had not corrected any of the violations from the April 25, 2008 Notices of Incidents of Noncompliance."(alteration added). At trial, Mr. Fancher testified

> on the 28th [of May 2008], I talked to a -- the office person there at Petro Mex, her name was Susan [Wilson], that they had a gas leak at the number 5 pad, and there was an underground problem, and that it required immediate attention. She said she would pass on the information to Jesus [Villalobos] or Linn [Wilson]. I mentioned the leak on the wellhead and the INC [Incidents of Noncompliance] that had not been complied with, such as the oil tank sealing.

(alterations added). The parties have stipulated:

> On May 29, 2008, Mr. Fancher issued a new Notice of Incidents of Noncompliance, EF08025, for a "major violation" on the Government 5 well, an underground leak. The notice directed Petro Mex to repair the leak by May 31, 2008. The notice further stated that "[e]ach violation must be corrected within the prescribed time from receipt of this Notice and reported to the [Field] office."

(all alterations in original; capitalization in original). Mr. Fancher explained at trial in his direct examination:

> On the 29th [of May 2008], I called to see if they had resolved the issue of the leak. She [Susan Wilson] said that Linn [Wilson] told her that they had been informed by someone else and that someone should be repairing it today.
>
> Q. Okay. Did you visit the Garfield lease again on May 29th, 2008?
>
> A. Yes, we did, and I say "we," myself and Carroll Snyder went out on that, and there was no activity being taken on -- on anything. There was no one out there.
>
> Q. Who is Carroll Snyder?
>
> A. Carroll Snyder was a full performance petroleum engineer technician that has since then retired.
>
> Q. Okay. What did you discover on that visit to the lease on the 29th?
>
> A. That the -- the gas was still leaking. There was [sic] no other compliance issues corrected.

(alterations added).

Additionally, the parties have stipulated:

> Also on May 29, 2008, Mr. Fancher issued EF08025SI, "Notice to Shut Down Operation" (Shut In Order). The Shut In Order stated that Petro Mex had 24 hours from oral notice being provided "on 5/28/2008 at 15:38 hr." to immediately "shut in all wells on this lease until all leaks are corrected and all compliance issues are resolved." The "WARNING" section in the Shut In Order stated that "[o]perations are not to be resumed until permitted by the authorized officer." The Shut In Order stated "when violation is corrected, sign this notice and return to" the Field Office. It also informed Petro Mex of its review and appeal rights.

(alteration in original; capitalization in original).[10] At the trial, defendant's counsel asked Mr. Fancher to discuss the meaning of some of the language in Petro Mex's Shut-In Order:

> [Q.] Could you please -- under the Remarks section of the shut-in order, could you please read the sentence following, "You are shut in."
>
> A. It says, "We are required to shut in all wells on this lease until all leaks are corrected and all compliance issues are resolved."
>
> Q. I want to ask you about this language, "all compliance issues are resolved." You did not list the specific compliance issues here, did you?
>
> A. No, I did not.
>
> Q. Why did you use this language, "all compliance issues?"
>
> A. Because I had compliance issues with Petro Mex and so did our surface people and others in BLM. So I wanted to make sure all the INCs [Incidents

---

[10] The "Remarks" section of Shut-In Order stated in full:

> YOU ARE SHUTIN [sic]. You are required to shut in all well on [sic] this lease until all leaks are corrected and all compliance issues are resolved. This shutin [sic] shall be complied within 24 hours of our verbal notification to you [sic] office personnel "Susan" on 5/29/2008 at 15:38 hr. When necessary for compliance, or where continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment [sic], production accountability, or royalty income, the authorized officer may shut down operations. Immediate shut-in action may be taken where continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income.

(capitalization in original; alterations added).

of Noncompliance] and letters that were out were addressed and corrected. And there was a lot going on, so. . .

Q. Did compliance issues include the five incidents of noncompliance from April 25th, 2008?

A. Yes.

Q. Was anything else included in all compliance issues?

A. There was surface -- the surface inspectors had issues with them, too. There was some letters and documents like that, but I don't remember specifically what they were.

(first alteration added; ellipse in original). In response to the question, "[w]hat did you intend the shut-in order to encompass?" Mr. Fancher answered: "They encompass everything that -- all the production, all the valves, the tanks, the oil, the receipts, everything, getting them fully in compliance and caught up with everything that I, at least, had the authority to check on." (alteration added). Mr. Fancher also testified at trial that he could have issued a Shut-In Order, absent a leak:

[Q.] You said this was the first shut-in order that you had ever issued, right?

A. That is correct.

Q. How did you feel when you issued this shut-in order?

A. Well, I kind of felt kind of let down a little bit. I tried to work with Petro Mex a lot and tried to get them on the right path of doing -- what to do with the reporting and with the site security and everything. I think I bent over backwards trying to get it straightened out. And then there was other issues with the drilling and stuff like that and we worked with them painlessly on that. So when this gas leak took out, the oil came up missing, no run tickets, it was just pretty much, you know, just like -- they just like blew us off basically is the way I felt. So I felt totally within my right and power to shut them in and requesting information, getting them caught up fully to that point anyway.

Q. Yesterday, you described the leak on the Government 5 well that led you to go out to the lease on May 27th, 2008.

A. Yes.

Q. If the Government 5 well had not had that leak, would you have still issued a shut-in order to Petro Mex?

A. Yes, yes. I was working on the shut-in order in that area because of the missing oil, the reporting, site security. There was too many violations really just on that one pad to just kind of lie -- just to forget it. You know, they just wasn't paying attention and I needed to get their attention and I was planning a shut-in order to do that.

In his trial testimony, Mr. Fancher had a dialogue with defendant's counsel to put the decision to issue the Shut-In Order in context for the ongoing issues with Petro Mex. Defendant's counsel first asked, regarding May 14, 2008:

[Q.] Did you visit the lease that day?

A. Yes, I did.

Q. What did you discover?

A. I discovered that there was no compliance from Petro Mex and would return -- and they would not return my calls. So I installed a BLM seal on that valve, on the 15-9 valve from that tank.

Q. Okay. When did you next -- well, this was an in-person visit to the lease? Yes, right?

A. Yes.

Q. Because you just said you installed a seal. When did you next visit the Garfield lease?

A. According to these notes, I followed up again on 5/27, and there was no change, except a new leak was called in to us by the public, and this was on the -- the 5 pad or by the number 5 pad.

Q. Okay. And let me just stop you there because I want to ask you a little bit more about that before we go on.

Did you personally observe that gas leak?

A. Yes. When I went out there, I did observe it.

Q. And what did you -- how did you -- how did you observe it? For example, using your senses or -- how did you know there was a gas leak?

A. I knew there was a gas leak because I could hear it, and you can smell gas because they have an odorizer that they put in it.

Q. And had Petro Mex corrected any of the April 25th, 2008, incidents of noncompliance as of your May 27th visit?

A. No, they hadn't.

Q. All right. What did you do as a result of the leak?

A. Well, then we had to think -- take everything into consideration. I understood the field well enough to know --

Q. And I'm sorry, sir, but I'm just asking specifically for the leak.

A. Oh.

Q. So did you issue an incident of noncompliance, for example, for the leak?

A. I issued a -- a notice of shut-down, a shut-in order.

(alteration added). The parties have stipulated that "[i]n addition to the oral notice, a hard copy of the Shut-In Order was delivered in person and by certified mail." (alteration added). At trial, defendant's counsel and Mr. Fancher had the following exchange:

Q: [h]ow do you then notify an operator of a shut-in order?

A. We would immediately call him as soon as we could and try to get some kind of communication to him, his office, or we would make a diligent effort to ensure that he knows about it probably by telephone. And then we would still send a written copy of the form to him.

Q. And how do you send those written copies?

A. Certified, return receipt.

Q. Have you ever issued a shut-in order that was verbal only without any written confirmation?

A. No.

Q. Would you ever issue a shut-in order that was oral only without written confirmation?

A. No.

Q. Why not?

A. There would be no documentation of it if I didn't put it on paper and keep -- keep tabs on it. It's a serious matter, shutting somebody in, so it has to

be -- it has to be documented. It has to be in the -- in the well file as well as the office database.

Q. What is an operator supposed to do upon receipt of a shut-in order?

A. They should immediately, you know, take the action that is prescribed in it. In this case, it would be like fixing the leak and getting all the other compliance issues that needed to be resolved.

The Shut-In Order also provided under "Review and Appeal Rights:"

A person contesting a violation shall request a State Director review of the Incidents of Noncompliance. This request must be filed within 20 working days of receipt of the Incidents of Noncompliance with the appropriate State Director (see 43 CFR 3165.3). The State Director [sic] review decision may be appealed to the Interior Board of Lands [sic] Appeals, 801 North Quincy Street, Suite 300, Arlington VA 22203 (see 43 CFR 3165.4). Contact the above listed Bureau of Land Management office for further information.

(alterations added).

Plaintiff's counsel and Mr. Fancher had the following exchange on cross-examination regarding the resolution of some of the Notices of Incidents of Noncompliance that led to the Shut-In Order:

[Q.] [T]hat's the notice of incident of noncompliance regarding the underground leak on Government 5, right?

A. That's correct.

Q. And that was the -- that was the violation that prompted the shut-in order. Is that correct?

A. Yes.

Q. Okay. Do you know when that was corrected?

A. I think like May 30th.

Q. And, again, I'll have you reference -- I'll have you look back at the interrogatory answers to refresh your memory for [Notice of Incident of Noncompliance No.] 8025. Eight-zero-two-five, I should say.

A. [Notice of Incident of Noncompliance No.] 8025 was corrected on July 3rd, 2008.

. . .

31

Q. [Notice of Incident of Noncompliance No.] 8025, will you look at that again and tell me what the interrogatory says about when that was corrected?

A. It says it -- the violation was corrected by June 2rd [sic], 2008.

Q. So that was within three or four days of you issuing that notice, correct?

A. Yes, that's correct.

Q. What's your -- really quick, what's your actual memory of that, of knowing about them fixing that underground leak?

A. The only thing I remember would be we traveled out there to verify the leak. We heard about it and we went out and checked it and went back to see if there was any action taken on it. That was the 28th -- the 27th, 28th, and 29th [of May 2008]. I think it was like the 30th, we actually -- there were people out there pouring cement into a couple pipes trying to get it to stop leaking.

Q. All right. So you actually observed the crew fixing that leak?

A. Yes.

Q. At least attempting to fix that leak?

A. Yeah, they -- and maybe it was on the 29th [of May 2008] that they fixed it. You know, I don't -- the exact day, I don't -- I don't -- you know, that's a little bit too far back.

(alterations added).

Regarding additional Notices of Incidents of Noncompliance issued by the BLM to Petro Mex in April and May of 2008, plaintiff's counsel and Mr. Fancher had the following exchange at trial:

Q. There were six notices of incidents of noncompliance issued between April 25th and May 27th [2008], correct?

A. Yes.

Q. And from the notes I just took, it looks like three of them were corrected by July 1st, 2008, right? According to what you just told us.

A. Or at least closed by --

Q. Well, I'm talking about the ones that were actually corrected. You testified that the bull plug was corrected on June 3rd, 2008.

A. Okay.

Q. The sales valve was collected on July 1st, 2008 -- corrected, correct?

A. Yes.

Q. And that's when you observed Mr. Villalobos actually doing that.

A. Okay.

Q. Is that correct?

A. What's the number on that?

Q. [Notice of Incident of Noncompliance No.] 8017.

A. Okay. Oh, yes, I -- it may have been corrected by that date, yes.

Q. But then you talked about how you saw Mr. Villalobos do that.

A. And is that --

Q. You had that meeting with him.

A. And that was the 1st of April --

Q. July 1st. It was July 1st.

A. I corrected it then, yeah. I put a seal on it, but he didn't have the darts for it.

Q. And then the underground leak was fixed on June 3rd, correct, [Notice of Incident of Noncompliance No.] 8025?

A. [Notice of Incident of Noncompliance No.] 8025?

Q. Mm-hmm.

A. [Notice of Incident of Noncompliance No. 80] 25 was -- it was corrected June 3rd, 2008.

Q. Okay. And then one of them was closed on July 1st, 2008, [Notice of Incident of Noncompliance No.] 8021, correct?

A. It was not corrected. It was just closed on July 1st.

Q. Well, that's what I said. It was closed on July 1st, 2008, right?

A. Oh, yes, closed.

Q. And no assessment was issued?

A. No, not at that time, no.

Q. And then the other two remaining were both closed on October 9th, 2009, correct?

A. August 4th -- that's. . .

Q. Again, you testified that [Notice of Incident of Noncompliance No.] 8018 was closed on October 9th, 2009. That's the numbered storage tank.

A. Yes.

Q. And [Notice of Incident of Noncompliance No.] 8020 was closed on October 9th, 2009. That was the full water tank.

A. Yes, we closed the INC [Incidents of Noncompliance] that day.

Q. Okay. So there were -- out of the six incidents, by the end of July 2008, there were only two that were still outstanding?

. . .

A. Yes. Well, that wasn't [sic] closed anyway.

Q. And that was the numbered storage tank and the water tank, correct?

A. Yes[.]

(alterations added).

The parties stipulated that "[o]n June 16, 2008, Mr. Fancher inspected the Garfield lease. Mr. Fancher observed that the Garfield lease wells were 'not producing because of line pressure.'" (alteration added). The also parties stipulated that "[o]n July 1, 2008, Mr. Fancher met with Mr. Villalobos at the Garfield lease. Mr. Fancher and Mr. Villalobos 'talked about the oil and seal on the tank.' Mr. Fancher found 'no indication that the well is on.'" (alterations added). Mr. Fancher's "conversation record" for the July 1, 2008 meeting stated:

Carol Snyder and my self [sic] visited Jesus Villolabos [sic]. We talked about the stains at the staging are [sic] and I told him they needed to be dealt with. I recommended he call Christina Stark. We went to the 15-9 well and talked about the oil and seal on the tank. He changed the seal with their seal. The level is still @9.5'. There was no indication that the well is on. I told him he needed to empty the water tank so it does not over flow. He said he would call the water truck out to haul the water off. We discussed the letter Bob [Robert Hartman] sent requesting the drilling reports and targeted the cementing reports. He said that Trudy [Grubilnick] and Linn [Wilson] was expose [sic] to have that together with the late reporting and be sending us a copy. We talked about the bond issue. He is fully aware of the situation there. Jesus was setting up a compressor on the private land location.

(alterations added). At trial, Mr. Wilson testified he called Mr. Fancher in July of 2008 to discuss the April and May 2008 Notices of Incidents of Noncompliance. Mr. Wilson and plaintiff's counsel had the following exchange at trial:

[Q.] [D]id you place a phone call to the field office?

A. Yes.

Q. Will you tell me about that phone call, when you think it was and what you -- who you talked to?

A. I called Ed Fancher and told him that all the incidents of noncompliance had been repaired, and would he like to go out and do a reinspection. And he told me, no, not at this time.

Q. When did you make that phone call to the best of your recollection?

A. It would have been right at the end of July [of 2008].

Q. Okay. Did you write anything down regarding that phone call? Do you have any record of that?

A. No, I do not.

(alterations added). At trial, plaintiff's counsel additionally asked Mr. Wilson, the Operations Manager of Petro Mex: "To the best of your knowledge, were all of those -- were all of the issues from the April and May notices of incidents of noncompliance resolved by the end of July?" Mr. Wilson testified: "I believe they was [sic]. Yes." (alteration added).

The joint stipulated facts reflect that "[i]n August 2008, Petro Mex resumed production from the Garfield lease. The Garfield Lease produced gas during the months of August, September, and October of 2008. Production from the Garfield Lease

decreased in late October 2008, and ceased completely beginning November 1, 2008."
(alteration added; internal reference omitted). Mr. Villalobos testified at trial regarding
resuming production in August 2008, explaining in an exchange with plaintiff's counsel:

Q. The wells produced -- you turned the wells back in August of 2008, right?

A. Yes.

Q. And to the best of your memory, did those wells produce in August and
September of 2008?

A. Yes.

Q. Did they produce in October of 2008?

A. I think they did, yes.

Q. You shut the wells back down at the end of October, correct?

A. Yes.

Q. Why was that?

A. I think that's when they -- they send us the shut-in orders.

Q. Well, we talked about the shut-in order was in May of 2008, correct?

A. Yes.

Q. The written shut-in order?

A. Yes.

Q. So in October of 2008, why did you shut the wells back in?

A. That's when Mr. Ed [Fancher] called me and he told me that I need to
shut the wells in again.

Q. Okay. So let's talk about that. It's your testimony that you received a call
from Mr. Fancher?

A. Yes.

Q. Okay. And what did Mr. Fancher tell you in that phone call?

A. I remember that morning he called me and said I got to shut those wells in, all the wells in.

Q. So why did he tell you you needed to shut the wells in?

A. Well, he -- I asked him again why they need to shut them in. He say, I don't know, I got to -- he say, I'm the bad man, I got to give you the bad news, and I got orders to tell you to shut them in. And I ask him again why. I said, well -- I don't know, he said. You got to shut them in.

. . .

Q. Okay. So what did you do once you got off the phone with Mr. Fancher?

A. I got off the phone and I called Linn [Wilson]. I say, I just got a call from Mr. Ed [Fancher], they want us to shut in all the wells in. And I told Ed, why. I keep fighting. I say, why.

Q. And did you instruct Mr. Wilson to go shut the wells in?

A. And I told -- he say, well, that's what they want, I guess that's what we need to do. So I say, well, all right, shut them in.

Q. Okay. Did you remember getting -- did you ever get anything in writing about this from Mr. Fancher or the field office?

A. I can't remember.

(alterations added). Mr. Fancher, in response to defendant's counsel's question: "Did you have a telephone call with Mr. Villalobos in October 2008 in which you told him the lease was still shut in?" testified: "I don't recall that conversation."

Regarding the shut down in October 2008, Linn Wilson had the following exchange with plaintiff's counsel at trial:

Q. Why did you shut the wells back in in October?

A. Because Jesus [Villalobos] called me and told me that he had received a phone call that we had to shut the wells back in, that we was on -- we was still in the shut-in order.

And so i [sic] called Brian Gartner with Energy Transfer,[11] and asked him if he could go out and shut the compressor down for me, and he said he

---

[11] Energy Transfer's role was not defined at trial, however, from the testimony it appears Energy Transfer may have purchased gas from Petro Mex and may have paid royalties. Defendant's counsel and Mr. Villalobos had the following exchange on cross-examination

would. And then that was -- I believe that was on a Friday, and he -- then I went back up there on either Monday or Tuesday and took care of all the block valves and the wellheads.

Q. Okay. Production was going pretty well in October before that, wasn't it?

A. Yes, it was.

Q. Would there have been any other reason to shut down at the end of October?

A. No.

Q. And we talked about how in August, it looked like you resumed production around the 14th. Correct?

A. Correct.

Q. Why was that?

A. Because I had spoke to Ed Fancher and told him at the end of July that all the incidents of noncompliance had been completed and did he want to do a reinspection. And he said -- told me, no, not at this time.

Q. Okay.

---

at trial, with Mr. Villalobos' answers as follows:

> [T]he companies trying to buy the gas, they -- we got it -- they give us -- they show us if we want to pay the royalties or they want to pay the royalties. And that -- back then, they was paying the royalties for us, for Petro Mex.
>
> Q. Do you recall the name of that company? Could that have been maybe Energy Transfer or --
>
> A. No, that was before the Energy Transfer. I know they used to have the main office in Salt Lake City. I can't remember the name of the company.
>
> Q. And the company -- and whatever the company's name was, they would make Petro Mex's royalty payments, but would they also do the production reporting for Petro Mex?
>
> A. No. They only take care of the royalty payments. That's it.

Additionally, Joint Exhibit 33 reflected gas volume statements from Energy Transfer from February 2008 to December 2008.

A. So my assumption was that we could turn everything back on.

Q. Did he tell you you could turn everything back on?

A. No, he did not.

Q. Did you ask him if you could turn everything back on?

A. No, I did not.

Q. Okay. So were you concerned about the shut-in order still being in place?

A. I was. When I found out about it in October, I was.

Q. But when you turned it on in August, when you resumed production in August, were you concerned about the shut-in still being in place?

A. No.

Q. Why not?

A. Because we had completed all the incident [sic] of noncompliance.

(alterations added). On cross-examination, defendant's counsel pressed Mr. Wilson about restarting production in August 2008:

[Q.] Whose responsibility was it to sign and date, complete this shut-in notice?

A. It could have been either one of us. Could have been myself or Jesus Villalobos.

Q. Whose responsibility was it to mail it back to BLM?

A. Again, it could have been either one of us. Whoever signed it would have usually take [sic] it and mail it back.

Q. Did you sign and return this form?

A. No, I did not.

Q. Okay. Earlier you testified that when you called Mr. Fancher at the end of July, you did not tell him that Petro Mex was going to resume production. Is that right?

A. No, I did not. I asked him if he wanted to reinspect the wells.

Q. And let me -- so did -- just to be clear, did you tell Mr. Fancher you were going -- that Petro Mex was going to resume production during that --

A. No.

Q. Okay. -- end of July phone call?

A. No.

. . .

Q. [C]ould you look at the warning section, please. Do you see that?

A. Okay.

Q. Can you read the first sentence, please, under, Warning.

A. "Operations are not to be resumed until permitted by the authorized officer."

Q. Okay. And Petro Mex resumed production in August 2008.

A. Yes.

Q. And did -- Petro Mex did so without permission of the authorized officer. Right?

A. Correct.

Q. Do you recall specifically when in August Petro Mex resumed production?

A. I believe it was mid-August, around the 14th, 15th.

Q. And then Petro Mex shut down production again near the end of October 2008. Right?

A. Correct.

(alterations added). Mr. Wilson testified regarding the shutting down production again in October 2008:

[A.] Looks like we was in full production up until the 25th of October, and then it dropped off. I believe that's when we shut the wells back in.

40

Q. Okay.

A. I had -- I called a guy to go shut in the -- shut down the compressor, but the wells was still open at that time.

Q. Okay. Based on the numbers here, when do you think the compressor was shut down?

A. I would say it was shut down on the 24th.

(alteration added).

Subsequent to the October 2008 shutdown, Mr. Fancher visited Petro Mex in 2009. According to the joint stipulated facts:

On March 30, 2009, Mr. Fancher inspected the Garfield lease. Mr. Fancher observed that one well had a health and safety violation, a pump jack present without any guards, but he did not issue a Notice of Incidents of Noncompliance for that violation. Mr. Fancher observed that a field compressor he had observed in June 2008 was "now gone." Mr. Fancher "found that Petro Mex had sold gas during after [sic] the shut in."

(alteration in original). Mr. Fancher's notes, which were admitted as a joint exhibit at trial, twice indicated: "We found that Petro Mex had sold gas during after [sic] the shut in. This is on our plate." (alteration added). On cross-examination regarding Mr. Fancher's March 30, 2009 inspection of the Garfield Lease, plaintiff's counsel asked:

[Q.] You did say on the first one you note that "We found that Petro Mex had sold gas during and after the shut-in. This is on our plate." What did you mean by "this is on our plate?"

A. This is on our plate meaning this is something new that we had to deal with that it came up. We'd have to investigate it and see when they started and everything and that's basically all I meant by it.

Q. So what happen -- what did you do? Did you do any investigating into that question?

A. Well, I did the investigating as far as I could on the OGORs [Oil and Gas Operations Report], the reported MMS website. I looked in Colorado's website also and seen that they had started and stopped. That's really about all I did, what I remember.

(alterations added). With defendant's counsel, Mr. Fancher clarified the phrase "this is on our plate"

meant that we had to research that and find out why they did that, why they started production without -- without notifying us.

Q. And on what date was this?

A. This was on March 30th, 2009.

Q. Was this the first time that you learned that Petro Mex had produced during the shut-in?

A. Yes, I think it is.

Q. Did you know in August 2008, at that time, did you have any knowledge that Petro Mex was producing?

A. I don't remember any knowledge of that. I'd have to look and see if I made any notes anywhere.

Q. Okay. Do you know whether in September 2008 you had any knowledge that Petro Mex was producing?

A. No, no, ma'am.

Q. Did you have any knowledge in October 2008 that Petro Mex was producing from the Garfield lease during the shut-in?

A. No, ma'am.

According to the joint stipulated facts, subsequent to Mr. Fancher's March 30, 2009 inspection,

[o]n April 1, 2009, Robert Hartman sent a letter to Petro Mex stating that BLM's records showed Petro Mex had "last produced in October 2008," and removal of the field compressor "eliminates the possibility of production from the wells." Mr. Hartman stated that BLM had determined that "the lease is not capable of production in paying quantities." In the April 1, 2009 letter, Mr. Hartman cited 43 C.F.R. § 3107.2-2 and gave Petro Mex 60 days to "restore production in paying quantities." Mr. Hartman further stated that, "if justification that the lease is capable of production in paying quantities is not submitted within 60 days from receipt of this letter, the lease will automatically terminate." The letter was delivered to Petro Mex by both regular mail and certified mail. Because the certified copy was returned unclaimed, a third copy was hand delivered to Petro Mex's office the week of May 18, 2009.

(alteration added). At trial, Mr. Hartman, on direct examination explained:

> This is a letter that's commonly referred to as a 60-day letter but more appropriately potential lease termination letter. And it's telling the lessees of a lease that they -- the BLM has reviewed the production and it appears that the wells are no longer capable -- or the lease is no longer capable of production.
>
> Q. Okay.
>
> A. And we ask -- yes.
>
> Q. And I didn't mean to cut you off there if I did, but how many such 60-day letters have you issued in your career?
>
> A. I don't know, maybe 500. It's one of our most common letters. It's the really only way that leases are terminated. They have -- the lessees, per the regulations, are required to be given notification that, hey, this lease is in danger, please respond.
>
> Q. Okay. And in your experience, how do operators usually respond?
>
> A. One of three ways. They'll ignore it; or just -- yeah, they can ignore it, which is an option. They'll return the wells to production with proper notification. Or those are the only real -- really two options.

Defendant's counsel questioned Mr. Hartman about the language in the 60 day letter that stated: "If justification that the lease is capable of production in paying quantities is not submitted within 60 days from receipt of this letter, the lease will automatically terminate," and asked Mr. Hartman:

> [Q.] [H]ow could Petro Mex have shown justification that the lease is capable of production in paying quantities?
>
> A. Well, I guess a couple ways. They could have put a compressor onsite and produced the wells. Obviously if they were shut in at that time, they would have had to eliminate that hurdle before that. The other option that was suggested by Petro Mex in one of the meetings I guess we're going to talk about, but that idea of venting the gas to the atmosphere, doing what we would call an absolute open flow testing of the wells, where gas is vented to the atmosphere or measured and then vented to the atmosphere.
>
> Q. And does that require special equipment to do the venting test?
>
> A. It requires -- yes, special equipment, yes.

Q. And then have you ever issued a 60-day letter while an operator was shut in?

A. No.

Q. And then do you recall when after [sic] you sent this letter if Petro Mex contacted you?

A. I don't remember contacting, but reading through the case file in the last couple days indicated that we were contacted.

. . .

[Q.] Do you recall speaking with Petro Mex on May 5th, 2009?

A. I do not remember specifically, no.

Q. Okay. What about references to, like, the compressors being stolen and this list of equipment? Was this necessary information for you to know?

A. It didn't seem to be applicable to what our desire was to have the leases paid or to get the leases back on production. No, it did not.

Q. Is there any reference in this letter about Petro Mex having any kind of justification for returning the wells to production in paying quantities?

A. No. I don't see any reference.

Q. Okay. And then there's at the very bottom a reference to an MMS fine and royalties, but to your understanding, does BLM have any involvement with the MMS fine or royalties?

A. No, we do not.

Q. And then there's also –

A. Not that I'm aware of, we don't have any. Definitely not at the field office level.

(alterations added).

In response, Mr. Villalobos sent a letter to Mr. Hartman in May 2009, which stated, in part:

Pursuant to our conversation on May 5th, 2009,[12] Petro-Mex LLC would be willing to pay off what fines that have been levied against Petro-Mex_@12 ½% of total production

. . .

Petro-Mex disagrees with the M.M.S. fine. The royalties have- been paid. The paper work wasn't filed on time. $150,000.00 is a little steep for 8 months of reports that wasn't filed on time. The people in charge of filing paperwork have been replaced.

(punctuation in original; footnote added)

As stipulated to by the parties:

On May 27, 2009, Mr. Villalobos and his friend, John Durham, met with Mr. Hartman, Mr. Fancher, and David Lehmann from the Field Office. Mr. Hartman documented the meeting in a June 16, 2009 letter to Petro Mex that was signed by Catherine Robertson. Mr. Hartman summarized the issues discussed at the May 27, 2009 meeting as including "royalty payments, production reporting, increased bond amounts, past incidents of non-compliance and lease status for the leases operated by Petro-Mex." As to the status of the lease, the letter stated that Petro Mex's response "during the meeting is that the lease is capable of production but without compression the wells are not able to produce." Petro Mex did not have a compressor on the lease from May 2009 to August 2009. In the June 16, 2009 letter, the Field Office directed Petro Mex to provide a "written response to explain the paying status" of the lease within 15 days. The Field Office warned that "failure to provide adequate justification will result in termination of the lease[]."[13]

At the May 27, 2009 meeting, Petro Mex and [sic] Field Office discussed alternatives for demonstrating production. Petro Mex offered to perform production testing by flow testing the wells, and either venting the gas to the atmosphere or setting a compressor and selling the gas. As to royalties due on production, which were the basis for the October 22, 2008 Notice of Civil Penalty, the June 16, 2009 letter stated that Petro Mex remained

---

[12] At trial, in response to the question, "so did you actually call Mr. Hartman after receiving this letter?" Mr. Villalobos testified, "I don't know. I think John [Durham] did. I didn't call Bob, no." Mr. Villalobos testified, regarding the 2009 letter, "I told Linn [Wilson] to write it up and I sign it. I don't know who wrote it, Linn or Susan [Wilson] or Barbara [Sonnier]. I don't know who did." (alterations added)

[13] The June 16, 2009 letter stated: "Failure to provide adequate justification will result in the termination of the leases," referring to the Garfield Lease, as well as the Mesa Lease and Esmerelda Lease. As noted above, the Mesa Lease and Esmerelda Lease are not at issue in the above captioned case.

> delinquent. Mr. Hartman acknowledged Petro Mex's request to modify its royalty amount "in order to pay off fines," but explained that the Field Office lacked authority to "modify lease terms such as royalty rates." Mr. Hartman explained the Field Office would forward Petro Mex's request to the State Office, "but at this time will not recommend approval."

(first alteration in original; footnote added; internal references omitted). The June 16, 2009 letter to Petro Mex noted:

> This office requested a bond increase from Petro Mex due to large liability on your leases. Your history of non-compliance with on the ground operations and apparent failure to report timely to the MMS led this office to require this bond increase. Our letter was dated August 25, 2008 and asked for a response from Petro Mex within 30 days of receipt of the letter. You addressed this issue in our May 27 meeting indicating that Petro Mex was unwilling or unable to provide this increase in bond amount. As noted above, your May 20, 2009 letter requested an increase in royalties in order to pay off fines. This office does not have the authority to modify lease terms such as royalty rates. Your failure to keep current with royalty obligations gives us no comfort that you will with future obligations. The failure to respond to requests for well completion information, bond increase requests and lease production data is also troubling. We will forward your request to our state office for their review but at this time will not recommend approval.

The June 16, 2009 letter to Petro Mex also stated that

> [y]our letter [undated letter from Petro Mex that was received by BLM on May 20, 2009] stated that you disagree with the Mineral Management Service fines and royalties had been paid. In our meeting you reiterated that you were current with royalty payments. We have talked to MMS personnel in Denver concerning royalties and fines that are due. It is our understanding that minimum royalties may be current for the two producing leases but the royalties that are due on production are not current. The failure to pay production royalties is the basis for the penalties as outlined in the Notice of Civil Penalty letter dated October 22, 2008.

(alterations added).

Regarding the June 16, 2009 letter to Petro Mex, the joint stipulated facts also stated:

> As to the bond, the letter stated that Petro Mex indicated it "was unwilling or unable to provide" the required increase in the amount of its bond to $100,000. BLM issued an "order of the authorized officer" to increase the bond and directed Petro Mex to respond in writing to the August 25, 2008 letter within 20 days. BLM warned that failure to submit the required bond

"will" result in "an assessment of $250. . . and lease cancellation." In the June 16, 2009 letter, BLM issued an "order of the authorized officer" directing that "[a]ll production is to remain shut in" on the Garfield lease "until Petro-Mex satisfies the increased bond request and all fines are paid to [MMS]." BLM warned that "[f]ailure to abide by this order will result in an assessment of $250. . . and civil penalties."

(alterations in original; internal references omitted). The parties further stipulated that "[t]he June 16, 2009 letter informed Petro Mex of its appeal rights," and "[t]he June 16, 2009 letter was delivered to Petro Mex by certified mail, first class mail, and hand delivery." Mr. Villalobos testified that Petro Mex did not appeal.

Regarding the May 27, 2009 meeting and June 16, 2009 letter, defendant's counsel asked Mr. Hartman

did Petro Mex ever -- when it comes to the paying status, did Petro Mex ever ask permission from you to take any steps related to demonstrating an ability to produce in paying quantities from the Garfield lease?

A. Not that I remember.

Q. Did the shut-in prevent Petro Mex from flow-testing the wells for purposes of demonstrating ability to produce in paying quantities?

A. I think with the request -- I'm looking back, if they had requested it, we probably could have gotten around that shut-in order to actually allow testing, but as far as I know, they did not.

Q. So what do you mean by that? So gotten around the shut-in order, so --

A. We could have -- we could have worked -- worked with them with the idea that -- two options. We could have extended the so-called 60-day letter to additional time until things got straightened out on the INCs [Incidents of Noncompliance], the shut-in orders, or we could have worked out the idea of flow-testing versus installing compressors, but that 60 days obviously -- well, it's not obvious here, but that 60 days is flexible as long as we're receiving feedback from the operator that they're wanting to do something.

Q. And so when you say it's flexible and could have extended it, why didn't you extend the 60-day letter?

A. It wasn't apparent to me that they were actually interested in continuing in responding to any of our information requests.

Petro Mex's Bond

The parties have stipulated that

> [p]rior to May 2008, Petro Mex's bond requirement was $25,000. In April 2008, the Field Office's field manager, Catherine Robertson, sent a memorandum to the Colorado BLM State Director requesting an increased bond from $25,000 to $100,000 for Petro Mex. Ms. Robertson stated that the reasons for the requested increase in bond coverage included: (1) Petro Mex's "history of failing to comply" with orders and Notices of Incidents of Noncompliance; and (2) the fact that Petro Mex was delinquent in its production reporting. Ms. Robertson stated that the increased bond was "required to reduce the liability" to the Government in the event the wells were plugged and abandoned because the estimated cost per well was $20,000.[14]

(alteration and footnote added; internal references omitted). At trial, Mr. Hartman testified that he drafted the April 2008 memorandum for Ms. Robertson's signature. Regarding the April 2008 memorandum, defendant's counsel and Mr. Hartman had the following exchange:

> [Q.] And then can you just generally explain what this memorandum is?
>
> A. It's a recommendation to the state director from the field office manager saying that an operator has particular issues and that we believe that a bond

---

[14] The joint stipulated facts note that in Ms. Robertson's April 2008 memorandum to the Colorado BLM State Director requesting an increased bond for Petro Mex, "Petro Mex's wells were then in a 'shut in or unapproved temporarily abandoned status.' However, none of Petro Mex's wells were then in a 'shut in or unapproved temporarily abandoned status.'" Mr. Hartman had the following exchange with plaintiff's counsel regarding the Ms. Robertson's phrasing that "none of Petro Mex's wells were then in a 'shut in or unapproved temporarily abandoned status:'"

> [Q]. Is it possible that that was an incorrect statement that the wells were currently in a shut-in or an unapproved temporarily abandoned status.
>
> A. Yes.
>
> Q. So it's certainly possible that in sending this memorandum to the state director asking for the increased bond, you provided incorrect information.
>
> A. With respect to the well status, maybe, yes.

(alteration added).

-- an increase to their bond should be required. And it lists our criteria of why we believe it should be increased.

Q. Okay.

A. Yes.

Q. And then the first indent refers to -- and I think ties back to the spreadsheet we just looked at, but refers to seven wells and all of them are currently in a shut-in or unapproved temporarily abandoned status. And even if that were not true, would you have still made a recommendation to increase the bond?

A. Whether they were shut in or not?

Q. Yes.

A. Being the criteria? Yes. Nonproduction is a concern. It's one of the criteria for a bond increase. Yes.

Q. And then there's a reference to the middle paragraph, which is the indented paragraph, refers to a history of failing to comply with orders of the authorized officer and incidents of noncompliance resulting in assessments being issued. Why was that a reason for asking for an increase in bond coverage?

A. It's one of the -- on the -- let's see, in the memo, the memo from Washington. It's one of the criteria that can be used to show a bond increase is needed.

Q. And then can you explain why you have that third indented paragraph and what the purpose of that was?

A. This is based on -- I believe it was based on conversations or emails from MMS between me and one of the -- some MMS representative that there were failures to pay royalty and failures to report production.

(alteration added). The parties have stipulated:

On May 15, 2008, the Colorado BLM State Director approved the bond increase request and required Petro Mex to obtain a bond of $100,000. The State Director gave Petro Mex 60 days from receipt of her letter to comply. The State Director's decision was delivered to Petro Mex by certified mail. On August 25, 2008, Ms. Robertson notified Petro Mex that BLM had failed to receive any response to the State Director's order to increase its bond. Ms. Robertson directed Petro Mex to provide the requested additional bond

amount within 30 days of receipt of her letter, and stated, "[t]his is an order of the authorized officer." Ms. Robertson's letter was delivered to Petro Mex by certified mail.

(internal reference omitted). The August 25, 2008 letter from Ms. Robertson stated, in part:

> Reference is to the attached letter from the Bureau of Land Management-Colorado State Office that requested you provide an increase in bonding amount for your oil and gas operations within Colorado. The letter requested a response by 60 days of receipt of the letter. To date no response has been received. As the May 15th letter indicates, this office has concerns on the amount of liability that exists on Petro Mex Resources operated properties. Your history of non compliance with on the ground operations and the apparent failure to report timely to the Minerals Management Service led this office to request this bond increase. Please provide the requested additional bond amount as requested in the May 15, 2008 within 30 days of receipt of this letter. This is an order of the authorized officer. If you fail to submit the required reports in the time specified, you will be liable for an assessment of $250.00 under 43 CFR 3163.1(a)(2) and possible lease cancellation.

Regarding the increased bond, Mr. Villalobos testified in response to plaintiff's counsel's question,

> [w]hat about the bond? That hadn't been posted yet, right [by October 2008], the increased bond?
>
> A. No.
>
> Q. How come you hadn't posted the increased bond yet?
>
> A. Because I was still fighting that. I keep arguing why they want that bond.
>
> Q. Okay. Did you have revenue sufficient to post an increased bond yet?
>
> A. I can't remember, but I did have the money to --
>
> Q. Okay.
>
> A. -- take care of the bond.[15]

---

[15] The parties have stipulated that on January 12, 2010, "Petro Mex obtained the required additional bond, which brought its total bond amount to $100,000."

(alterations and footnote added).

Civil Penalty

The parties have jointly stipulated that

[o]n October 22, 2008, DOI's Minerals Management Service (MMS) issued a Notice of Civil Penalty to Petro Mex for "knowing/willful failure to pay royalties and failure to comply with reporting requirements." As a basis for the Civil Penalty, the MMS found that Petro Mex had failed to pay royalties on gas produced and sold on two leases, including the Garfield lease, for sales months August 2007 through May 2008. As a basis for the Civil Penalty, the MMS found that Petro Mex had failed to submit required form MMS 2014, Report of Sales and Royalty Remittance, for the lease during that same time period, August 2007 through May 2008. The Civil Penalty that was assessed was three times the estimated royalty owed for the delinquent periods, or $149,131.[16] This amount did not include the royalties then due or interest. The invoice sent with the Notice of Civil Penalty indicated the Civil Penalty was due by November 26, 2008.

(alteration added; internal references omitted). The October 22, 2008 Notice also indicated

PM [Petro Mex] has also failed to submit forms MMS-2014. These reports must be submitted monthly to MMS as required by 30 C.F.R. § 210.10. PM is not being assessed penalties at this time for its failure to submit these reports. However, penalties of as much as $500 per day per violation may be assessed should MMS not receive the reports for the two leases and sales months cited above within 20 days of receipt of this Notice. Such penalties, provided for in 30 C.F.R. § 241.53, may be escalated to $5000 should the violations continue beyond 40 days of receipt.

(alteration added). Regarding royalty payments, on cross-examination with defendant's counsel, Mr. Villalobos had the following exchange:

---

16 The October 22, 2008 Notice explained that

[w]hile MMS has the authority to assess $ 10,000 a day for each of these violation days. [sic] we are limiting that assessment to $100 per violation per day. However, that amount would be $247,500. Accordingly, MMS is limiting this penalty to three times the *estimated* royalty owed for the delinquent periods, or $149,131. The penalty will continue to accrue at the rate of $100.00.

(alterations added; emphasis in original; internal reference omitted).

[Q.] [W]e're in 2007 through 2009. Production was not reported during the period of time Petro Mex did not have a bookkeeper, right?

A. In 2007?

Q. So when Petro Mex did not have a bookkeeper, Petro Mex was not reporting production, correct?

A. I believe that was 2008. Part of 2008, if I remember right.

(alteration added).

The BLM's Decision to Terminate the Garfield Lease

After the October 22, 2008 Notice of Civil Penalty to Petro Mex, on July 21, 2009, Mr. Hartman sent a memorandum to the State Director indicating that Petro Mex was notified on April 1, 2009 "of the potential termination of the lease due to lack of paying production." The parties have stipulated: "Mr. Hartman went on to state that, 'to date no verbal or written intent to reestablish production on the lease has been received.' Mr. Hartman then stated that 'it is recommended the lease terminate due to lack of production.'" At trial, plaintiff's counsel specifically asked Mr. Hartman about the line: "To date, no verbal or written intent to reestablish production on the lease has been received," and asked him:

[Q.] Hadn't they [Petro Mex] indicated a willingness to reestablish production on the lease if you'd work with them?

A. Not in my mind. They were talking about venting. It was about their only option that they gave me.

Q. Do you think this memo gives the impression that Petro Mex wasn't even talking to you guys?

A. That's fair.

Q. It doesn't really represent all the communications and the things that they had said, does it?

A. No, it doesn't.

Q. Missing a lot of context.

A. That's correct.

(alterations added).

Petro Mex responded to Mr. Hartman on August 6, 2009, and as stipulated to by the parties:

Petro Mex stated that at the May 27, 2009 meeting "production testing was discussed. We stated that we could flow test the wells and vent the gas or set a new compressor. To go to sales both plans were not acceptable." Petro Mex then stated that, "at this time Petro Mex can't figure out a way to test [the wells]." Petro Mex stated it was "investigating the MMS payment," and stated that "if any royalties have not been paid, they will be." Petro Mex stated that it was "currently working on the increase of the bond amount." Petro Mex confirmed "[t]he wells are still shut-in."

(alterations in original). Mr. Hartman testified on direct examination with defendant's counsel:

[A.] My reaction [to Petro Mex's response] was that there was -- and, then, they -- at the bottom of the letter, they talk about -- well, we had discussed flow testing and installation of compressor, and they made a statement that -- that I guess that the BLM didn't think that that was acceptable, and Petro Mex couldn't figure out a way to test them. And my reaction is I don't think it changed anything in regards to what -- where BLM was headed with recommending the termination of the leases.

Q. Well, why not? Was it -- why not? Why didn't it change anything?

A. There was really no plan here other than they said they didn't know what to do. That's what I got out of this.
. . .
[Q.] was it your overall impression that this -- that this just wasn't a solution or an adequate response to the June 16th letter even?

A. I don't think it was a valid response. What we were after -- what we were after throughout the discussions and the letters was continuous production.

Q. Okay, so --

A. And I didn't think this was an acceptable response.

In response to defendant's counsel's question, Mr. Hartman further testified:

Q. And so this letter, you at least received it August 6th, 2009, and you had earlier made the recommendation to terminate the lease for nonproduction on -- I believe that was August -- don't let me get my dates wrong -- on July 21st, 2009, but after receiving this letter via fax, did you consider taking back your recommendation for the -- the recommendation to terminate?

53

A. No, I did not. And I just -- and I didn't see any viable solution that they were proposing. They weren't really voluntarily -- they weren't proposing anything that was going to fix it other than actual production. And I didn't even see that.

Q. Mm-hmm. Was there any further correspondence with Petro Mex after this letter was faxed to you regarding the showing [sic] production of paying quantities?

A. I don't believe so.

Q. And so did the [BLM's Colorado] state office eventually accept your recommendation to terminate the lease?

A. I believe so. I believe the leases were terminated -- or attempted to be.

(alterations added). The joint stipulated facts stated that

[i]n an August 26, 2009 decision, BLM's Colorado State Office terminated the Garfield Lease. As grounds for the termination, the State Office explained that "the Grand Junction Field Office has determined that this lease was no longer capable of producing oil and gas in paying quantities after October 1, 2008." The State Office went on to state that "as no evidence of new production has been received the lease terminated the same date."

(alteration added)

After the BLM's August 26, 2009 decision, Petro Mex appealed the State Director's termination decision to the Interior Board of Land Appeals on September 18, 2009. On September 27, 2010, the Interior Board of Land Appeals issued a decision, reversing the decision to terminate the Garfield Lease. The Interior Board of Land Appeals noted that

Petro Mex repeatedly informed GJFO [Grand Junction Field Office] that it would restore production from these leases if the May 2008 shut-in orders were lifted, but GJFO refused to lift those orders. Thus, the issue here presented is what effect, if any, those shut-in orders have on Petro Mex's rights and obligation, under and pursuant to the MLA's [Mineral Leasing Act of 1920] third exception to lease termination.

(alterations added).[17] The Interior Board of Land Appeals held

---

[17] The Interior Board of Land Appeals reference to the third exception comes from 43 C.F.R. § 3107.2-2, which states:

we reverse BLM's decisions terminating these leases. Petro Mex challenges the decisions on appeal as violative of its rights under the MLA's exceptions to lease termination. It claims GJFO erroneously determined that the wells on these leases were not capable of producing in paying quantities and compounded its error by failing to afford Petro Mex an opportunity to be heard before an Administrative Law Judge on that issue. Petro Mex also contends it was precluded by GJFO's shut-in orders from restoring production under the MLA's third exception. Petro Mex raises additional claims under the MLA's other exceptions to automatic lease termination, but in light of our resolution of this case, we need not address them here.

Petro Mex contends GJFO erred in determining that these leases (and their wells) were incapable of producing gas in paying quantities. BLM responds by asserting that Petro Mex failed to provide "objective evidence that the wells could produce gas in paying quantities" and failed to request State Director Review of the June 2009 Order. It is uncontroverted that wells on the leases at issue were producing natural gas in paying quantities when they were again shut-in to comply with the GJFO orders in early October. The only stated basis for GJFO determining these leases were not capable of producing gas in paying quantities under 43 C.F.R. § 3107.2-2 was that Petro Mex lacked field compressors necessary to deliver that gas to purchasers. Although the parties disagree on whether these wells can produce without compression, it is undisputed that if GJFO's shut-in orders were lifted, Petro Mex could install field compressors and return them to producing status shortly thereafter.

There is no record evidence that the wells at issue were not "capable of producing oil or gas in paying quantities" under the MLA's third exception, only that their production could not be sold without compression. The legislative history makes clear that "actual production" is not necessary for this exception to apply and that it is sufficient if a well has an "established physical capability . . . to produce oil or gas in paying quantifies." [sic] American Resources Management Corp., 40 IBLA [195] 200 [(1979)]; see discussion, supra. The adequacy of or necessity for surface facilities is

---

A lease which is in its extended term because of production in paying quantities shall not terminate upon cessation of production if, within 60 days thereafter, reworking or drilling operations on the leasehold are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction. The 60-day period commences upon receipt of notification from the authorized officer that the lease is not capable of production in paying quantities

43 C.F.R. § 3107.2-2 (2022).

largely (if not totally) irrelevant in determining whether a well is capable of producing oil or gas in paying quantities. [sic] See 40 IBLA at 201.

. . .

We therefore conclude that GJFO erred in determining that these leases (and their wells) were not capable of producing gas in paying quantities under 43 C.F.R. § 3107.2-2 because they currently lack field compressors and an ability to compress the gas produced for transport by pipeline. To the extent those determinations were affirmed by BLM's decision, they are reversed and that decision is modified. See Coronado Oil. Co., 164 IBLA [309,] 326 [(2005), aff'd, No. 05-CO-llJ (D. Wyo. Aug. 23, 2006), appeal dismissed, No. 06-8083 (10th Cir. Sept. 14, 2007)].

(internal citations omitted; footnote omitted; alterations added). The Interior Board of Land Appeals also indicated:

Petro Mex repeatedly represented that it would and could restore production if the May 2008 shut-in orders were lifted; GJFO refused to lift its orders, which were still in place when BLM terminated these leases on August 26, 2009. Although they state that all wells would remain shut-in until "all compliance issues are resolved," we interpret this language in the context of the facts presented as referring to the violations identified by GJFO in its NOICs [Notices of Incidents of Noncompliance] to Petro Mex.

. . .

GJFO erroneously refused to lift and required continuing compliance with its May 2008 shut-in orders. The record shows Petro Mex could restore its wells to producing status if those orders were lifted. Until GJFO lifts those orders and gives notice to Petro Mex under 43 C.F.R. § 3107.2-3, BLM cannot terminate these leases for nonproduction. If it intends to pursue lease termination under 30 U.S.C. § 226(i), BLM must allow Petro Mex a reasonable time in which to place its wells in a producing status after such notice is given. Cf., Coronado Oil Co., 164 IBLA at 326. Simply stated, there can be no termination of these leases by operation of law under the circumstances of this case.

(internal citations omitted; alteration added).

In an October 27, 2010 letter, Mr. Fancher lifted the May 29, 2008 Shut-In Order. The parties have stipulated that "Petro Mex resumed production in December 2010, and the Garfield Lease thereafter produced gas," and "[o]n March 1, 2011, BLM's State Director rescinded the recommendation to terminate the lease and return it to non-terminable status." (alteration added). Mr. Fancher, in a dialogue with defendant's counsel at trial, indicated:

56

This is a letter referring to the shut-in order. I wrote it and it was lifting the shut-in order at that time. I wrote then that in light of the recent IBLA [Interior Board of Land Appeals] decision, and I quoted the decision, that our most recent meeting -- or in our most recent meeting, we discussed the outstanding compliance issues. I have lifted -- enclosed a notice of shutdown order of those two items.

Q. Okay. Previously, we looked at the language in the shut-in order regarding the necessity of fixing all compliance issues. Do you recall that discussion?

A. Yes.

Q. Okay. Had all compliance issues been corrected at the time you lifted the shut-in order?

A. No, no, they had not.

Q. Given that not everything had been corrected, why did you lift the shut-in order?

A. We felt that the two years had been gone by. In hindsight, I should have insisted it remain until they did get everything corrected and did get all the accountability issues corrected, but I chose to go ahead and let them, in good faith, to start operating again.

. . .

Q. What part, if any, did the IBLA [Interior Board of Land Appeals] decision play in your decision to lift the shut-in?

A. They remanded the decision back to the field office for nonproduction or whatever. I don't remember specifically what it stated.

(alterations added). In response to plaintiff's counsel question, "what happened after the decision of the Interior Board of Land Appeals?" Mr. Wilson testified "we got notice that we could turn the wells back on, and we went and set a compressor, and we started production again."

Procedural History

Thereafter, Petro Mex filed its complaint in this court. As noted above, the case was originally assigned to Judge Firestone, subsequently reassigned to Judge Hodges, and ultimately reassigned to the undersigned. Plaintiff alleged in its complaint:

In granting the Leases, and pursuant to the provisions thereof, the United States promised that the leaseholders, including Petro Mex, that they would have the right to explore for, produce and sell oil and gas from the defined parcels. Petro Mex relied upon such promises and obligations. In granting the Leases, the United States agreed to comply with the terms of the Leases and all applicable rules and regulations and to allow Petro Mex to explore for, produce and sell oil and gas from the defined parcels provided that they were not in material breach of the Lease and all applicable rules and regulations, and to follow all applicable rules and regulations in managing the Leases and Petro Mex's performance under the Leases.

In its complaint, plaintiff contends:

The United States breached the Leases and its agreement with Petro Mex by ordering Petro Mex to cease production on the Leases in October of 2008 when it had no valid contractual, statutory or regulatory grounds to do so, and by refusing to allow production to resume once Petro Mex had adequately demonstrated that there were no more remaining violations on the Leases that constituted "immediate, substantial and adverse impacts on public health and safety [or] the environment." The United States breached the Leases and its agreement with Petro Mex by attempting to terminate the Leases on or about August 26, 2009 when it had no valid contractual, statutory or regulatory grounds to do so. As a result of the breaches of the Leases by the United States, Petro Mex has suffered damages, including the loss of the full potential value of the Leases (including loss of profits), loss of reasonable expectancy and reliance damages including the expenses incurred in reliance upon the right to produce and sell oil and gas from the Leases.

(alteration in original). For damages, plaintiff alleges:

As a result of the breaches of the Leases by the United States, Petro Mex has suffered damages, including the loss of the full potential value of the Leases (including loss of profits), loss of reasonable expectancy and reliance damages including the expenses incurred in reliance upon the right to produce and sell oil and gas from the Leases.

WHEREFORE, Petro Mex request [sic] that a judgment be entered against the United States for the breach of the Leases awarding damages for the loss of the full potential value of the Leases (including loss of profits), loss of reasonable expectancy and reliance damages including the expenses incurred in reliance upon the right to produce and sell oil and gas from the Leases all in an amount exceeding five million dollars ($5,000,000.00) exclusive of interest, costs and attorney fees and such other and further relief as the Court deems just. Petro Mex also seeks an award of attorney fees along with interest, costs and expenses of litigation.

(capitalization in original; alteration added).

In response to the complaint, defendant filed a motion to dismiss for lack of jurisdiction, alleging that the facts giving rise to the alleged breaches occurred more than six years before the filing of the complaint and, thus, the case was time-barred under the statute of limitations set forth in 28 U.S.C. § 2501 (2012). Judge Firestone denied the motion to dismiss on August 10, 2015, as discussed more fully below. See Petro Mex, LLC v. United States, 122 Fed. Cl. 536, 540-41 (2015).

After the motion to dismiss was denied, Judge Firestone gave plaintiff the option to file an amended complaint, however, on October 23, 2015, plaintiff file a notice indicating the plaintiff would not file an amended complaint. Subsequently, the parties engaged in discovery. Once discovery was complete, the case was reassigned to Judge Hodges, and the parties filed cross-motions for summary judgment. Defendant argued that a prior material breach committed by Petro Mex, specifically the failure to pay royalties, provided the justification for the government's alleged breach of attempting to terminate the lease in August 2009. Judge Hodges, in a brief, unpublished opinion, determined that

> Defendant has not provided sufficient evidence or argument to show that it is entitled to judgment as a matter of law on this issue. Its assertion that the failure to pay royalties for a period of approximately nine months does not establish a relationship with the alleged breach of termination for non-production. In addition, the materiality of such an alleged breach is not clear from the facts presented.

Plaintiff's cross-motion for summary judgment argued that issue of whether the government breached the lease is precluded by the Interior Board of Land Appeals' decision, but Judge Hodges determined:

> While decisions from the Interior Department Board can have preclusive effects in this court, whether the Government committed a material breach of contract was not fully litigated by the parties. The Board's decision was based on a narrow set of issues that did not ultimately decide whether a breach of contract had occurred. In fact, the focus there was whether the termination for *non-production* was proper, not whether either party breached the contract, resulting in damages. The Board did not need to determine whether the Government breached the lease to decide that the termination was improper based on bureaucratic guidelines. The issues presented here are not precluded by prior litigation; genuine issues of material fact remain, and summary judgment based on issue preclusion must therefore be denied.

(emphasis in original).

After Judge Hodges denied the cross-motions for summary judgment, the parties attempted to engage in mediation to resolve the case. After the mediation was unsuccessful, on September 11, 2020, the above captioned case was reassigned to the undersigned. After a hearing with the parties, defendant filed a motion for leave to amend its answer to "assert a new claim of offset pursuant to 31 U.S.C. § 3728(a), and to re-open fact discovery for the limited purpose of updating gas production data from October 2016, through the present." The court granted the defendant's motion for leave to amend the answer, and on December 11, 2020, defendant filed an amended answer to plaintiff's complaint which included a claim for offset, which alleges that, "as of September 14, 2020, Petro Mex owes $330,205.58 to the United States for unpaid royalties, civil penalties, interest, administrative fees, and Treasury collection fees." On January 21, 2021, plaintiff filed a response to the amended answer and claim for offset. The parties subsequently undertook further discovery on the updated gas production data and prepared for, and proceeded to, trial.

## DISCUSSION

Statute of Limitations

Plaintiff's complaint was filed October 22, 2014 and the case was initially assigned to Judge Firestone. In lieu of an answer, defendant filed a motion to dismiss for lack of jurisdiction alleging that the plaintiff's claims were time-barred under the applicable statute of limitations. As indicated above, the motion to dismiss was denied by Judge Firestone.

In its post-trial filings, defendant argues that "Petro Mex failed to prove any shut-in related breach of contract," and claims that "Petro Mex's shut-in related breach claim is barred by the statute of limitations." Defendant argues that

[d]espite identifying October 2008 as the date of the United States' first alleged breach in both the parties' pretrial statement of fact and issues,[18] and in the introduction to its post-trial brief, Petro Mex briefs a different question: whether the United States breached the lease by "continuation of the May 29, 2008 shut-in order after the 'immediate' concern of the underground leak had been resolved." (capitalization altered). The answer to that question is "no." First, by Petro Mex's own allegations, this breach accrued before October 22, 2008 and is, therefore, outside the six-year statute of limitations in 28 U.S.C. § 2501.

(internal citations omitted; alteration and footnote added). Plaintiff responds that "Petro Mex does assert that the Government acted improperly when it failed to lift the Shut-In

---

[18] One of the joint issues of law filed by the parties in advance of the trial asked: "If the Court finds that the Field Office orally ordered Petro Mex to cease production on the Lease in October of 2008, whether that oral order was a partial breach of Section 1 of the Lease."

Order after the immediate safety issue or issues that led to the issuance of the order were resolved, but this does not mean that Petro Mex's claim accrued at that time." As referenced above, plaintiff's complaint alleges: "The United States breached the Leases and its agreement with Petro Mex by attempting to terminate the Leases on or about August 26, 2009 when it had no valid contractual, statutory or regulatory grounds to do so."

Although the Tucker Act waives federal sovereign immunity in certain cases, and grants this court jurisdiction to hear monetary claims against the government, including military pay claims, this court's jurisdiction is expressly limited by 28 U.S.C. § 2501, which prescribes a six-year statute of limitations for filing claims arising under the Tucker Act's waiver of sovereign immunity. According to 28 U.S.C. § 2501:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues. . . . A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.

Id. "The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), aff'd, 552 U.S. 130 (2008); see also Roseberry-Andrews v. United States, 144 Fed. Cl. 29, 33 (2019); Schnell v. United States, 115 Fed. Cl. 102, 104-5 (2014). The United States Court of Appeals for the Federal Circuit has indicated that a claim accrues ""when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money."" Samish Indian Nation v. United States, 419 F.3d 1355, 1369 (Fed. Cir. 2005) (quoting Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004)); see also FloorPro, Inc. v. United States, 680 F.3d 1377, 1381 (Fed. Cir. 2012); Martinez v. United States, 333 F.3d at 1303 ("A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" (quoting Nager Elec. Co. v. United States, 177 Ct. Cl. 234, 240, 368 F.2d 847, 851 (1966), motion denied, 184 Ct. Cl. 390, 396 F.2d 977 (1968)) (emphasis in original); Mildenberger v. United States, 643 F.3d 938, 944–45 (Fed. Cir. 2011); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988); see also Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 481 (2013); Brizuela v. United States, 103 Fed. Cl. 635, 639, aff'd, 492 F. App'x 97 (Fed. Cir. 2012), cert. denied, 133 S. Ct. 1645 (2013).

As summarized by the United States Court of Appeals for the Federal Circuit in Holmes v. United States:

> Section 2501 states that all claims that otherwise fall within the jurisdiction of the Court of Federal Claims "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. A

cause of action first accrues when all the events have occurred that fix the alleged liability of the government and entitle the claimant to institute an action. Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir. 2009). Generally, "[i]n the case of a breach of a contract, a cause of action accrues when the breach occurs." Alder Terrace, Inc., v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (quoting Mfrs. Aircraft Ass'n v. United States, 77 Ct. Cl. 481, 523, 1933 WL 1818 (1933)). Compliance with the statute of limitations is a jurisdictional requirement. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133–34, 128 S. Ct. 750, 169 L. Ed. 2d 591 (2008).

Holmes v. United States, 657 F.3d 1303, 1317 (Fed. Cir. 2011).

In addition, a Judge of the United States Court of Federal Claims has noted that:

It is well-established that a claim accrues under section 2501 "when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc), cert. denied, 540 U.S. 1177, 124 S. Ct. 1404, 158 L. Ed. 2d 76 (2004) (quoting Nager Elec. Co. v. United States, 368 F.2d 847, 851 (Ct. Cl. 1966)); see also Samish [Indian Nation v. United States], 419 F.3d [1355,] 1369 [(2005)]. Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely. See Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998); Entines v. United States, 39 Fed. Cl. 673, 678 (1997), aff'd, 185 F.3d 881 (Fed. Cir.), cert. denied, 526 U.S. 1117, 119 S. Ct. 1766, 143 L. Ed. 2d 796 (1999); see also John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1362 (Fed. Cir. 2006) (Newman, J., dissenting); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

Parkwood Assocs. Ltd. P'ship v. United States, 97 Fed. Cl. 809, 813-14 (2011), aff'd, 465 F. App'x 952 (Fed. Cir. 2012); see also Mgmt. & Training Corp. v. United States, 137 Fed. Cl. 780, 783 (2018); Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 209 (2011) (citing Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998)).

Accrual of a claim is "'determined under an objective standard'" and plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue. FloorPro, Inc. v. United States, 680 F.3d at 1381 (quoting Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996)). Plaintiff does not need to be aware of all relevant facts for a cause of action to accrue, the statute of limitations begins running once they are aware of sufficient facts to know that they have been wronged. See Osborn v. United States, 47 Fed. Cl. 224, 233 (2000).

The Federal Circuit in Holmes offered further explanation, writing,

the "accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." Id. [Holmes v. United States, 92 Fed. Cl. 311,] 319 (quoting Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008)). For the accrual suspension rule to apply, the plaintiff "must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." Young, 529 F.3d at 1384 (quoting Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc)).

Holmes v. United States, 657 F.3d at 1317 (footnotes omitted).

Plaintiff's October 22, 2014 complaint alleges that

[o]n May 27, 2008, inspections of certain wells on the Leases were again conducted by GJFO [Grand Junction Field Office] personnel. The inspections found that the violations cited during the April 25, 2008 inspections had not been rectified and found an additional major violation on the Government 5 well. In addition, the inspection of the Federal 2 well on the Mesa Lease found a major violation at that well. As a result of the foregoing violations, on May 27, 2008 the GJFO ordered all of the wells on both Leases to be shut-in "until all leaks are corrected and all compliance issues are resolved." Petro Mex immediately complied with this order and shut all of the wells in. Petro Mex corrected all of the major and minor violations that had been cited on the Leases by the GJFO pursuant to the April 25, 2008 and May 27, 2008 inspections by the end of June, 2008. Petro Mex advised the GJFO of this fact and resumed production from the wells on the Leases in August of 2008. In October of 2008, the GJFO advised Petro Mex that the May 27, 2008 shut-in orders on the Leases had not been lifted and should still be in effect. The GJFO ordered Petro Mex to halt the resumed production from the wells until the order was lifted. Petro Mex complied with this order and halted production from the wells on or about October 31, 2008. In the months following the October 2008 order, Petro Mex repeatedly asked the GJFO what it needed to do to have the May 27, 2008 shut-in order lifted, but they received nothing but vague, inconsistent and uncertain instructions or directions on how to do so.

(alterations added). Plaintiff's October 22, 2014 complaint also alleges that

[t]he United States breached the Leases and its agreement with Petro Mex by ordering Petro Mex to cease production on the Leases in October of 2008 when it had no valid contractual, statutory or regulatory grounds to do so, and by refusing to allow production to resume once Petro Mex had adequately demonstrated that there were no more remaining violations on

the Leases that constituted "immediate, substantial and adverse impacts on public health and safety [or] the environment." The United States breached the Leases and its agreement with Petro Mex by attempting to terminate the Leases on or about August 26, 2009 when it had no valid contractual, statutory or regulatory grounds to do so. As a result of the breaches of the Leases by the United States, Petro Mex has suffered damages, including the loss of the full potential value of the Leases (including loss of profits), loss of reasonable expectancy and reliance damages including the expenses incurred in reliance upon the right to produce and sell oil and gas from the Leases.

(second alteration in original).

In response to the August 22, 2014 complaint, defendant, on February 20, 2015, filed a motion to dismiss before Judge Firestone alleging "Petro Mex was on inquiry notice of a potential breach of contract action when it claimed that it had resolved the noncompliance issues, informed the BLM of this fact, and resumed production on the leases by August of 2008," and "[a]ll of the events fixing the Government's alleged liability had occurred by this point." (alteration added). According to defendant, therefore, "Petro Mex knew or should have known it had a potential breach of contract claim once it allegedly had resolved the noncompliance issues, but BLM did not permit it [Petro Mex] to resume production." (alteration added).

As reflected above, while assigned the case earlier, Judge Firestone had denied defendant's February 20, 2015 motion to dismiss on August 10, 2015. Judge Firestone first noted that

[a]ccording to the government, Petro Mex's claim accrued on or before August 2008—but no later than October 1, 2008—because the only potential breach by the BLM was its failure to lift the shut-in orders after Petro Mex alleges that it had remedied its noncompliance and so notified the BLM. The government argues that only one shut-in order was imposed, so the BLM's reinforcement of that order could not be a separate breach. Additionally, the government states that it is unclear whether the alleged phone call instructing plaintiff to continue the shut-in order actually occurred, as it contends that the BLM does not make such requests without confirming it in writing. Further, the government argues that the decision to terminate Petro Mex's leases in 2009 does not give rise to a separate breach claim because Petro Mex's failure to produce stems from the BLM's same failure to lift the shut-in orders in August 2008.

In response, Petro Mex argues that its complaint was timely filed because the government has mischaracterized its claims and that, when properly construed, the breach of contract claims were timely filed. First, Petro Mex argues that it is asserting a breach based on the BLM s decision in late October 2008 to order Petro Mex to stop production after the violations were corrected. Petro Mex has filed an affidavit asserting a breach based on a

late October 2008 BLM phone call in which Petro Mex claims it was instructed by the BLM to stop the production it had resumed in August 2008. Second, Petro Mex argues that the BLM's August 2009 termination decisions also breached the leases because, as the IBLA [Interior Board of Land Appeals] determined, they were legally wrongful. Petro Mex asserts that the breaches associated with termination of the Leases do not relate back to the original shut-in orders issued in May 2008 or to BLM's actions taken in October 2008. Rather, Petro Mex claims that the termination decisions are separate from the shut-in orders because BLM based the terminations of the Leases on new compliance issues that were identified in 2009 involving the compressor and certain fines and a bond allegedly owed by Petro Mex.

Petro Mex, LLC v. United States, 122 Fed. Cl. at 540–41 (alterations added). Although denying the motion to dismiss, Judge Firestone's decision indicated that she assumed, for purposes of the motion to dismiss, and prior to the trial before the undersigned and further development of the facts in the case, she was considering that plaintiff has stated a valid claim for breach of contract, and based on that assumption, the claims were timely filed. Judge Firestone held:

The court finds that plaintiff's breach of contract claims are not barred by the statute of limitations for two main reasons. First, while the government argues that the breach alleged by plaintiff cannot be an actual breach, the government has not moved to dismiss for failure to state a claim. At this stage of the proceeding, the court must take plaintiff's alleged breach claims at face value. See Ashcroft [v. Iqbal], 556 U.S. [662,] 678, 129 S. Ct. 1937 [(2009)] (citing [Bell Atl. Corp. v.] Twombly, 550 U.S. [544,] 555–56, 127 S. Ct. 1955 [(2007)]). As such, regardless of whether plaintiff has stated a valid claim for breach of contract, the court's task at this juncture is to determine whether, assuming plaintiff has stated a valid claim for breach of contract, the claims were timely filed. Accordingly, the court rejects the government's motion to dismiss based on the statute of limitations because the breach alleged by plaintiff occurred within 6 years of filing the complaint. Plaintiff does not challenge the BLM's failure to timely respond to a request to lift the shut-in order in August 2008, as the government contends. Rather, plaintiff alleges that the BLM wrongfully told or ordered Petro Mex to shut-in during a phone call in late October 2008 after the violations on the Leases were allegedly corrected. While the evidence of the alleged date of the phone call, sometime after October 22, 2008, comes from plaintiff's employees, the date and the occurrence of the phone call have not been disputed by the government. While government argues that it has not been able to confirm that any phone call was made, the undisputed evidence presented before the court indicates that, for the purpose of determining whether the statute of limitations has run, Petro Mex was told to stop production on either October 24 or 25, 2008. Accordingly, the breach claim based on the October shut-in is therefore timely filed. If, after discovery, the

evidence establishes that there was no phone call, plaintiff's breach claim will fail on the merits.

Petro Mex, LLC v. United States, 122 Fed. Cl. at 541 (footnote omitted; alterations added). At the time of Judge Firestone's 2015 decision, Judge Firestone did not have the benefit of the full trial record, including the trial exhibits and trial testimony, developed after the case was transferred, and Judge Firestone accepted as true the claims in plaintiff's complaint for the purposes of the motion to dismiss, she was considering at the time. Subsequent to Judge Firestone's decision in 2015, as detailed above in the lengthy findings of fact, the parties filed joint stipulated facts, filed numerous exhibits and took extensive testimony from witnesses. As discussed below, in the court's breach analysis, the defendant argued "[a]lthough Mr. Villalobos testified that the call occurred, his testimony has been inconsistent, and is unsupported by any contemporaneous record."

Before the undersigned, after the trial record was closed, defendant, in its post-trial brief, again raised the statute of limitations issue and argues "Petro Mex's shut-in related breach claim is barred by the statute of limitations." In her opinion, when she denied defendant's earlier motion to dismiss, Judge Firestone had indicated further evidence should be reviewed in order to evaluate the breach issues and any impact on the statute of limitations. Therefore, in order to evaluate if the parties' claims were within the statute of limitations in this court, consistent with Judge Firestone's earlier opinion, see Petro Mex, LLC v. United States, 122 Fed. Cl. 536, the parties conducted discovery and the court held a trial, in order to hear testimony from both plaintiff and government witnesses and to weigh the credibility of trial testimony before reaching a decision on all the issues.

After the trial before the undersigned, defendant argues:

Petro Mex alleges that it had a right to have the shut-in order lifted "presumably as early as June 3, 2008, when the underground leak on the Government 5 [well] was fixed," Pl. Post-Tr. Br. at 41, and no later than July 2008, id. at 34-35. Thus, Petro Mex itself places accrual of its claim at between three and nearly five months outside the statute of limitations.

(alteration in original). Defendant argues: "Now that the record has been fully developed through trial, Petro Mex has settled on a theory, and that theory rests upon a single event—failure to lift the shut-in in July 2008—and its continuing negative effects." Defendant also points to plaintiff's argument in its post-trial brief which states: "The Government's continuation of the May, 29 2008 Shut-In Order after the 'immediate' concern of the underground leak had been resolved was not permitted by the applicable legal authorities and violated Petro Mex's right to produce oil and gas from the Lease." Plaintiff contends,

Petro Mex does not dispute the Government's finding from April, 25 [sic] 2008 that it was in violation of certain regulations with regard to the Lease at that time, such that Mr. Fancher was justified in citing them and issuing

the April 2008 Notices. But it must be remembered that of those five notices, only one was for a major violation; the remainder were all minor violations. Similarly, Petro Mex does not dispute the Government's finding from May 27, 2008 that there was a serious and major safety violation on the Lease that justified not only the issuance of the May 27, 2008 Notice, but also the Shut-In Order. There is little question that the "underground leak" that was observed on that day [May 27, 2008] constituted an "Act of Noncompliance" that was subject to the remedies set forth in 43 C.F.R. § 3163.1. Specifically, the underground leak without question constituted a situation where "continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income," such that it was justified to take "immediate shut-in action" under 43 C.F.R. § 3163.1(a)(3). However, once the immediate situation of the underground leak was addressed, the Government was not justified or authorized under the applicable regulations to maintain or keep the Shut-In Order in place for the purpose of gaining compliance with other, non-immediate prior violations. And later, the Government was also not authorized to maintain or keep the Shut-In Order in place for the purpose of gaining compliance with other, non-related compliance issues that arose after the issuance of the Shut-In Order. In doing so, the Government unduly interfered with Petro Mex's right to produce oil and gas and breached its obligations under the Lease.

(alterations added). Plaintiff argues "it is clear that once the issue that justified the taking of 'immediate shut-in action' On [sic] May 29, 2008 (the underground leak) had been resolved and the Government was aware of such, the Government had an obligation to lift the Shut-In Order." (alteration added). Turning to the testimony at trial, plaintiff indicates:

Mr. Fancher testified at trial that he actually observed a crew on the Lease repairing the underground leak within days of the Shut In Order being fixed. However, despite having observed the leak being fixed and presumably being satisfied with the effort that was made to fix it (he made no attempt to inspect or check the leak when he visited the 15-9 well with Mr. Villalobos on July 1, 2008), when asked at trial if he had considered the Shut-In Order to still be in place on August 1, 2008, almost two months later, he stated that he did "because not everything was corrected at that time." As was demonstrated at trial, the only issues that were still outstanding by that time were EF08018 (unnumbered storage tank) and EF08020 (insufficient water storage pit and full tank). Neither issue justified the continuance of the Shut-In Order.

(internal references omitted). Therefore, plaintiff concludes:

Given the foregoing, it is clear that Petro Mex had a right to have the Shut-In Order lifted and to re-establish production on the Lease sometime during

the summer of 2008, presumably as soon as June 3, 2008 when the underground leak on the Government 5 was fixed. The Government does not deny that it was aware that this violation (as well as any other safety violations) was fixed by the end of July 2009 [sic]. Further, Mr. Wilson testified that he advised Mr. Fancher near the end of July that Petro Mex had remedied all of the outstanding violations and that Mr. Fancher had declined an offer to reinspect the wells to verify. However, regardless of whether this call happened or not (Mr. Fancher has denied receiving the call but admitted to not conducting further inspections), it cannot be disputed that the Government had actual knowledge that the issue justifying the "immediate" shut-in action had been resolved. Based upon this, and upon the fact that the Lease provided Petro Mex with the "right and privilege to drill for, mine, extract, remove, and dispose of . . . oil and gas deposits" from the Lease, provided it was in compliance with the applicable regulations, Petro Mex was legally justified in re-starting production from the Lease in August of 2008 as it did.

(internal references omitted; alteration added).

At the closing argument, plaintiff's counsel argued:

Trial testimony and exhibits established that three of the five notices of incidents of noncompliance that were issued pursuant to the April 25 inspections were all either resolved or closed by July 1st of 2008. More importantly, trial testimony also established that the violation that led to the issuance of the shut-in order, which was the underground leak, was also resolved or fixed by June 2nd, 2008. That meant that at the end of July 2008, only two of the six notices of incidents of noncompliance that were issued against Petro Mex in April and May of 2008 may have remained outstanding. These are for an unnumbered storage tank on one well and an insufficient water storage pit and pool tank on another. Lynn[19] Wilson, Operations Manager for Petro Mex in 2008, testified that by the end of July of 2008, they believed that all of the outstanding issues for the notices of incidents of noncompliance had been resolved. At that time, he placed a call to Mr. Fancher and advised him of the foregoing, asking Mr. Fancher if he wished to conduct a reinspection of the wells. According to Mr. Wilson, Mr. Fancher told him he did not intend to conduct such a reinspection. Pursuant to this conversation and based on his prior experience with the Field Office, Mr. Wilson believed that Petro Mex was therefore entitled to resume production on the leases, as he believed that the issues justifying the immediate order were resolved. He explained that Petro Mex's prior experience with the Field Office, and with Mr. Fancher, in particular, was that formal written notices and approvals were often not required to be

---

[19] Although the trial transcript occasionally refers to Mr. Wilson as "Lynn Wilson," Mr. Wilson's first name is "Linn."

> delivered or received and that informal verbal approvals were common. Pursuant to this, Petro Mex resumed production on the lease and produced gas on the lease from August of 2008 until the end of October of 2008.

(alteration added). As demonstrated by the quotations above, plaintiff did not identify a specific date by which that all events occurred necessary to enable the plaintiff to bring suit occurred.

Defendant now argues, based on the facts as developed at trial, through the trial exhibits and trial testimony, as well as the arguments in plaintiff's post-trial brief and at closing argument, "Petro Mex alleges that it had a right to have the shut-in order lifted 'presumably as early as June 3, 2008, when the underground leak on the Government 5 [well] was fixed,' and no later than July 2008," and argue that "Petro Mex itself places accrual of its claim at between three and nearly five months outside the statute of limitations" when it subsequently filed its complaint on October 22, 2014. (internal references omitted; alteration in defendant's post-trial brief). Plaintiff's post-trial brief specifically states that "it is clear that Petro Mex had a right to have the Shut-In Order lifted and to re-establish production on the Lease sometime during the summer of 2008, presumably as soon as June 3, 2008 when the underground leak on the Government 5 was fixed."

As noted above, plaintiff's counsel and Mr. Fancher had the following exchange at trial regarding the resolution of some of the Notices of Incidents of Noncompliance that led to the Shut-In Order:

> [Q.] [T]hat's the notice of incident of noncompliance regarding the underground leak on Government 5, right?
>
> A. That's correct.
>
> Q. And that was the -- that was the violation that prompted the shut-in order. Is that correct?
>
> A. Yes.
>
> Q. Okay. Do you know when that was corrected?
>
> A. I think like May 30th.
>
> Q. And, again, I'll have you reference -- I'll have you look back at the interrogatory answers to refresh your memory for [Notice of Incident of Noncompliance No.] 8025. Eight-zero-two-five, I should say.
>
> A. 8025 was corrected on July 3rd, 2008.

. . .

Q. [Notice of Incident of Noncompliance No.] 8025, will you look at that again and tell me what the interrogatory says about when that was corrected?

A. It says it -- the violation was corrected by June 2rd [sic], 2008.

Q. So that was within three or four days of you issuing that notice, correct?

A. Yes, that's correct.

Q. What's your -- really quick, what's your actual memory of that, of knowing about them fixing that underground leak?

A. The only thing I remember would be we traveled out there to verify the leak. We heard about it and we went out and checked it and went back to see if there was any action taken on it. That was the 28th -- the 27th, 28th, and 29th [of May 2008]. I think it was like the 30th, we actually -- there were people out there pouring cement into a couple pipes trying to get it to stop leaking.

Q. All right. So you actually observed the crew fixing that leak?

A. Yes.

Q. At least attempting to fix that leak?

A. Yeah, they -- and maybe it was on the 29th [of May 2008] that they fixed it. You know, I don't -- the exact day, I don't -- I don't -- you know, that's a little bit too far back.

(alterations added).

Plaintiff contends that "Petro Mex's claims did not accrue until it received actual notice in October of 2008 that the Government had not lifted the May 29 Shut-In Order, therefore those claims were brought within the time allowed by the statute of limitations." Plaintiff also argues "Petro Mex does assert that the Government acted improperly when it failed to lift the Shut-In Order after the immediate safety issue or issues that led to the issuance of the order were resolved, but this does not mean that Petro Mex's claim accrued at that time." Petro Mex contends that

the evidence presented at trial demonstrated Petro Mex did not believe, based on past practice of the field office, that it was necessary to receive formal notice of the lifting of a shut-in order before resuming production and it erroneously, but in good faith, believed that the shut-in order had in fact

been lifted by August of 2008 when it resumed production. Linn Wilson testified that he had contacted the Field Office in late July of 2008, advised them that the issues had been resolved on the lease and asked if another inspection was required to verify.

According to plaintiff,

> [w]hen the Field Office indicated another inspection was not necessary, Petro Mex took this to mean that the issues were resolved and the shut-in order was constructively lifted meaning production could be resumed. This impression was based on past practices of the Field Office where formal practices or requirements were frequently eschewed.

(alteration added). Therefore, plaintiff argues:

> Petro Mex had no idea that the shut-in order had not, in fact, been lifted until they were ordered to halt production two months later after October 22, 2008. Petro Mex does not dispute that *the Government knew* that the shut-in order had not been lifted, but that does not show that Petro Mex had knowledge of such prior to October 22, 2008.

(emphasis in original). Plaintiff continues: "In this matter, it cannot be shown that Petro Mex had any idea, or even any reason to suspect, that the Government considered the Shut-In Order to still be in effect once the violations had been corrected as it was perfectly reasonable for Petro Mex to believe that it had instead been lifted. Petro Mex, therefore, had no notice, inquiry or otherwise, that they were still prohibited from producing."

As noted above, the accrual of a claim is "'determined under an objective standard'" and plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue. See FloorPro, Inc. v. United States, 680 F.3d at 1381 (quoting Fallini v. United States, 56 F.3d at 1380). Furthermore as articulated by the United States Court of Appeals for the Federal Circuit,

> [a]ccording to the accrual suspension rule, "the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." Id. [Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003)] To achieve such suspension the plaintiff "must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." Id. (quoting Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985)).

Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (alterations added). Defendant argues Petro Mex offered "no evidence that the Field Office attempted to conceal the fact that the shut-in order was still in place," "[n]or was the fact that the shut-in order was still in place 'inherently unknowable.'" As described above, the parties stipulated:

Also on May 29, 2008, Mr. Fancher issued EF08025SI, "Notice to Shut Down Operation" (Shut In Order). The Shut In Order stated that Petro Mex had 24 hours from oral notice being provided "on 5/28/2008 at 15:38 hr." to immediately "shut in all wells on this lease until all leaks are corrected and all compliance issues are resolved." The "WARNING" section in the Shut In Order stated that "[o]perations are not to be resumed until permitted by the authorized officer." The Shut In Order stated "when violation is corrected, sign this notice and return to" the Field Office. It also informed Petro Mex of its review and appeal rights.

(alteration in original; capitalization in original). Plaintiff does not argue that Mr. Fancher, as the authorized officer permitted operations to begin again, nor that anyone from Petro Mex signed the notice and returned it to the BLM. As indicated above, when discussing shutting down wells in October 2008, Mr. Wilson testified:

Q. Why did you shut the wells back in in October?

A. Because Jesus [Villalobos] called me and told me that he had received a phone call that we had to shut the wells back in, that we was on -- we was still in the shut-in order.

And so i [sic] called Brian Gartner with Energy Transfer, and asked him if he could go out and shut the compressor down for me, and he said he would. And then that was -- I believe that was on a Friday, and he -- then I went back up there on either Monday or Tuesday and took care of all the block valves and the wellheads.

Q. Okay. Production was going pretty well in October before that, wasn't it?

A. Yes, it was.

Q. Would there have been any other reason to shut down at the end of October?

A. No.

Q. And we talked about how in August, it looked like you resumed production around the 14th. Correct?

A. Correct.

Q. Why was that?

A. Because I had spoke to Ed Fancher and told him at the end of July that all the incidents of noncompliance had been completed and did he want to do a reinspection. And he said -- told me, no, not at this time.

Q. Okay.

A. So my assumption was that we could turn everything back on.

Q. Did he tell you you could turn everything back on?

A. No, he did not.

Q. Did you ask him if you could turn everything back on?

A. No, I did not.

Q. Okay. So were you concerned about the shut-in order still being in place?

A. I was. When I found out about it in October, I was.

Q. But when you turned it on in August, when you resumed production in August, were you concerned about the shut-in still being in place?

A. No.

Q. Why not?

A. Because we had completed all the incident of noncompliance.

(alterations added). On cross-examination, defendant's counsel pressed Mr. Wilson about restarting production in August 2008:

[Q.] Whose responsibility was it to sign and date, complete this shut-in notice?

A. It could have been either one of us. Could have been myself or Jesus Villalobos.

Q. Whose responsibility was it to mail it back to BLM?

A. Again, it could have been either one of us. Whoever signed it would have usually take it [sic] and mail it back.

Q. Did you sign and return this form?

A. No, I did not.

Q. Okay. Earlier you testified that when you called Mr. Fancher at the end of July, you did not tell him that Petro Mex was going to resume production. Is that right?

A. No, I did not. I asked him if he wanted to reinspect the wells.

Q. And let me -- so did -- just to be clear, did you tell Mr. Fancher you were going -- that Petro Mex was going to resume production during that --

A. No.

Q. Okay. -- end of July phone call?

A. No.

(alterations added). Additionally, defendant's counsel asked Mr. Wilson about Mr. Hartman's March 14, 2007 letter to Petro Mex:

Q. [C]ould you look at the warning section, please. Do you see that?

A. Okay.

Q. Can you read the first sentence, please, under, Warning.

A. "Operations are not to be resumed until permitted by the authorized officer."

Q. Okay. And Petro Mex resumed production in August 2008.

A. Yes.

Q. And did -- Petro Mex did so without permission of the authorized officer. Right?

A. Correct.

Q. Do you recall specifically when in August Petro Mex resumed production?

A. I believe it was mid-August, around the 14th, 15th.

Q. And then Petro Mex shut down production again near the end of October 2008. Right?

A. Correct.

Therefore, no evidence was introduced at trial that Petro Mex was unaware of the Shut-In Order, or that the BLM had permitted operations of the wells to begin again.

Defendant also argues

[a]pplying an objective standard, FloorPro, Inc., 680 F.3d at 1381, any reasonably prudent lease operator should have known that the shut-in order was still in place. At a minimum, a reasonably prudent operator in Petro Mex's position would have been on inquiry notice that it was at least possible the shut-in order was still in place. Mr. Villalobos's testimony that he "assumed" Petro Mex could resume production in August 2008, only reinforces this conclusion. Petro Mex, having stuck its head in the sand and failed to inquire whether the shut-in order was still in place, cannot now rely upon that failure to save its claim from the statute of limitations.

(internal reference omitted; alteration added). Plaintiff also cites to the FloorPro decision to argue that "accrual occurs when the events constituting a breach occur *and* when the non-breaching party knows or should have known of their existence. See FloorPro, Inc. v. United States, 680 F.3d at 1381 (quoting Goodrich v. United States, 434 F.3d 1329, 1333 (Fed. Cir. 2006))." (emphasis in original). Relying on FloorPro, plaintiff argues "Petro Mex maintains the position that it was not aware of and had no reason to know of the Government's failure to lift the Shut-In Order until it was notified of such after October 22, 2008. As a result, the claim did not accrue until such date and the claim was brought within the applicable statute of limitations period." (capitalization in original). The facts in the FloorPro case do not assist Petro Mex. The facts in FloorPro, as summarized by the Federal Circuit, are as follows:

On February 6, 2002, the United States Navy awarded Contract No. N62467–02–M–2013 to G.M. & W. Construction Corporation ("GM & W") for the installation of floor coating in several warehouse bays at a military base. GM & W subsequently entered into a subcontracting agreement with FloorPro, pursuant to which FloorPro agreed to perform the floor-coating work for a sum of $37,500.00. FloorPro completed the work on February 27, 2002, and promptly submitted an invoice to GM & W.

On March 8, 2002, the Navy informed GM & W that the floor-coating work had been completed satisfactorily. On April 17, 2002, FloorPro contacted the Navy's contracting officer, stating that it had not been paid by GM & W. The contracting officer then contacted GM & W to inquire why FloorPro had not been paid for the floor-coating work. GM & W informed the contracting officer that there were several claims pending against it, and that it was not sure whether any funds that the Navy directly deposited into its bank account would be available to pay FloorPro. Accordingly, on April 22, 2002, the Navy and GM & W entered into a contract modification ("Modification P00001"), which provided that the Defense Finance and Accounting Service

("DFAS") would not pay GM & W directly, as required by the original contract, but would instead pay for the floor-coating work by issuing a hard-copy, two-party check payable to GM & W and FloorPro. Modification P00001 further provided that the Navy would mail the check directly to FloorPro. Notwithstanding Modification P00001, on July 17, 2002, the DFAS paid GM & W directly by an electronic fund transfer to its bank account. On July 18, 2002, the contracting officer informed FloorPro that DFAS had "ignored" Modification P00001 and "did not issue the two-party check as [Modification P00001] had directed." FloorPro responded by sending a letter, dated July 23, 2002, asking the contracting officer "[w]hat exactly is being done by [the Navy] to process a payment to us for our work?" On August 9, 2002, Captain B.M. Scott, a Navy acting commander, sent FloorPro a letter confirming that the government had paid GM & W in full on the contract. Scott asserted that "[a]s the Government does not possess privity of contract with FloorPro, Inc., or any other subcontractor," payment to GM & W had "fulfill[ed] the extent of the Government's obligations" under the contract.

FloorPro, Inc. v. United States, 680 F.3d at 1379 (capitalization and alterations in original). The Federal Circuit in FloorPro explained the lengthy appeal process and noted:

On October 2, 2009, FloorPro filed suit against the government in the Court of Federal Claims. The government moved for summary judgment, arguing that FloorPro's claim was time-barred because it was filed more than six years after it first accrued. In response, FloorPro argued that its claim did not accrue until October 5, 2004, "at which time the Navy filed a brief at the [ASBCA] contending that FloorPro had no enforceable rights under [Modification P00001]."

Id. at 1380 (alterations in original). The Federal Circuit in FloorPro determined:

FloorPro's cause of action accrued when the government breached Modification P00001 by making payment directly to GM & W, rather than sending a two-party check to FloorPro as the modification required. See Franconia Assocs. v. United States, 536 U.S. 129, 141, 122 S. Ct. 1993, 153 L. Ed. 2d 132 (2002) (explaining that claims seeking damages for breach of contract generally accrue at the time of the breach); Kinsey v. United States, 852 F.2d 556, 557 (Fed. Cir. 1988) (emphasizing that a cause of action for breach of a government contract generally accrues when payment is due but wrongfully withheld). FloorPro became aware of the breach no later than August 9, 2002, when the Navy informed FloorPro that: (1) it had paid GM & W directly for the floor-coating work; (2) it believed that it had fulfilled the extent of its contract obligations; and (3) FloorPro's only recourse was to seek payment "from GM & W through the civil court system." Thus, no later than August 2002, FloorPro knew not only that the Navy had paid GM & W directly, but that the government believed that it

had fulfilled all of its obligations under the contract and would not make any payment to FloorPro. At this point, FloorPro had "a complete and present cause of action," Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp., 522 U.S. 192, 201, 118 S. Ct. 542, 139 L. Ed. 2d 553 (1997) (citations and internal quotation marks omitted), and all events necessary to fix the alleged liability of the government for the failure to comply with Modification P00001 had occurred. Because FloorPro did not file its complaint in the Court of Federal Claims until October 2, 2009, more than six years after its claim accrued, its action is time-barred.

FloorPro argues that its cause of action did not accrue until October 5, 2004, when the government filed its brief in the ASBCA proceedings. It asserts that while it "knew that the Government had paid GM & W directly in violation of Modification P00001, the Government did not repudiate the terms of the modification" until the government filed its brief with the ASBCA. We do not find this reasoning persuasive. FloorPro knew long before the government filed its brief in the ASBCA proceedings that the government had "repudiate[d]" Modification P00001. As noted above, the Navy's August 2002 letter stated that it had fulfilled all of its obligations under the contract by making payment directly to GM & W and that FloorPro's only recourse was to seek payment "from GM & W through the civil court system." This letter was an unequivocal refusal to pay FloorPro under the terms of Modification P00001, which required the Navy to issue a hard-copy, two-party check payable to both GM & W and FloorPro and to send the check to FloorPro.

FloorPro, Inc. v. United States, 680 F.3d at 1381-82 (alterations in original). The facts in FloorPro, as indicated above, are different than the facts in the above captioned case, specifically the payment method by the government to plaintiff FloorPro has no analog to anything in the above captioned case Furthermore, in FloorPro there was a modification to the contract, which is not present in the above captioned case.

In addition, Petro Mex argues

[i]n this matter, it cannot be shown that Petro Mex had any idea, or even any reason to suspect, that the Government considered the Shut-In Order to still be in effect once the violations had been corrected as it was perfectly reasonable for Petro Mex to believe that it had instead been lifted. Petro Mex, therefore, had no notice, inquiry or otherwise, that they were still prohibited from producing.

At the trial, on cross-examination with defendant's counsel, Mr. Villalobos claimed that he had permission to re-open the wells:

[Q.] Mr. Villalobos, now in terms of time, we're still in August 2008. But just to confirm, you knew that when Petro Mex resumed production in August 2008, it did not have permission to do so, correct?

A. We didn't have it in writing permission, but like I said, I talked to Ed [Fancher] before and he told me that as soon as I had all the INCs [Incidences of Noncompliance] done, we could turn production back on or the wells on.

. . .

Q. Okay, all right. So, Mr. Villalobos, now do you recall testifying this morning that Mr. Fancher called -- allegedly called and reminded you that the shut-in order was still in effect?

A. I didn't remember. He called me and reminded me that. But we talk about it, even in that meeting.

Q. Okay. And I'm just -- and do you recall when Mr. Fancher called you?

A. I can't remember what date exactly.

Q. Do you remember what month?

A. I think it was back in August if I remember right.

Q. Okay. And so when -- and when Mr. Fancher allegedly called you, you testified this morning that it was to shut the wells in the Garfield lease back in. Is that correct?

A. Yes.

Q. And isn't it true that you have no contemporary records of that call?

A. Yes.

Q. And you also testified that you did not try and get any phone company records, correct?

A. Well, I tried -- I tried to get the records from Altell. Back then, they used to be Altell. And then Altell sold to AT&T and that was a nightmare. But I did talk two or three times trying to get the phone records and they said they might take a year to get them. So I give up. I didn't get nothing.

(alterations added). The plaintiff produced no credible evidence that Petro Mex inquired about the status of the Shut-In Order or received permission from Mr. Fancher to lift the Shut-In Order. The court agrees with defendant that a reasonably prudent operator should

have communicated with the BLM to determine if the Shut-In Order was still in place. See FloorPro, Inc. v. United States, 680 F.3d at 1381. Plaintiff cannot now rely on the failure to inquire as a basis to bring its claims within the statute of limitations.

Additionally, defendant argues "[a]lthough Petro Mex complains that this breach continued through lease termination in August 2009, it makes no effort in its brief to demonstrate how that might bring its claim within the statute of limitations. Nor could it. The continuing claim doctrine does not apply."[20] Plaintiff responds that

> Petro Mex asserts, and has always asserted, that the specific action constituting a breach of the lease was the actual unauthorized termination of the lease on or about August 26, 2009. While the original failure to lift the Shut-In Order in June of 2008 began a series of actions that ultimately led to the Government's decision to terminate the lease, that particular action was, in fact, an "independent and distinct event" that can be found to have its own "associated damages."

(quoting Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1456 (Fed. Cir. 1997)).

The Federal Circuit case of Tamerlane, Ltd. v. United States, 550 F.3d 1135, explained the continuing claims doctrine, as follows:

> This doctrine applies where a plaintiff's claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1456 (Fed. Cir. 1997). The doctrine allows "later arising claims even if the statute of limitations has lapsed for earlier events." Tamerlane II, 80 Fed. Cl. [724,] 736 [(2008)] (quoting Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 879 (Fed. Cir. 1998)).

Tamerlane, Ltd. v. United States, 550 F.3d at 1145 (footnote omitted). In Wells v. United States, 420 F.3d 1343, the United States Court of Appeals for the Federal Circuit articulated the requirements for qualifying for the continuing claims doctrine, as follows:

> "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages. . . . However, a claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim."

Id. at 1345 (omission in original) (quoting Brown Park Estates-Fairfield Dev. Co. v. United

---

[20] The court notes that the parties refer to the doctrine as both the "continuing claims doctrine" and the "continuing claim doctrine." Unless the phrase is used in a quotation, this Opinion adopts the phase the "continuing claims doctrine."

States, 127 F.3d at 1456). In Tamerlane, borrowers brought an action against the government for breach of Farmers Home Administration loan contracts, the Federal Circuit found that:

> In this case, Appellants appear to improperly conflate the government's breach of the *original* loan agreements with the use restrictions that arose from the *incentive* loan agreements. That is, there is no second opportunity for breach of the original agreements just because the incentive agreements contain time-limited use restrictions. As the Court of Federal Claims correctly found, there was a single agreement that was breached on a single occasion, which does not allow any sort of "continuing claims" to be brought under the prevailing law of this Circuit.

Tamerlane, Ltd. v. United States, 550 F.3d at 1146 (emphasis in original). The Tamerlane court then compared the facts in Tamerlane to the circumstances presented in Ariadne Financial Services Pty. Ltd. v. United States, 133 F.3d 874 (Fed. Cir. 1998):

> This situation is analogous to that in Ariadne, where we were confronted with a plaintiff who sought compensation from the government for repudiation of a contract that promised continuing performance into the future. [Ariadne Fin. Servs. Pty. Ltd. v. United States,] 133 F.3d at 879. In finding that a single statutory repudiation made clear the government's intent to reject the terms of the contracts, we held that each subsequent denial of the promised contractual benefits did not give rise to a separate cause of action, and found that the continuing claims doctrine did not permit the plaintiff to obtain a second limitations period where the limitations period on the original breach had already expired. Id.

Tamerlane, Ltd. v. United States, 550 F.3d at 1146 n.17 (alteration added); see also Wagstaff v. United States, 105 Fed. Cl. 99, 112 (2012) ("The continuing claims doctrine does 'not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time.'" (quoting Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d at 879)).

Petro Mex contends that

> [t]he Government's entire argument on the statute of limitations ultimately fails because, in contrast to what the Government proposes, Petro Mex's claims do not rest upon a single event. While Petro Mex asserts that the failure to lift the Shut-In Order was improper and, at least consequentially, began a series of events that ultimately led to the Government's breaches, Petro Mex's claims are centered on those subsequent independent events: The October order to shut down operations and the August 26, 2009 termination of the lease. Just because those events flowed from the refusal to lift the Shut-In Order does not mean that they were not independent, distinct events.

(capitalization in original; alteration added). Plaintiff's initial post-trial brief, however, argued

> the evidence presented at trial made it clear that <u>the continuation of the</u> <u>Shut-In Order</u> for the period from April to August of 2009, the period of nonproduction that eventually led to the termination of the Lease, was also based on non-immediate issues. The exhibits and trial testimony made clear that at that point the issues that were keeping the Shut-In Order in place were the Bond Increase and the Civil Penalty.

(emphasis added). Plaintiff also argued:

> The Government may attempt to argue that the post June 16, 2009 shut-in of the Garfield Lease was authorized because the June 16, 2009 letter from the GJFO to Petro Mex constituted a "new" shut-in order. This argument is without merit. While it is true that the portion of the letter that directs Petro Mex to keep production shut-in on the Lease until the Bond Increase and Civil Penalty are satisfied states that it is an "order of the authorized officer," it also states that the production is to "remain shut in," indicating that the order is simply a continuation of the original Shut In Order. Mr. Hartman also stated in his trial testimony that when he wrote the letter, he considered the shut-in order to be a continuation of the original Shut In Order and not a "new" shut-in order. But even if this were not the case, any purported "new" shut-in order issued by the June 16, 2009 letter under 43 C.F.R. § 3163.1(a)(3) for the purpose of ensuring compliance with the Bond Increase or the Civil Penalty would have been invalid because (a) the issues were not immediate threats so as to support "immediate shut-in action" and (b) no "due notice, in writing" was provided prior to its issuance. Given the foregoing, it is clear that Petro Mex had a right to have the Shut-In Order lifted and to re-establish production on the Lease sometime during the summer of 2008, presumably as soon as June 3, 2008 when the underground leak on the Government 5 was fixed. The Government does not deny that it was aware that this violation (as well as any other safety violations) was fixed by the end of July 2009. Further, Mr. Wilson testified that he advised Mr. Fancher near the end of July that Petro Mex had remedied all of the outstanding violations and that Mr. Fancher had declined an offer to reinspect the wells to verify. However, regardless of whether this call happened or not (Mr. Fancher has denied receiving the call but admitted to not conducting further inspections), it cannot be disputed that the Government had actual knowledge that the issue justifying the "immediate" shut-in action had been resolved. Based upon this, and upon the fact that the Lease provided Petro Mex with the "right and privilege to drill for, mine, extract, remove, and dispose of . . . oil and gas deposits" from the Lease, provided it was in compliance with the applicable regulations, Petro Mex

> was legally justified in re-starting production from the Lease in August of 2008 as it did.

(internal reference omitted; omission in original). As referenced above, plaintiff's post-trial reply brief stated:

> Petro Mex asserts, and has always asserted, that the specific action constituting a breach of the lease was the actual unauthorized termination of the lease on or about August 26, 2009. While the original failure to lift the Shut-In Order in June of 2008 began a series of actions that ultimately led to the Government's decision to terminate the lease, that particular action was, in fact, an "independent and distinct event" that can be found to have its own "associated damages."

Plaintiff, however, does not elaborate on why the Shut-In Order is distinct from the ultimate decision to terminate the Garfield Lease. In response, defendant argues plaintiff's claim that the termination was not an "independent and distinct event" as alleged by plaintiff. Defendant states that

> the Field Office's alleged breach, by failing to lift the shut-in order in June or July 2008 once it knew the underground leak was fixed, was "a single distinct event." The Field Office then terminated the lease on the basis that Petro Mex could not show production in paying quantities because it was shut-in. Placed in such a "Catch-22" situation, as a result, the later lease termination in August 2009 flows *back* to the alleged failure of the Field Office to lift the shut-in order, and is not a separate breach.

(emphasis in original). Furthermore, defendant notes,

> Petro Mex itself has inextricably linked the Field Office's request to restore production in paying quantities, and resulting lease termination, with the initial failure to lift the shut-in order. The Field Office did not lift the shut-in order after the underground leak was fixed, which prevented Petro Mex from producing any natural gas.

Defendant argues: "Now that the record has been fully developed through trial, Petro Mex has settled on a theory, and that theory rests upon a single event—failure to lift the shut-in in June or July 2008—and its continuing negative effects." The court agrees with defendant that the continuing claims doctrine does not apply to the facts of this case, as there was a "series of independent and distinct events or wrongs, each having its own associated damages." Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d at 1456. As discussed below, plaintiff also has not demonstrated that the BLM issued a separated order to stop production of Petro Mex's wells in October 2008, as plaintiff previously alleged before Judge Firestone and Judge Hodges.

Therefore, as determined in the findings of facts, and consistent with the testimony at trial, as well as the arguments in the parties' post-trial briefs, Petro Mex resolved the underground leak in June 2008, and defendant appears to have been aware that the leak was fixed by site visits and notification from Petro Mex employees. Plaintiff argues in its post-trial brief,

> once the immediate situation of the underground leak was addressed, the Government was not justified or authorized under the applicable regulations to maintain or keep the Shut-In Order in place for the purpose of gaining compliance with other, non-immediate prior violations. And later, the Government was also not authorized to maintain or keep the Shut-In Order in place for the purpose of gaining compliance with other, non-related compliance issues that arose after the issuance of the Shut-In Order. In doing so, the Government unduly interfered with Petro Mex's right to produce oil and gas and breached its obligations under the Lease.

Petro Mex, however, did not inquire if the Shut-In Order was still in place. Additionally, Petro Mex resumed production under the Garfield Lease, without informing Mr. Fancher or the BLM, and without permission to do so, produced oil between August 2008 and October 2008. As noted by defendant, "[d]uring these months of production, Petro Mex was aware that it could not operate the wells until an authorized officer gave it permission and also that Petro Mex had never asked for written authorization to resume production." (alteration added). Under the objective standard for notice of the accrual of claims, see FloorPro, Inc. v. United States, 680 F.3d at 1381, plaintiff was on notice that its claim accrued prior to August 2008, and not, as plaintiff's argues, in October of 2008. Furthermore, as analyzed below, plaintiff also has not demonstrated that the BLM issued a separated order to stop production of Petro Mex's wells in October 2008. Therefore, based on the facts developed at trial, plaintiff's claims were filed outside the applicable six year statute of limitations when plaintiff filed its complaint on October 22, 2014. See John R. Sand & Gravel Co. v. United States, 457 F.3d at 1354. Petro Mex's claims are barred by the statute of limitations.

Breach

To be complete, and for the benefit of the parties' efforts and participation in the trial which was held, and to address all the issues in the case, included those addressed in both Judge Firestone's earlier opinion on the motion to dismiss, see Petro Mex, LLC v. United States, 122 Fed. Cl. 536, and Judge Hodges' earlier, unreported opinion on the cross-motions for summary judgment, the court addresses the case, including the breach allegations raised by the plaintiff, and the burden of proof plaintiff bears to prove a breach of contract. Contract claims against the United States are governed by the Tucker Act, which grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive

department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2018). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289–90 (2009); Me. Cmty. Health Options v. United States, 140 S. Ct. 1308, 1327–28 (2020); United States v. Mitchell, 463 U.S. 206, 215 (1983); see also Sanford Health Plan v. United States, 969 F.3d 1370, 1378 (Fed. Cir. 2020); Alvarado Hosp., LLC v. Price, 868 F.3d 983, 991 (Fed. Cir. 2017); Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999); Gulley v. United States, 150 Fed. Cl. 405, 411 (2020); Kuntz v. United States, 141 Fed. Cl. 713, 717 (2019). To invoke the jurisdiction of the United States Court of Federal Claims for breach of contract claims, plaintiff "must show that either an express or implied-in-fact contract underlies [their] claim." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). If plaintiff's complaint "alleges that an express and, in the alternative, an implied-in-fact contract underlies its claim," "[t]his allegation suffices to confer subject matter jurisdiction in the Court of Federal Claims." Trauma Serv. Grp. v. United States, 104 F.3d at 1324–25 (alteration added) (citing Gould, Inc. v. United States, 67 F.3d 925, 929 (Fed. Cir. 1995)). The parties have stipulated that "[t]hrough a series of assignments, Petro Mex acquired record title to the Garfield Lease effective October 1, 2004. At all times relevant to this case, Petro Mex was the owner and the operator of the Garfield Lease." Therefore, there is no dispute between the parties that Petro Mex had a contract with the government during the relevant period of time in the above captioned case.

In its post-trial brief,

Petro Mex asserts that the Government breached that obligation or duty when it (a) prevented Petro Mex from producing oil and natural gas on the Lease in October of 2008, even though Petro Mex had demonstrated that there were no continuing violations on the Lease that posed a threat of "immediate, substantial and adverse impacts on public health and safety, the environment, production accountability, or royalty income" and (2) terminated the Lease on or about August 26, 2009 when it had no valid contractual, statutory or regulatory grounds to do so.

In order "[t]o recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir.), reh'g denied (Fed. Cir. 1989); see also Sunrez Corp. v. United States, 157 Fed. Cl. 640, 649 (2022); Hous. Auth. of Slidell v. United States, 149 Fed. Cl. 614, 626 (2020); Shell Oil v. United States, 130

Fed. Cl. 8, 34 (2017) (quoting San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959), aff'd, 896 F.3d 1299 (Fed. Cir. 2018); "'The plaintiff or party alleging the breach has the burden of proof on all of its breach of contract claims.'" Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1360 (Fed. Cir. 2009) (quoting 23 Richard A. Lord, Williston on Contracts § 63:14 (4th ed. 1999)), reh'g granted in part, 638 F.3d 781 (Fed. Cir. 2011); see also Beard v. United States, 125 Fed. Cl. 148, 157 (2016) ("To prevail on a breach-of-contract claim, the plaintiff bears the burden of proving: (1) the existence of a valid contract between the parties; (2) a duty arising from the contract; (3) a breach in duty; and (4) damages caused by the breach." (internal quotation marks and citations omitted)).

As noted above, there is no dispute that a valid contract existed between the parties. Regarding defendant's obligations or duties arising out of the contract, the first section of the Garfield Lease provides:

> SECTION 1. *Rights of Lessee.* — The lessee is granted the exclusive right and privilege to drill for, mine, extract, remove, and dispose of all the oil and gas deposits, except helium gas, in the lands leased, together with the right to construct and maintain thereupon, all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipelines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment thereof, for a period of 10 years, and so long thereafter as oil or gas is produced in paying quantities; subject to any unit agreement heretofore or hereafter approved by the Secretary of the Interior, the provisions of said agreement to govern the lands subject thereto where inconsistent with the terms of the lease.

(capitalization and emphasis in original). Therefore, as indicated by plaintiff,

> there can be little question that, absent some limitation provided for in the Lease, the statutes or the applicable regulations that allows the Government to limit or halt the exercise of such right, the Government has an obligation and/or duty to allow to allow [sic] Petro Mex to "extract, remove, and dispose of" the oil and natural gas deposits on the Lease without interference.

(capitalization in original; alteration added). The court agrees with Petro Mex's characterization of the defendant's obligations or duties arising out of the contract. Therefore, for plaintiff to succeed on the merits in this case, plaintiff must demonstrate a breach of that agreement by the government.

Plaintiff argues that the "[g]overnment breached its duty to allow Petro Mex to extract, remove and sell oil and natural gas from the Garfield Lease in 2008 and 2009." (alteration added). More specifically, plaintiff first argues "[t]he government's continuation of the May, 29 2008 Shut-In Order after the 'immediate' concern of the underground leak had been resolved was not permitted by the applicable legal authorities and violated Petro Mex's right to produce oil and gas from the Lease." (alteration added). As noted above, plaintiff concedes that "Petro Mex does not dispute the Government's finding from April,

25 2008 [sic] that it was in violation of certain regulations with regard to the Lease at that time, such that Mr. Fancher was justified in citing them and issuing the April 2008 Notices." (alteration added). In addition, as noted in plaintiff's post-trial brief:

> Petro Mex does not dispute the Government's finding from May 27, 2008 that there was a serious and major safety violation on the Lease that justified not only the issuance of the May 27, 2008 Notice, but also the Shut-In Order. There is little question that the "underground leak" that was observed on that day [May 27, 2008] constituted an "Act of Noncompliance" that was subject to the remedies set forth in 43 C.F.R. § 3163.1.

(alteration added). Plaintiff argues:

> However, once the immediate situation of the underground leak was addressed, the Government was not justified or authorized under the applicable regulations to maintain or keep the Shut-In Order in place for the purpose of gaining compliance with other, non-immediate prior violations. And later, the Government was also not authorized to maintain or keep the Shut-In Order in place for the purpose of gaining compliance with other, non-related compliance issues that arose after the issuance of the Shut-In Order. In doing so, the Government unduly interfered with Petro Mex's right to produce oil and gas and breached its obligations under the Lease.

> The operative language of 43 C.F.R. § 3163.1 (2022) provides:

> (a) Whenever any person fails or refuses to comply with the regulations in this part, the terms of any lease or permit, or the requirements of any notice or order, the authorized officer shall notify that person in writing of the violation or default.
> (1) For major violations, the authorized officer may also subject the person to an assessment of $1,000 per violation, per inspection.
> (2) For minor violations, the authorized officer may also subject the person to an assessment of $250 per violation, per inspection.
> (3) When necessary for compliance, or where operations have been commenced without approval, or where continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income, the authorized officer may shut down operations. Immediate shut-in action may be taken where operations are initiated and conducted without prior approval, or where continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income. Shut-in actions for other situations may be taken only after due notice, in writing, has been given;
> (4) When necessary for compliance, the authorized officer may enter upon a lease and perform, or have performed, at the sole risk and expense of the

operator, operations that the operator fails to perform when directed in writing by the authorized officer. Appropriate charges shall include the actual cost of performance, plus an additional 25 percent of such amount to compensate the United States for administrative costs. The operator shall be provided with a reasonable period of time either to take corrective action or to show why the lease should not be entered;

(5) Continued noncompliance may subject the lease to cancellation and forfeiture under the bond. The operator shall be provided with a reasonable period of time either to take corrective action or to show why the lease should not be recommended for cancellation;

(6) Where actual loss or damage has occurred as a result of the operator's noncompliance, the actual amount of such loss or damage shall be charged to the operator.

43 C.F.R. § 3163.1. Plaintiff argues, given the language of the regulation,

[a]pplying the terms of 43 C.F.R. § 3163.1(a)(3) to the circumstances of May 29, 2008 on the Lease, it is clear that the issuance of the Shut-In Order was an "immediate shut-in action" that could only be authorized pursuant to concerns that "continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment production accountability, or royalty income." This clearly would apply to the underground leak, that all parties agree constituted a substantial safety hazard. However, 43 C.F.R. § 3163.1(a)(3) *did not* provide the authority for the Government to take "immediate shut-in action" and issue an immediate shut-in-order to resolve the additional compliance issues outstanding from the April 2008 Notices unless such issues also created a threat of "immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income." To the extent that the Government wished to shut-in Petro Mex for, as Mr. Fancher put it "all the continued noncompliance that was still outstanding," unless that noncompliance created a threat that justified immediate action under 43 C.F.R. § 3163.1(a)(3), the Government was first required to provide Petro Mex with "due notice, in writing" that such action was to be taken.

(emphasis in original; alteration added). Therefore, plaintiff argues, "[g]iven the foregoing, it is clear that once the issue that justified the taking of 'immediate shut-in action' [sic] On May 29, 2008 (the underground leak) had been resolved and the Government was aware of such, the Government had an obligation to lift the Shut-In Order." (alterations added). In its post-trial brief, plaintiff maintains

Mr. Fancher testified at trial that he actually observed a crew on the Lease repairing the underground leak within days of the Shut In Order being fixed. However, despite having observed the leak being fixed and presumably being satisfied with the effort that was made to fix it (he made no attempt to inspect or check the leak when he visited the 15-9 well with Mr. Villalobos on

July 1, 2008, when asked at trial if he had considered the Shut-In Order to still be in place on August 1, 2008, almost two months later, he stated that he did "because not everything was corrected at that time." As was demonstrated at trial, the only issues that were still outstanding by that time were EF08018 (unnumbered storage tank) and EF08020 (insufficient water storage pit and full tank). Neither issue justified the continuance of the Shut-In Order.

(internal references omitted).

In response, defendant argues, "[p]erhaps recognizing the weaknesses in its evidence of an alleged October 2008 shut-in, Petro Mex instead devotes the bulk of its argument to attempting to demonstrate that the Field Office violated the regulation governing shut-in orders. First, Petro Mex raises a notice issue." (alteration added). Defendant contends:

Pursuant to 43 C.F.R. § 3163.1(a)(3), the Field Office can impose an "immediate" shut-in order without advance notice for a violation that "could result in immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income." Petro Mex *concedes* that the underground leak was such a violation. Pl. Post-Tr. Br. at 37. But it contends that none of the other violations or compliance issues covered by the shut-in order met this standard and, therefore, they could not be "rolled into" the shut-in order absent separate "due notice, in writing." Id. As demonstrated below, Petro Mex is wrong that the underground leak was the only violation or compliance issue meeting the standard for immediate shut-in. But even if Petro Mex were correct, the Court still should reject its notice argument.

(emphasis in original).

Defendant continues: "As an initial matter, Petro Mex failed to raise this notice argument until the post-trial brief. Petro Mex did not identify this issue in the complaint, its summary judgment briefing, or the pretrial statement of facts and law," and therefore, defendant argues, "[t]he Court should find the argument waived." (internal references omitted). As discussed in more depth regarding the issue of prior material breaches below, because the issue was raised in plaintiff's post-trial brief, defendant had an opportunity to challenge plaintiff's arguments regarding notice in its post-trial briefs and at the closing argument, the court does not find that plaintiff has waived its arguments on this issue. There was also extensive trial testimony about the Shut-In Order. Moreover, although cited in the context of quoting the Interior Board of Land Appeals' decision, plaintiff's complaint nevertheless refers to the specific FAR provision, 43 C.F.R. § 3163.1(a)(3), and alleges:

In its decision reversing and remanding the decision of the BLM to terminate the Leases, the IBLA [Interior Board of Land Appeals] panel stated that the

noncompliance issues that the BLM used to justify its October, 2008 shut-in order (the failure to post the increased reclamation bond and to pay or contest an MMS civil penalty) "may well be significant, but neither of these violations could justify the taking of immediate action under 43 C.F.R. § 3163.1(a)(3)." The panel also stated that "we do not believe an order to avoid 'immediate, substantial and adverse impacts on public health and safety [or] the environment' under 43 C.F.R. § 3163.1(a)(3) can be continued simply because a minor violation or other compliance concern arises or comes to light." Finally, the panel stated that the foregoing meant that the GJFO "erred by refusing to lift its shut-in orders" and then keeping production shut-in on the Leases until the bond was posted and all fines were paid to the MMS.

(second alteration in original).

As noted above, the language of 43 C.F.R. § 3163.1(a)(3) provides:

When necessary for compliance, or where operations have been commenced without approval, or where continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income, the authorized officer may shut down operations. Immediate shut-in action may be taken where operations are initiated and conducted without prior approval, or where continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income. Shut-in actions for other situations may be taken only after due notice, in writing, has been given.

Id.

Defendant argues that

[t]he more natural and reasonable reading of the regulation is that when, as here, the Field Office has a basis for an immediate shut-in, the Field Office may include in its shut-in order all existing bases for shutting in the lease, including those that, standing alone, might otherwise have required advance notice. In short, when the Field Office is required to shut in a lease to stop an immediate threat, it only makes sense that the Field Office may include in that same order any additional, then-existing bases for shut-in action, because the Field Office has broad discretion in determining how to require compliance with Interior's regulations.

(alteration added). At the trial, defendant's counsel asked Mr. Fancher to discuss the meaning of some of the language in the Shut-In Order:

[Q.] Could you please -- under the Remarks section of the shut-in order, could you please read the sentence following, "You are shut in."

A. It says, "We are required to shut in all wells on this lease until all leaks are corrected and all compliance issues are resolved."

Q. I want to ask you about this language, "all compliance issues are resolved." You did not list the specific compliance issues here, did you?

A. No, I did not.

Q. Why did you use this language, "all compliance issues?"

A. Because I had compliance issues with Petro Mex and so did our surface people and others in BLM. So I wanted to make sure all the INCs [Incidents of Noncompliance] and letters that were out were addressed and corrected. And there was a lot going on, so. . .

Q. Did compliance issues include the five incidents of noncompliance from April 25th, 2008?

A. Yes.

Q. Was anything else included in all compliance issues?

A. There was surface -- the surface inspectors had issues with them, too. There was some letters and documents like that, but I don't remember specifically what they were.

(ellipse in original; alteration added). In response to the question, "[w]hat did you intend the shut-in order to encompass?" Mr. Fancher answered: "They encompass everything that -- all the production, all the valves, the tanks, the oil, the receipts, everything, getting them fully in compliance and caught up with everything that I, at least, had the authority to check on." Mr. Fancher also reflected on his decision when issuing the Shut-In Order at trial in an exchange with defendant's counsel:

[Q.] You said this was the first shut-in order that you had ever issued, right?

A. That is correct.

Q. How did you feel when you issued this shut-in order?

A. Well, I kind of felt kind of let down a little bit. I tried to work with Petro Mex a lot and tried to get them on the right path of doing -- what to do with the reporting and with the site security and everything. I think I bent over backwards trying to get it straightened out. And then there was other issues with the drilling and stuff like that and we worked with them painlessly on that. So when this gas leak took out, the oil came up missing, no run tickets, it was just pretty much, you know, just like -- they just like blew us off

basically is the way I felt. So I felt totally within my right and power to shut them in and requesting information, getting them caught up fully to that point anyway.

Q. Yesterday, you described the leak on the Government 5 well that led you to go out to the lease on May 27th, 2008.

A. Yes.

Q. If the Government 5 well had not had that leak, would you have still issued a shut-in order to Petro Mex?

A. Yes, yes. I was working on the shut-in order in that area because of the missing oil, the reporting, site security. There was too many violations really just on that one pad to just kind of lie -- just to forget it. You know, they just wasn't paying attention and I needed to get their attention and I was planning a shut-in order to do that.

(alteration added).

Although agreeing that Mr. Fancher had the authority to issue the Shut-In Order for the underground leak, plaintiff argues any other violation that continued to shut down Petro Mex's oil and gas wells required additional notice. The regulation at issue, 43 C.F.R. § 3163.1(a)(3), does not directly address a situation such as the one presented in this case, in which multiple violations exist simultaneously, including ones that involve "immediate, substantial, and adverse impacts on public health and safety." Id. The regulation at regulation at issue, 43 C.F.R. § 3163.1a, however, does provide the BLM with discretion in determining appropriate action:

(a) Whenever any person fails or refuses to comply with the regulations in this part, the terms of any lease or permit, or the requirements of any notice or order, the authorized officer shall notify that person in writing of the violation or default.
(1) For major violations, the authorized officer may also subject the person to an assessment of $1,000 per violation, per inspection.
(2) For minor violations, the authorized officer may also subject the person to an assessment of $250 per violation, per inspection.
(3) When necessary for compliance, or where operations have been commenced without approval, or where continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income, the authorized officer may shut down operations. Immediate shut-in action may be taken where operations are initiated and conducted without prior approval, or where continued operations could result in immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income. Shut-in actions

for other situations <u>may</u> be taken only after due notice, in writing, has been given;

(4) When necessary for compliance, the authorized officer <u>may</u> enter upon a lease and perform, or have performed, at the sole risk and expense of the operator, operations that the operator fails to perform when directed in writing by the authorized officer. Appropriate charges shall include the actual cost of performance, plus an additional 25 percent of such amount to compensate the United States for administrative costs. The operator shall be provided with a reasonable period of time either to take corrective action or to show why the lease should not be entered;

(5) Continued noncompliance <u>may</u> subject the lease to cancellation and forfeiture under the bond. The operator shall be provided with a reasonable period of time either to take corrective action or to show why the lease should not be recommended for cancellation;

(6) Where actual loss or damage has occurred as a result of the operator's noncompliance, the actual amount of such loss or damage shall be charged to the operator.

43 C.F.R. § 3163.1(a) (emphasis added). Although not specifically addressed in the regulation, based on the absence of specific language in the regulation regarding separate notices and based on Mr. Fancher's testimony at trial regarding the Shut-In Order to include all violations over which he had authority, and the BLM's discretion to determine how to enforce violations, <u>see</u> <u>Blancett v. U.S. Bureau of Land Mgmt.</u>, 2006 WL 696050, at *9 (D.D.C. Mar. 20, 2006), the court finds that the BLM was not required to provide separate notice for each of the violations that were occurring at the time the Shut-In Order was issued.

Defendant further argues that

[e]ven if Mr. Fancher had issued the multiple notices Petro Mex contends were required, Petro Mex agrees that it still would have been immediately shut-in on May 28, 2008 for the underground leak. Then, during the time that it was working to repair the leak, Petro Mex could have argued to the Field Office that its compliance issues did not warrant a shut-in.

(alteration added). The Shut-In Order also provided under "Review and Appeal Rights:"

A person contesting a violation shall request a State Director review of the Incidents of Noncompliance. This request must be filed within 20 working days of receipt of the Incidents of Noncompliance with the appropriate State Director (see 43 CFR 3165.3). The State Director [sic] review decision may be appealed to the Interior Board of Lands [sic] Appeals, 801 North Quincy Street, Suite 300, Arlington VA 22203 (see 43 CFR 3165.4). Contact the above listed Bureau of Land Management office for further information.

(alterations added). Plaintiff did not introduce evidence at trial that Petro Mex requested review by the Colorado BLM State Director or filed an appeal with the Interior Board of Land Appeals.

Additionally, defendant argues if notice was required, "Petro Mex fails to demonstrate how violation of the notice provision would be a violation of the lease." For support defendant cites Nutt v. United States. In Nutt, the court explained, by way of background,

> Plaintiffs Gary Nutt and Howard and Maretta Smithson (collectively referred to as "plaintiffs") operate farms in Castro County, Texas. Plaintiffs had outstanding loan agreements with the Farmers Home Administration (the "FmHA"), an agency of the United States Department of Agriculture, at the time the events that give rise to these claims occurred. The FmHA grants farm operating loans to eligible borrowers who are unable to obtain reasonable financing elsewhere. 7 C.F.R. § 1941 (1983). The FmHA also makes "emergency loans" and various debt servicing options available to farmers, while administering the various loans, grants, and assistance programs under regulations promulgated by the Secretary of the Department of Agriculture. Loans are made to an eligible borrower only after the FmHA determines that the borrower's plan of operation has a reasonable chance of success.

Nutt v. United States, 12 Cl. Ct. 345, 347 (1987), aff'd sub nom. Smithson v. United States, 847 F.2d 791 (Fed. Cir. 1988). The Judge in Nutt noted that

> the Smithsons claim that the FmHA's delays in processing and finally approving their loan application caused them to suffer economic losses. They argue that the FmHA owed them a contractual duty to process their application in a timely fashion. They cite 7 C.F.R. § 1910.6(a) (1983), which describes the sequence of events that should occur after an applicant has been deemed eligible for a loan. The Smithsons assert that the process described by the regulation became a contractual obligation of the FmHA to process applications "promptly" according to the process because the regulations were incorporated into their security agreement by section IV. E. of the agreement, which, again, reads: "This agreement is subject to the present regulations of the Secured Party and to its future regulations not inconsistent with the express provisions hereof."

> The Smithsons argue that this contract term incorporated all applicable regulations into the contract as affirmative obligations of the Government. Although this contract language is nearly identical to the contract provision in Dahl [Dahl v. United States, 695 F.2d 1373 (Fed. Cir. 1982)], the opinion in Dahl cannot be read as broadly as the Smithsons advocate. Had the FmHA intended to convert its FmHA regulatory duties into contractual obligations, it could have employed the language it used in Pettersen

[Pettersen v. United States, 10 Cl. Ct. 194, 199, aff'd, 807 F.2d 993 (Fed. Cir. 1986)], *i.e.,* that the parties "agree to comply with the terms and conditions [including various regulations] specified in the Appendix to this contract." 10 Cl. Ct. at 198. Or, the FmHA could have drafted the term to state simply that the parties agreed to comply with all applicable regulations. Instead, the language that was included is far more susceptible to an interpretation that the terms and obligations of the contract would be both construed according to present regulations and subject to changes in the regulations not inconsistent with the contract's express provisions. Viewed in this way, the contract establishes the FmHA's regulations as a backdrop to, and occasional modifier of, express contractual obligations.

It is unreasonable to infer that the FmHA meant to obligate itself in wholesale fashion to comply with each FmHA regulation or risk breach of contract damages. Absent both an en masse incorporation of regulations and express or implied contractual promises by the FmHA to evaluate loan applications according to some time schedule, the Smithsons' breach claim based on timeliness must fail.

Nutt v. United States, 12 Cl. Ct. at 353 (footnote omitted; alterations added).[21] Based on the holding in Nutt, defendant contends, if regulations like 43 C.F.R. § 3163.1 "were contractual promises, then the plaintiff could, as Petro Mex has attempted to do here, 'choose among a multitude of regulations as to which he could claim a contract breach.'" (quoting Nutt v. United States, 12 Cl. Ct. at 353). Therefore, defendant argues, "language like that found in Petro Mex's lease, which references 'all reasonable regulations of the Secretary of the Interior now or hereafter in force,' cannot be read to mean that the Field Office obligated itself in wholesale fashion to comply with each and every agency regulation or risk breach of contract damages." (internal citation omitted).[22]

---

[21] One of plaintiffs' arguments in Nutt was that the "FmHA failed to make or insure loans or advances (or subordination loans for plaintiff Nutt), to plaintiffs on a timely basis." Nutt v. United States, 12 Cl. Ct. at 349.

[22] Defendant clarifies its position, as follows:

This is not to say that the Field Office has permission to violate its regulations. Rather, regulatory violations in the day-to-day administration of a lease are subject to challenge under the Administrative Procedure Act (APA), which allows the district court to compel the agency to comply with the regulations. Nutt, 12 Cl. Ct. at 350. But in the context of contract claims, where the United States is subject to money damages, review "is more limited and subject to very stringent requirements." Id. at 350-51. A "formidable standard" applies to ensure that the Government will be held to have obligated itself in contract only where that promise is express and clear, so as to leave no ambiguity" that the United States has agreed to waive its sovereign immunity.

In response, Petro Mex argues:

> Nutt/Smithson is distinguishable from this matter. To begin with, Nutt/Smithson involved a completely different type of contract than the oil and gas lease at issue in this matter. Nutt/Smithson involved loan and security agreements between eligible farmers and the Farmers Home Administration, not leases whereby the contracting party was granted, by the Government, an explicit and "exclusive right and privilege to drill for, mine, extract, remove and dispose of all the oil and gas deposits, except helium gas, in the lands leased." Id. at 347 compared to JX1. In this matter, however, the Government has made an explicit promise, through the lease, to allow Petro Mex to remove hydrocarbons from the leased lands, only subject to "the terms and provisions of the act of February 25, 1920 (41 Stat. 437, 30 U.S.C. sec 181) as amended, hereinafter referred to as the act, and all reasonable regulations of the Secretary of the Interior now or hereafter in force." JX1/2. To this end, and as the court in Nutt explained, breach of contract claims can be had against the Government for regulatory violations only where it can be shown that the Government "obligated itself in contract only upon a showing of an express or implied-in-fact agreement to do so." Id. at 351.
>
> Petro Mex argues that, unlike in Nutt, that is the case in this matter where the Government explicitly granted Petro Mex the right, and thus obligated itself to allow Petro Mex to, remove hydrocarbons from the leased property as long as there existed no regulatory grounds for the Government to halt such production. It is important for the Court to remember that the central point or purpose of the lease at issue in this matter was to allow for the removal of oil and gas from the leased property by the owner or operator of the lease, and that halting that ability and stopping an owner or operator from doing so strikes at the very central promise made by the Government in selling the lease to the owner or operator. The promise to allow production is the fundamental agreement at the heart of the lease, and the Government's commitment to allow such, subject to its own regulations, is equally fundamental. This surely meets the "formidable standard" discussed by the court in Nutt whereby a promise in a contract must be express and clear for it to be actionable by the contracting party.

---

The court agrees with the defendant that the United States Court of Federal Claims has jurisdiction over contract claims, and notes that the violation of a regulation can result in a breach of contract, see, e.g., United States v. Winstar Corp., 518 U.S. 839 (1996), and similar subsequent cases.

Petro Mex, however, does not clarify or analyze why the situation in the above captioned case "surely meets the 'formidable standard' discussed by the court in <u>Nutt.</u>" Instead, plaintiff generally alleges that

> [t]he circumstances here do not involve the Field Office imposing simple fines or assessments for operational violations; instead, the Field Office actually misused the regulations to actually halt production on the lease and then subsequently keep production halted for over a year resulting in the termination of the lease. Such a violation is actionable under breach of contract principles.

(alteration added). Defendant responds: "Petro Mex simply assumes that any misstep by the Field Office in its application of the rules and regulations constitutes a violation of the lease. It does not." Without more specificity and argument supported by statutes, regulations or caselaw, Petro Mex has not demonstrated a nexus between the alleged failure to provide notice for violations other than the underground leak and the breach of the Garfield Lease agreement by the government.

> Relatedly, defendant also argues:

> Petro Mex's allegations regarding the regulatory scheme for imposing and continuing the May 2008 shut-in order are exactly the kind of complaints that the APA [Administrative Procedure Act] was designed to address. And Petro Mex could have, but did not, seek review of the Field Office's orders under that standard at any time between July 2008, when it alleges the shut-in order should have been lifted, and August 2009, when the lease was terminated.

(alteration added). As referenced above, defendant acknowledges "[t]his is not to say that the Field Office has permission to violate its regulations. Rather, regulatory violations in the day-to-day administration of a lease are subject to challenge under the Administrative Procedure Act (APA), which allows the district court to compel the agency to comply with the regulations." Moreover, as indicated above, Petro Mex argued in its post-trial filings that

> 43 C.F.R. § 3163.1(a)(3) *did not* provide the authority for the Government to take "immediate shut-in action" and issue an immediate shut-in-order to resolve the additional compliance issues outstanding from the April 2008 Notices unless such issues also created a threat of "immediate, substantial, and adverse impacts on public health and safety, the environment, production accountability, or royalty income."

(emphasis in original).

To the extent that plaintiff challenges the general application of the notice requirement in the BLM's administrative procedures, the United States Court of Federal

Claims lacks jurisdiction over violations of APA claims. See Martinez v. United States, 333 F.3d 1295, 1313 (Fed. Cir. 2003) ("[T]he Court of Federal Claims lacks APA jurisdiction." (citing Murphy v. United States, 993 F.2d 871, 874 (Fed. Cir. 1993) ("[T]he Claims Court has no authority to invoke the APA."))), cert. denied, 540 U.S. 1177 (2004); see also Boeing Co. v. United States, 162 Fed. Cl. 78, 84 (2022) ("This court does not have jurisdiction to review the validity of regulations pursuant to the Administrative Procedure Act (APA)."); Albino v. United States, 104 Fed. Cl. 801, 815 (2012) (citing Martinez v. United States, 333 F.3d at 1303, 1314). As such, the "Federal district courts—not the Court of Federal Claims—are the proper fora for APA actions." Stroughter v. United States, 89 Fed. Cl. 755, 762–63 (2009) (citing 5 U.S.C. § 703 (2006); Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005)); see also Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (affirming the United States Court of Federal Claims holding "that it lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the Administrative Procedure Act, 5 U.S.C. § § 701-706 (1994)"); HCIC Enters., LLC v. United States, 147 Fed. Cl. 118, 126 (2020) (quoting Stroughter v. United States, 89 Fed. Cl. at 763 ("The APA does not authorize an award of money damages, 5 U.S.C. § 702 (providing for judicial review of actions 'seeking relief other than money damages') and, in any event, it is well-established that '[f]ederal district courts—not the Court of Federal Claims—are the proper fora for APA actions.'")); Allen v. United States, 140 Fed. Cl. 550, 563 (2018) (citing Stroughter v. United States, 89 Fed. Cl. at 763); Amber Res. Co. v. United States, 68 Fed. Cl. 535, 544 (2005), aff'd, 538 F.3d 1358 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2008) ("In the absence of a contrary statute, a challenge to administrative discretion can only be reviewed in district court pursuant to the APA."). Therefore, to the extent plaintiff is challenging the existing regulatory notice requirement, as it applies to the Shut-In Order, plaintiff's challenges cannot be raised in this court.

The plaintiff also contends in its post-trial brief in this court that

> even though it is strongly denied by the Government, it is only logical to conclude that Petro Mex shut down production from the Lease in October of 2008 pursuant to some kind of direction or order from the GJFO [Grand Junction Field Office] to do so. Mr. Villalobos testified at trial that he ordered Mr. Wilson to stop production at that time because he received a call from Mr. Fancher ordering Petro Mex to do so.

(alteration added). Petro Mex contends:

> It is hard to imagine any other reason that Mr. Villalobos would make that call to Mr. Wilson other than the truth that was asserted, that he was contacted by the GJFO. But the strongest reason to believe that the GJFO issued some kind of order or direction to halt production from the Lease is because, absent such an order or direction, Petro Mex had *no other reason to do so.* It is undisputed that during August, September and October of 2008, the Lease was productive. In fact, production from the wells in October of 2008 was particularly strong. But despite this, and despite losing several months of revenue from the Lease in June and July of 2008, Petro

Mex indisputably shut-in the Lease on or around October 24 or 25, 2008. When asked if there was any other reason Petro Mex would have to shut-in the wells, Mr. Wilson said simply "no." Mr. Villalobos, when asked the same question, stated "there's no reason to shut them in."

(emphasis in original; internal references omitted). Defendant responds that "[a]lthough Mr. Villalobos testified that the call occurred, his testimony has been inconsistent, and is unsupported by any contemporaneous record." (alteration added).

At the trial, on cross-examination with defendant's counsel, Mr. Villalobos claimed that he had permission to re-open the wells:

[Q.] Mr. Villalobos, now in terms of time, we're still in August 2008. But just to confirm, you knew that when Petro Mex resumed production in August 2008, it did not have permission to do so, correct?

A. We didn't have it in writing permission, but like I said, I talked to Ed [Fancher] before and he told me that as soon as I had all the INCs [Incidents of Noncompliance] done, we could turn production back on or the wells on.
. . .

Q. Okay, all right. So, Mr. Villalobos, now do you recall testifying this morning that Mr. Fancher called -- allegedly called and reminded you that the shut-in order was still in effect?

A. I didn't remember. He called me and reminded me that. But we talk about it, even in that meeting.

Q. Okay. And I'm just -- and do you recall when Mr. Fancher called you?

A. I can't remember what date exactly.

Q. Do you remember what month?

A. I think it was back in August if I remember right.

Q. Okay. And so when -- and when Mr. Fancher allegedly called you, you testified this morning that it was to shut the wells in the Garfield lease back in. Is that correct?

A. Yes.

Q. And isn't it true that you have no contemporary records of that call?

A. Yes.

Q. And you also testified that you did not try and get any phone company records, correct?

A. Well, I tried -- I tried to get the records from Altell. Back then, they used to be Altell. And then Altell sold to AT&T and that was a nightmare. But I did talk two or three times trying to get the phone records and they said they might take a year to get them. So I give up. I didn't get nothing.

(alterations added).

At trial Mr. Fancher testified regarding the October 2008 timeframe with defendant's counsel:

A. I discovered that Petro Mex had sold gas during -- like right after the shut-in and so then that became something we had to deal with.

Q. The last sentence of your entry here says, "This is on our plate." Do you see that?

A. I see that. I mean, that's something that we had to deal with, yes, ma'am.

Q. Okay. And you may have just anticipated my question there, but what did you mean by that?

A. I meant that we had to research that and find out why they did that, why they started production without -- without notifying us.

Q. And on what date was this?

A. This was on March 30th, 2009.

Q. Was this the first time that you learned that Petro Mex had produced during the shut-in?

A. Yes, I think it is.

Q. Did you know in August 2008, at that time, did you have any knowledge that Petro Mex was producing?

A. I don't remember any knowledge of that. I'd have to look and see if I made any notes anywhere.

Q. Okay. Do you know whether in September 2008 you had any knowledge that Petro Mex was producing?

A. No, no, ma'am.

Q. Did you have any knowledge in October 2008 that Petro Mex was producing from the Garfield lease during the shut-in?

A. No, ma'am.

Q. Did you have a telephone call with Mr. Villalobos in October 2008 in which you told him the lease was still shut in?

A. I don't recall that conversation.

Q. Do you recall having such a conversation at all?

A. No, ma'am.

. . .

Q. Did you look through your records to gather up all your paperwork about the telephone conversations that you did have records of?

A. Yes, yes, we did. I went through all the files, all the conversation records, part of the files, all my notes in my computer, and I didn't find any at all.

Notwithstanding Mr. Fancher's testimony at trial, in its post-trial brief, Petro Mex argues "the Government has provided no alternative theory as to why Petro Mex would shut-in an otherwise productive lease." Plaintiff speculates that

it seems reasonable to postulate that what happened in this situation was that Mr. Hartman in fact *did* discover that Petro Mex had resumed production in mid to late October and did in fact take action to have that production halted. This simple scenario would fully explain and support Mr. Villalobos's assertion regarding the October 2008 phone call from the GJFO containing the order or direction to halt production.

(emphasis in original; internal references omitted). At trial, Mr. Hartman testified on cross-examination with plaintiff's counsel:

[Q.] This exhibit [Joint Exhibit 9] has a set of notices of incident of noncompliance that Mr. Fancher issued in August of 2007 against Petro Mex or on Petro Mex. I'm not sure of the right phrase to use there. Do you see that?

A. Yes.

Q. Okay. Do you know if Mr. Fancher brought these [Notices of Incidents of Noncompliance] to your attention when he issued them in August of 2007?

100

A. He normally wouldn't, and I don't remember -- remember these, no.

Q. So it wasn't a normal practice for Mr. Fancher to let you know when he issued an incident of noncompliance against an operator?

A. That's correct.

Q. Okay. And I think you testified you didn't really have any supervisory authority over him, right?

A. That's correct.

Q. I'm going to ask you to look at the next exhibit, which is Exhibit 10, Joint Exhibit 10, which is trial page 31 and 32.

A. I see them.

Q. And I'll submit to you that this is a set of incidents of noncompliance that Mr. Fancher issued against Petro Mex in October of 2007. Do you see that?

A. Yes.

Q. Okay. Do you remember if Mr. Fancher brought these to your attention at all? At the time.

A. I don't believe he did. I don't remember them.

Q. Okay. Again, it wouldn't have been normal practice for him to let you know about every INC [Incidents of Noncompliance] he issued?

A. That's correct.

(alterations added). Regarding the Shut-In Order, defendant's counsel and Mr. Hartman had the following exchange on direct examination:

[Q.] [W]ere you aware that Mr. Fancher issued a shut-in order on the Garfield lease in May 2008?

A. Yes, I was.

Q. All right. What was your understanding of why he issued that shutdown -- shut-in order?

A. If I remember correctly -- excuse me -- there were issues with seals -- tank seals and I believe a leaking pipeline or leaky well head.

Q. All right. And then did Mr. Fancher consult with you before he issued the order?

A. No. We talked about it, but his authority is completely different than what I'm allowed to do. You know, there's schooling and there are classes on enforcement. I never attended and I was always -- anyway, PETs [petroleum engineering technicians] did their own -- did their own stuff.

Q. So when you say you talked about it with him, was it more just general -- I mean, him asking your advice, or he wasn't asking your permission or anything -- or authority, was he?

A. No. No, I don't have any authority in those matters.

Q. Okay. Were you ever aware that Petro Mex had resumed production after Mr. Fancher had issued the shut-in order?

A. I believe he became aware of it, that they had started producing, but I'm not sure how we -- how he became aware of it. It was later in -- I believe in later that year.

Q. Was it possible, too, that would you have ever ordered Mr. Fancher to order Petro Mex to shut in the wells again if they had been producing?

A. No, that's not me -- that's not my bailiwick, to tell inspectors what to do.

(alterations added).

Defendant responds to plaintiff's theories regarding Mr. Fancher's testimony and Mr. Hartman's testimony by arguing, "[n]ot only is Petro Mex's theory based upon pure speculation, but it also is contrary to the established facts. It contradicts the testimony from Mr. Hartman and Mr. Fancher and it also overlooks the fact that Petro Mex was *not* reporting its production during the shut-in. Rather, it was producing without the Field Office's knowledge." (emphasis in original; alteration added). Furthermore, defendant claims that "[r]ather than carry its burden of proof, Petro Mex attempts to shift its burden onto the United States." (alteration added). The court agrees that the burden is on plaintiff, and not on defendant, to prove the alleged breach. See Stockton E. Water Dist. v. United States, 583 F.3d at 1360.

Even though it is not the government's burden to prove the alleged breach, the defendant nevertheless in its post-trial brief, addressed plaintiff contention that "the Government has provided no alternative theory as to why Petro Mex would shut-in an otherwise productive lease," by suggesting that

the more likely explanation for Petro Mex's cessation[23] of production in October 2008 is that Petro Mex knew the lease was shut-in, decided to produce anyway, and did not report its production or pay royalties because doing so would have put the Field Office on notice that Petro Mex was violating the shut-in order. But, upon receipt of the Civil Penalty and MMS's October 22, 2008 bill for $149,131, Mr. Villalobos likely realized that Petro Mex could get in further serious trouble for producing during the shut-in, and stopped.

(internal reference omitted; footnote added).

The court finds that the parties have sparred with each other relying on speculation about the cause of the cessation of production in October 2008. The parties offered conflicting testimony at trial, even about basic factual matters, such as did or did not Mr. Fancher call Mr. Villalobos in October 2008. Given Mr. Fancher's testimony that the Petro Mex Shut-In Order, issued May 29, 2008, was the first Shut-in Order he ever issued, and given his testimony and practice regarding documentation, numerous examples of which were included as joint exhibits to the trial record before the court, the court finds it less credible that Mr. Fancher would have directed Petro Mex to shut down the wells with only a verbal instruction over the telephone, without subsequently providing a written Shut-In Order to Petro Mex and to the BLM files.[24] As referenced above, there is, however, no record of a written Shut-In Order issued by Mr. Fancher in October 2008 in the record. Based on the record before the court, including the testimony at the trial, the court finds that plaintiff has not met its burden to prove the BLM ordered a shut down in October 2008.

---

[23] The court notes that the trial testimony and the post-trial briefing refer to cessation of production. The term is included in both 30 U.S.C. § 226(i) and 43 C.F.R. § 3107.2-2. See 30 U.S.C. § 226(i) ("No lease issued under this section which is subject to termination because of cessation of production shall be terminated for this cause so long as reworking or drilling operations which were commenced on the land prior to or within sixty days after cessation of production are conducted thereon with reasonable diligence, or so long as oil or gas is produced in paying quantities as a result of such operations."); see also 43 C.F.R. § 3107.2-2 ("A lease which is in its extended term because of production in paying quantities shall not terminate upon cessation of production if, within 60 days thereafter, reworking or drilling operations on the leasehold are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction."). Mr. Hartman's April 1, 2009 letter to Petro Mex also referred to the cessation of production including a reference to 43 C.F.R. § 3107.2-2.

[24] The court notes that in denying the defendant's "motion to dismiss based on the statute of limitations because the breach alleged by plaintiff occurred within 6 years of filing the complaint," Judge Firestone specifically cautioned: "If, after discovery, the evidence establishes that there was no phone call, plaintiff's breach claim will fail on the merits." Petro Mex, LLC v. United States, 122 Fed. Cl. at 541.

Separately, plaintiff alleges that "the government's termination of the Lease in August of 2009 was not permitted by the applicable legal authorities because the Lease had wells that were capable of production and Petro Mex was not provided a 'reasonable time' in which to resume production before termination." Petro Mex contends that

> [i]t wanted to resume production to avoid termination but was prevented from doing so by the BLM's unauthorized order. Regardless, it cannot be found that any period of time that is granted to reestablish production, however long or short, can be considered to be a "reasonable time" to do so where a parties' ability to comply with such order is then simultaneously being blocked by a legally *unauthorized* shut-in order issued by the same entity that granted the period of time. Under the circumstances, the GJFO failed to comply with the requirement that they provide a "reasonable time" to reestablish production on the Lease prior to termination. Therefore, the termination was unlawful and violated Petro Mex's rights under the Lease.

(emphasis in original; alteration added). In its post-trial reply brief, plaintiff argues given the "intractable position that the Field Office took regarding the continuation of the, by then illegitimate, Shut-In Order, and the fact that the Field Office actively prevented Petro Mex from resuming production based upon such, Petro Mex was never given a 'reasonable time' to place the lease back into production."

The statute at 30 U.S.C. § 226(i), "Termination," provides:

> No lease issued under this section which is subject to termination because of cessation of production shall be terminated for this cause so long as reworking or drilling operations which were commenced on the land prior to or within sixty days after cessation of production are conducted thereon with reasonable diligence, or so long as oil or gas is produced in paying quantities as a result of such operations. No lease issued under this section shall expire because operations or production is suspended under any order, or with the consent, of the Secretary. No lease issued under this section covering lands on which there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same unless the lessee is allowed a reasonable time, which shall be not less than sixty days after notice by registered or certified mail, within which to place such well in producing status or unless, after such status is established, production is discontinued on the leased premises without permission granted by the Secretary under the provisions of this chapter.

30 U.S.C. § 226(i) (2018). There are two relevant implementing regulations to 30 U.S.C. § 226. First, 43 C.F.R. § 3107.2-2 provides:

> A lease which is in its extended term because of production in paying quantities shall not terminate upon cessation of production if, within 60 days thereafter, reworking or drilling operations on the leasehold are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction. The 60-day period commences upon receipt of notification

from the authorized officer that the lease is not capable of production in paying quantities.

43 C.F.R. § 3107.2-2 (2022). Second, 43 C.F.R. § 3107.2-3 provides:

No lease for lands on which there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same, unless the lessee fails to place the lease in production within a period of not less than 60 days as specified by the authorized officer after receipt of notice by certified mail from the authorized officer to do so. Such production shall be continued unless and until suspension of production is granted by the authorized officer.

43 C.F.R. § 3107.2-3 (2022).

Plaintiff argues that "[i]n this matter, there is little question that the Garfield Lease contained wells that were capable of production at the time that the April 1, 2009 letter was delivered to Petro Mex from the GJFO [Grand Junction Field Office]," and "[i]t is undisputed that the Lease had several wells that, prior to being shut-in, had a demonstrated and established 'physical capability' to produce oil and gas in paying quantities." (alterations added). Therefore, plaintiff contends that "any non-production issue on the Lease should have been governed by the third exception contained in 30 U.S.C. § 226(i), for leases where production has stopped on a lease having wells that are capable of production." As cited above, the joint stipulated facts provided that

[o]n May 27, 2009, Mr. Villalobos and his friend, John Durham, met with Mr. Hartman, Mr. Fancher, and David Lehmann from the Field Office. Mr. Hartman documented the meeting in a June 16, 2009 letter to Petro Mex that was signed by Catherine Robertson. Mr. Hartman summarized the issues discussed at the May 27, 2009 meeting as including "royalty payments, production reporting, increased bond amounts, past incidents of non-compliance and lease status for the leases operated by Petro-Mex." As to the status of the lease, the letter stated that Petro Mex's response "during the meeting is that the lease is capable of production but without compression the wells are not able to produce." Petro Mex did not have a compressor on the lease from May 2009 to August 2009. In the June 16, 2009 letter, the Field Office directed Petro Mex to provide a "written response to explain the paying status" of the lease within 15 days. The Field Office warned that "failure to provide adequate justification will result in termination of the lease[]."[25]

At the May 27, 2009 meeting, Petro Mex and [sic] Field Office discussed alternatives for demonstrating production. Petro Mex offered to perform

---

[25] As noted above the June 16, 2009 letter stated: "Failure to provide adequate justification will result in the termination of the leases," referring to the Garfield Lease, as well as the Mesa Lease and Esmerelda Lease.

production testing by flow testing the wells, and either venting the gas to the atmosphere or setting a compressor and selling the gas. As to royalties due on production, which were the basis for the October 22, 2008 Notice of Civil Penalty, the June 16, 2009 letter stated that Petro Mex remained delinquent. Mr. Hartman acknowledged Petro Mex's request to modify its royalty amount "in order to pay off fines," but explained that the Field Office lacked authority to "modify lease terms such as royalty rates."

(second alteration in original; footnote added; internal references omitted).

The court notes that pursuant to 43 C.F.R. § 3107.2-3, after notice from Mr. Hartman, Petro Mex was required "to place the lease in production within a period of not less than 60 days as specified by the authorized officer after receipt of notice by certified mail from the authorized officer to do so." 43 C.F.R. § 3107.2-3. As described above, Mr. Hartman's April 1, 2009 letter to Petro Mex providing notice, which stated in full:

Dear Sirs,

Our records indicate Federal lease COC0124705A last produced in October 2008. There are five wells on the lease and all are operated by Petro Mex, LLC. All of the wells are located in T8S, RI0W in Garfield County, CO.

Federal 15-9 Government 9 Government 5 Government 6 Federal 6-9

A field inspection in March 2009 found that the field compressor had been removed which eliminates the possibility of production from the wells.

We have determined that the lease is not capable of production in paying quantities. Under 43 CFR 3107.2-2, a lease which is in it its extended term because of production in paying quantities shall not terminate upon cessation of production if, within 60 days thereafter, reworking or drilling operations are commenced on the leasehold and are conducted with reasonable diligence during the period of nonproduction. You are allowed 60 days from the receipt of this letter to restore production in paying quantities to the leasehold.

If justification that the lease is capable of production in paying quantities is not submitted within 60 days from receipt of this letter, the lease will automatically terminate.

If you have any questions, please contact me at (970) 244-3041.

Sincerely,

Bob Hartman

Petroleum Engineer

The court notes that Mr. Hartman's April 1, 2009 letter cited to the regulation at 43 C.F.R. § 3107.2-2, instead of 43 C.F.R. § 3107.2-3, which the court believes would have been the proper regulation to include in the April 1, 2009 letter. Nonetheless, the court does not believe Mr. Hartman's citation to 43 C.F.R. § 3107.2-2, instead of on 43 C.F.R. § 3107.2-3 changes the court's analysis, as both regulations establish a 60 day timeframe requiring the lessee to resume production after receiving the letter from the BLM, as 43 C.F.R. § 3107.2-2 provides "within 60 days thereafter," and 43 C.F.R. § 3107.2-3 provides "within a period of not less than 60 days." Compare C.F.R. § 3107.2-2, with 43 C.F.R. § 3107.2-3. The regulation at 43 C.F.R. § 3107.2-2 provides:

> A lease which is in its extended term because of production in paying quantities shall not terminate upon cessation of production if, within 60 days thereafter, reworking or drilling operations on the leasehold are commenced and are thereafter conducted with reasonable diligence during the period of nonproduction. The 60-day period commences upon receipt of notification from the authorized officer that the lease is not capable of production in paying quantities,

and 43 C.F.R. § 3107.2-3 provides:

> No lease for lands on which there is a well capable of producing oil or gas in paying quantities shall expire because the lessee fails to produce the same, unless the lessee fails to place the lease in production within a period of not less than 60 days as specified by the authorized officer after receipt of notice by certified mail from the authorized officer to do so. Such production shall be continued unless and until suspension of production is granted by the authorized officer.

See 43 C.F.R. § 3107.2-2; 43 C.F.R. § 3107.2-3 (emphasis added).

Moreover, the requirements of 43 C.F.R. § 3107.2-3 required Petro Mex to "place the lease in production within a period of not less than 60 days as specified by the authorized officer after receipt of notice by certified mail from the authorized officer to do so," which is consistent with the instructions in Mr. Hartman's April 1, 2009 letter to Petro Mex, providing plaintiff "60 days from the receipt of this letter to restore production in paying quantities to the leasehold."[26]

---

[26] Mr. Hartman had the following exchange on direct examination with defendant's counsel:

> [Q.] [T]here's a reference to the next paragraph: "We have determined that the lease is not capable of production in paying quantities." And that appears to be somewhat a term of art, but what is production in paying quantities?

Under either 43 C.F.R. § 3107.2-2 or 43 C.F.R. § 3107.2-3, the court would still be required to determine if Petro Mex was producing under the terms of the Lease and if Petro Mex did so within the 60 day timeframe after being notified by Mr. Hartman. As noted above, during his trial testimony, Mr. Hartman explained the April 1, 2009 letter he sent to Petro Mex as follows:

> This is a letter that's commonly referred to as a 60-day letter but more appropriately potential lease termination letter. And it's telling the lessees of a lease that they -- the BLM has reviewed the production and it appears that the wells are no longer capable -- or the lease is no longer capable of production.
>
> Q. Okay.
>
> A. And we ask -- yes.
>
> Q. And I didn't mean to cut you off there if I did, but how many such 60-day letters have you issued in your career?
>
> A. I don't know, maybe 500. It's one of our most common letters. It's the really only way that leases are terminated. They have -- the lessees, per the regulations, are required to be given notification that, hey, this lease is in danger, please respond.
>
> Q. Okay. And in your experience, how do operators usually respond?
>
> A. One of three ways. They'll ignore it; or just -- yeah, they can ignore it, which is an option. They'll return the wells to production with proper notification. Or those are the only real -- really two options.

Defendant's counsel questioned Mr. Hartman about the language in the 60 day letter that stated: "If justification that the lease is capable of production in paying quantities is not submitted within 60 days from receipt of this letter, the lease will automatically terminate," and asked Mr. Hartman:

> [Q.] [H]ow could Petro Mex have shown justification that the lease is capable of production in paying quantities?

---

> A. The definition of that is that a lease has to produce enough gas to pay for the operational cost, the monthly operational cost, and pay for the -- the associated royalties or overriding royalties that are associated with that lease with a -- with some kind of profit.

(alterations added).

A. Well, I guess a couple ways. They could have put a compressor onsite and produced the wells. Obviously if they were shut in at that time, they would have had to eliminate that hurdle before that. The other option that was suggested by Petro Mex in one of the meetings I guess we're going to talk about, but that idea of venting the gas to the atmosphere, doing what we would call an absolute open flow testing of the wells, where gas is vented to the atmosphere or measured and then vented to the atmosphere.

(alterations added).

Between April 1, 2009 and June 16, 2009, Petro Mex and BLM exchanged numerous letters. In May 2009, in response to the 60 day letter, Mr. Villalobos, on behalf of Petro Mex, sent a letter to Mr. Hartman, which stated, in part:

Pursuant to our conversation on May 5th, 2009,[27] Petro-Mex LLC would be willing to pay off what fines that have been levied against Petro-Mex_@12 ½% of total production

. . .

Petro-Mex disagrees with the M.M.S. fine. The royalties have- been paid. The paper work wasn't filed on time. $150,000.00 is a little steep for 8 months of reports that wasn't filed on time. The people in charge of filing paperwork have been replaced.

(punctuation in original; alteration added). Additionally, Mr. Hartman discussed Petro Mex's response to the 60 day letter with defendant's counsel at trial.

[Q.] [D]o you recall when after [sic] you sent this letter if Petro Mex contacted you?

A. I don't remember contacting, but reading through the case file in the last couple days indicated that we were contacted.

Q. Okay. And that actually takes me to if you go to JX 39 [Joint Exhibit 39], and at trial page 110, and this is a letter -- it's a typed letter from Petro Mex, and it -- and whose handwriting is that up near the top?

A. That's my handwriting, showing the lease number and how we received it.

---

[27] As noted above, during Mr. Villalobos' trial testimony, in response to the question, "so did you actually call Mr. Hartman after receiving this letter?" Mr. Villalobos testified, "I don't know. I think John [Durham] did. I didn't call Bob, no." (alteration added). Mr. Villalobos testified, regarding the 2009 letter, "I told Linn [Wilson] to write it up and I sign it. I don't know who wrote it, Linn or Susan [Wilson] or Barbara [Sonnier]. I don't know who did." (all alterations added).

Q. And --

A. It was sent certified and received on May 20th, the letter was.

Q. Okay. And then in the first paragraph, it refers to a conversation on May 5th, 2009. Do you recall speaking with Petro Mex on May 5th, 2009?

A. I do not remember specifically, no.

Q. Okay. What about references to, like, the compressors being stolen and this list of equipment? Was this necessary information for you to know?

A. It didn't seem to be applicable to what our desire was to have the leases paid or to get the leases back on production. No, it did not.

Q. Is there any reference in this letter about Petro Mex having any kind of justification for returning the wells to production in paying quantities?

A. No. I don't see any reference.

Q. Okay. And then there's at the very bottom a reference to an MMS fine and royalties, but to your understanding, does BLM have any involvement with the MMS fine or royalties?

A. No, we do not.

Q. And then there's also –

A. Not that I'm aware of, we don't have any. Definitely not at the field office level.

(alterations added).

As described above, the parties have stipulated:

On May 27, 2009, Mr. Villalobos and his friend, John Durham, met with Mr. Hartman, Mr. Fancher, and David Lehmann from the Field Office. Mr. Hartman documented the meeting in a June 16, 2009 letter to Petro Mex that was signed by Catherine Robertson.

The June 16, 2009 letter from Ms. Robertson began:

Dear Mr. Villalobos,

Reference is to your undated letter that was received in this office on May 20, 2009. This letter stated that Petro-Mex would be willing to pay 12.5% of total production in order to pay fines that had been levied against your company. The letter listed equipment with their values that had been "lost". You state that Franks Oil Field Service has had to file bankruptcy due to uncollected invoices and that Petro-Mex disagrees with the M.M.S fine as "the royalties have been paid". A copy of your letter is attached. On May 27, 2009 a meeting was held in this office to discuss these issues. Those attending were you and John Durham with Petro-Mex and Bob Hartman, David Lehmann and Ed Fancher with the BLM. Issues discussed were royalty payments, production reporting, increased bond amounts, past incidents of non-compliance and lease status for the leases operated by Petro-Mex.

The parties also stipulated:

As to the status of the lease, the letter stated that Petro Mex's response "during the meeting is that the lease is capable of production but without compression the wells are not able to produce." Petro Mex did not have a compressor on the lease from May 2009 to August 2009. In the June 16, 2009 letter, the Field Office directed Petro Mex to provide a "written response to explain the paying status" of the lease within 15 days. The Field Office warned that "failure to provide adequate justification will result in termination of the lease[]."

At the May 27, 2009 meeting, Petro Mex and [sic] Field Office discussed alternatives for demonstrating production. Petro Mex offered to perform production testing by flow testing the wells, and either venting the gas to the atmosphere or setting a compressor and selling the gas. As to royalties due on production, which were the basis for the October 22, 2008 Notice of Civil Penalty, the June 16, 2009 letter stated that Petro Mex remained delinquent. Mr. Hartman acknowledged Petro Mex's request to modify its royalty amount "in order to pay off fines," but explained that the Field Office lacked authority to "modify lease terms such as royalty rates."

(first alteration in original; internal reference omitted). The June 16, 2009 letter to Petro Mex, which was admitted as a joint exhibit at trial, stated:

This office requested a bond increase from Petro Mex due to large liability on your leases. Your history of non-compliance with on the ground operations and apparent failure to report timely to the MMS led this office to require this bond increase. Our letter was dated August 25, 2008 and asked for a response from Petro Mex within 30 days of receipt of the letter. You addressed this issue in our May 27 meeting indicating that Petro Mex was unwilling or unable to provide this increase in bond amount. As noted above, your May 20, 2009 letter requested an increase in royalties in order to pay

111

off fines. This office does not have the authority to modify lease terms such as royalty rates. Your failure to keep current with royalty obligations gives us no comfort that you will with future obligations. The failure to respond to requests for well completion information, bond increase requests and lease production data is also troubling. We will forward your request to our state office for their review but at this time will not recommend approval.

The June 16, 2009 letter continued:

Your letter [undated letter from Petro Mex that was received by BLM on May 20, 2009] stated that you disagree with the Mineral Management Service fines and royalties had been paid. In our meeting you reiterated that you were current with royalty payments. We have talked to MMS personnel in Denver concerning royalties and fines that are due. It is our understanding that minimum royalties may be current for the two producing leases but the royalties that are due on production are not current. The failure to pay production royalties is the basis for the penalties as outlined in the Notice of Civil Penalty letter dated October 22, 2008.

(alteration added).

Regarding the June 16, 2009 letter to Petro Mex, the joint stipulated facts also stated:

As to the bond, the letter stated that Petro Mex indicated it "was unwilling or unable to provide" the required increase in the amount of its bond to $100,000. BLM issued an "order of the authorized officer" to increase the bond and directed Petro Mex to respond in writing to the August 25, 2008 letter within 20 days. BLM warned that failure to submit the required bond "will" result in "an assessment of $250. . . and lease cancellation." In the June 16, 2009 letter, BLM issued an "order of the authorized officer" directing that "[a]ll production is to remain shut in" on the Garfield lease "until Petro-Mex satisfies the increased bond request and all fines are paid to [MMS]." BLM warned that "[f]ailure to abide by this order will result in an assessment of $250. . . and civil penalties."

(alterations in original; internal references omitted).[28] The parties further stipulated that "[t]he June 16, 2009 letter informed Petro Mex of its appeal rights," and "[t]he June 16,

---

[28] The original language of Joint Exhibit 44 states: "All production is to remain shut in on leases COC-0124705A and COC-088586 until Petro-Mex satisfies the increased bond request and all fines are paid to Mineral Management Service This is an order of the authorized officer. Failure to abide by this order will result in an assessment of $250.00 under 43 CFR 3163.1(a)(2) and civil penalties."

2009 letter was delivered to Petro Mex by certified mail, first class mail, and hand delivery." Mr. Villalobos testified that Petro Mex did not appeal.

Regarding the May 27, 2009 meeting and June 16, 2009 letter, defendant's counsel had the following exchange with Mr. Hartman:

[Q.] [D]id Petro Mex ever -- when it comes to the paying status, did Petro Mex ever ask permission from you to take any steps related to demonstrating an ability to produce in paying quantities from the Garfield lease?

A. Not that I remember.

Q. Did the shut-in prevent Petro Mex from flow-testing the wells for purposes of demonstrating ability to produce in paying quantities?

A. I think with the request -- I'm looking back, if they had requested it, we probably could have gotten around that shut-in order to actually allow testing, but as far as I know, they did not.

Q. So what do you mean by that? So gotten around the shut-in order, so --

A. We could have -- we could have worked -- worked with them with the idea that -- two options. We could have extended the so-called 60-day letter to additional time until things got straightened out on the INCs [Incidents of Noncompliance], the shut-in orders, or we could have worked out the idea of flow-testing versus installing compressors, but that 60 days obviously -- well, it's not obvious here, but that 60 days is flexible as long as we're receiving feedback from the operator that they're wanting to do something.

Q. And so when you say it's flexible and could have extended it, why didn't you extend the 60-day letter?

A. It wasn't apparent to me that they were actually interested in continuing in responding to any of our information requests.

(alterations added).

According to the joint stipulated facts,

[o]n July 21, 2009, Mr. Hartman sent a memorandum to the [Colorado BLM] State Director stating that on April 1, 2008,[29] [sic] Petro Mex was notified "of the potential termination of the lease due to lack of paying production."

---

[29] The July 21, 2009 memorandum identified the date of the letter as April 1, 2009, not April 1, 2008.

Mr. Hartman went on to state that, "to date no verbal or written intent to reestablish production on the lease has been received." Mr. Hartman then stated that "it is recommended the lease terminate due to lack of production."

(alterations and footnote added). The memorandum stated in full:

> Memorandum
> To:                       State Director (CO-922)
> From:                   Petroleum Engineer, Grand Junction Field Office
> Subject:                Last Oil and Gas Production – COC-0124705A
> Last Production Date:    October 2008
> By a letter dated April 1, 2009, Petro-Mex Resources, operator and lessee on the subject lease, was notified of the potential termination of the lease due to a lack of paying production. The lessee was notified by certified mail, a copy sent by first class mail and another copy delivered by BLM law enforcement personnel. The certified mail letter was not accepted and was returned as unclaimed. Assuming a 5 day mail delivery timeframe effective notification of the lessee is on April 6, 2009. A follow up letter dated June 16, 2009 provided additional information and additional time. To date no verbal or written intent to reestablish production on the lease has been received.
>
> It is recommended the lease terminate due to lack of production. Please notify lessee of your decision.

Regarding the line "[t]o date, no verbal or written intent to reestablish production on the lease has been received," plaintiff's counsel and Mr. Hartman had the following exchange:

> [Q.] Hadn't they [Petro Mex] indicated a willingness to reestablish production on the lease if you'd work with them?
>
> A. Not in my mind. They were talking about venting. It was about their only option that they gave me.
>
> Q. Do you think this memo gives the impression that Petro Mex wasn't even talking to you guys?
>
> A. That's fair.
>
> Q. It doesn't really represent all the communications and the things that they had said, does it?
>
> A. No, it doesn't.

114

Q. Missing a lot of context.

A. That's correct.

(alteration added). At trial, Mr. Hartman and defendant's counsel also had the following exchange:

A. This is a recommendation to the state office to essentially terminate the lease. It explains what we did, when we did it, and who we notified. And based on the previous -- or our 60-day letter, no -- no valid response was received, and we recommended the lease be terminated.

Q. And so you say at the end of that first paragraph, "To date no verbal or written intent to reestablish production on the lease has been received." Do you see that?

A. Yes.

Q. And so had you attempted to -- I mean, did you have an obligation to call Petro Mex, just to see what they wanted to do with the lease?

A. No, I don't -- I didn't have any. I thought we had done what we could.

According to the joint stipulated facts:

Petro Mex stated that at the May 27, 2009 meeting "production testing was discussed. We stated that we could flow test the wells and vent the gas or set a new compressor. To go to sales both plans were not acceptable." Petro Mex then stated that, "at this time Petro Mex can't figure out a way to test [the wells]." Petro Mex stated it was "investigating the MMS payment," and stated that "if any royalties have not been paid, they will be." Petro Mex stated that it was "currently working on the increase of the bond amount." Petro Mex confirmed "[t]he wells are still shut-in."

(alterations in original). Mr. Hartman further testified that

My reaction [to Petro Mex's response] was that there was -- and, then, they -- at the bottom of the letter, they talk about -- well, we had discussed flow testing and installation of compressor, and they made a statement that -- that I guess that the BLM didn't think that that was acceptable, and Petro Mex couldn't figure out a way to test them. And my reaction is I don't think it changed anything in regards to what -- where BLM was headed with recommending the termination of the leases.

Q. Well, why not? Was it -- why not? Why didn't it change anything?

115

A. There was really no plan here other than they said they didn't know what to do. That's what I got out of this.

. . .

[Q.] was it your overall impression that this -- that this just wasn't a solution or an adequate response to the June 16th letter even?

A. I don't think it was a valid response. What we were after -- what we were after throughout the discussions and the letters was continuous production.

Q. Okay, so --

A. And I didn't think this was an acceptable response.

(alterations added). On direct examination with defendant's counsel, Mr. Hartman had the following exchange:

Q. And so this letter, you at least received it August 6th, 2009, and you had earlier made the recommendation to terminate the lease for nonproduction on -- I believe that was August -- don't let me get my dates wrong -- on July 21st, 2009, but after receiving this letter via fax, did you consider taking back your recommendation for the -- the recommendation to terminate?

A. No, I did not. And I just -- and I didn't see any viable solution that they were proposing. They weren't really voluntarily -- they weren't proposing anything that was going to fix it other than actual production. And I didn't even see that.

Q. Mm-hmm. was there any further correspondence with Petro Mex after this letter was faxed to you regarding the showing [sic] production of paying quantities?

A. I don't believe so.

Q. And so did the [BLM's Colorado] state office eventually accept your recommendation to terminate the lease?

A. I believe so. I believe the leases were terminated -- or attempted to be.

(alterations added). The parties jointly stipulated:

In an August 26, 2009 decision, BLM's Colorado State Office terminated the Garfield Lease. As grounds for the termination, the State Office explained that "the Grand Junction Field Office has determined that this lease was no longer capable of producing oil and gas in paying quantities after October 1, 2008." The State Office went on to state that "as no evidence of new production has been received the lease terminated the same date."

Defendant, reflecting on the above timeline, claims:

From the original 60-Day Letter sent on April 1, 2009 (and assuming five days for delivery, or to April 6, 2009), Mr. Hartman had patiently given Petro Mex 107 days to provide justification that the lease was capable of production in paying quantities before recommending that the lease terminate due to lack of production. The goal of the Field Office is to have productive wells, not to have wells sit idle for months on end, and that goal was met when Mr. Hartman finally recommended termination after 107 days; see 43 C.F.R. § 3162.7–1(a) ("The operator *shall* put into marketable condition, if economically feasible, all oil, other hydrocarbons, gas, and sulphur produced from the leased land.") (emphasis added). Moreover, the State Office did not issue the decision terminating the lease until August 26, 2009, on the basis that the "lease was no longer capable of producing oil or gas in paying quantities after October 1, 2008. As no evidence of new production has been received the least terminated the same date." Thus, Petro Mex had received a total of *143 days* to demonstrate production in paying quantities, well beyond the 60 days required by the regulations.

(emphasis in original; internal references omitted). Defendant also notes that "Petro Mex never defines what it considers would have been a 'reasonable time' to restore production."

Plaintiff contends that

Petro Mex's position on this question is the same as that of the IBLA [Interior Board of Land Appeals] opinion: That the clock providing a "reasonable time" to begin production could not even begin to start ticking until the Field Office lifted the Shut-In Order and provided Petro Mex with a legitimate opportunity to actually do what was being demanded of them, restore active production from the lease.

Plaintiff references the September 27, 2010 Interior Board of Land Appeals decision reversing the decision to terminate the Garfield Lease. As noted above, the Interior Board of Land Appeals held:

Petro Mex repeatedly represented that it would and could restore production if the May 2008 shut-in orders were lifted; GJFO [Grand Junction Field Office] refused to lift its orders, which were still in place when BLM terminated these leases on August 26, 2009. Although they state that all wells would remain shut-in until "all compliance issues are resolved," we interpret this language in the context of the facts presented as referring to the violations identified by GJFO in its NOICs [Notices of Incidents of Noncompliance] to Petro Mex.

. . .

> GJFO erroneously refused to lift and required continuing compliance with its May 2008 shut-in orders. The record shows Petro Mex could restore its wells to producing status if those orders were lifted. Until GJFO lifts those orders and gives notice to Petro Mex under 43 C.F.R. § 3107.2-3, BLM cannot terminate these leases for nonproduction. If it intends to pursue lease termination under 30 U.S.C. § 226(i), BLM must allow Petro Mex a reasonable time in which to place its wells in a producing status after such notice is given. Cf, Coronado Oil Co., 164 IBLA at 326. Simply stated, there can be no termination of these leases by operation of law under the circumstances of this case.

(internal citations omitted; alterations added). Although Petro Mex cites to and tries to rely on the reasoning of the Interior Board of Land Appeals decision in its submission, as defendant correctly notes:

> Petro Mex largely adopts the reasoning of the IBLA [Interior Board of Land Appeal], in that it was unlawful for BLM to terminate the lease (in the manner that it did with termination, versus cancellation) because the shut-in order prevented production. But with respect to *this* breach of contract claim, Petro Mex alleges that the Field Office referred to the wrong regulation in the 60-Day Letter and further argues that the Field Office should have given it "reasonable time" to re-establish production.

(alteration added; emphasis in original; internal reference omitted). Defendant noted that Mr. Hartman testified at trial in the above captioned case that the BLM provided Petro Mex 107 days to provide the justification that the Garfield Lease was capable of production in paying quantities before recommending that the Garfield Lease be terminated. Defendant argues that, at the time the Garfield Lease was terminated, "Petro Mex had received a total of *143 days* to demonstrate production in paying quantities, well beyond the 60 days required by the regulations." (emphasis in original; internal citations omitted). Defendant also emphasizes that Petro Mex never asked the BLM's permission "to take any steps related to demonstrating an ability to produce in paying quantities from the Garfield lease."

Plaintiff challenges the government's arguments and the credibility of Mr. Hartman. Plaintiff claims that

> [t]o make this argument, they rely heavily on the trial testimony of Robert Hartman who testified (according to the Government) that "he did not remember Petro Mex ever asking permission to take any steps related to demonstrating an ability to produce in paying quantities, and he thought that 'if they had requested it, we probably could have gotten around that shut-in order to actually allow testing, but as far as [he] knew, they did not.'" The Government additionally argues, again based on Mr. Hartman's testimony,

> that he would have "worked with" Petro Mex to allow them to demonstrate production, that the deadlines were "flexible," and, ultimately, that it was Petro Mex that was unwilling to prove that the wells were in fact productive. Based upon the available documentation from that time period and Mr. Hartman's prior statements, this testimony regarding the purported "flexibility" of the Field Office cannot be considered credible.

(internal references omitted; second alteration in original). As quoted above, the court finds Mr. Hartman's testimony with defendant's counsel regarding the May 27, 2009 meeting and June 16, 2009 letter credible. Mr. Hartman and defendant's counsel had the following exchange:

> [Q.] [D]id Petro Mex ever -- when it comes to the paying status, did Petro Mex ever ask permission from you to take any steps related to demonstrating an ability to produce in paying quantities from the Garfield lease?
>
> A. Not that I remember.
>
> Q. Did the shut-in prevent Petro Mex from flow-testing the wells for purposes of demonstrating ability to produce in paying quantities?
>
> A. I think with the request -- I'm looking back, if they had requested it, we probably could have gotten around that shut-in order to actually allow testing, but as far as I know, they did not.
>
> Q. So what do you mean by that? So gotten around the shut-in order, so --
>
> A. We could have -- we could have worked -- worked with them with the idea that -- two options. We could have extended the so-called 60-day letter to additional time until things got straightened out on the INCs [Incidents of Noncompliance], the shut-in orders, or we could have worked out the idea of flow-testing versus installing compressors, but that 60 days obviously -- well, it's not obvious here, but that 60 days is flexible as long as we're receiving feedback from the operator that they're wanting to do something.
>
> Q. And so when you say it's flexible and could have extended it, why didn't you extend the 60-day letter?
>
> A. It wasn't apparent to me that they were actually interested in continuing in responding to any of our information requests.

(alterations added).

After carefully considering the testimony at trial, as well as reviewing the exhibits in the record, the court disagrees with plaintiff's assertions that Mr. Hartman's "testimony

regarding the purported 'flexibility' of the Field Office cannot be considered credible." The numerous quotations from the trial record included above, as well as the joint exhibits introduced in the record, demonstrate continuing efforts by the BLM, including by Mr. Hartman, to try and give Petro Mex sufficient time to resolve plaintiff's myriad, outstanding, documented issues. The numerous attempts by BLM to work with Petro Mex and the length of time the BLM allowed Petro Mex to try to resolve its issues speaks to the flexibility by the agency, as well as that Petro Mex's failure to respond to communications from the agency regarding issues at plaintiff's wells paints a different picture. The parties' joint stipulated facts reflect that on April 1, 2009, "Robert Hartman sent a letter to Petro Mex stating that BLM's records showed Petro Mex had 'last produced in October 2008,' and removal of the field compressor 'eliminates the possibility of production from the wells.'" The April 1, 2009 letter to Petro Mex gave Petro Mex 60 days to "restore production in paying quantities." After that time, on May 27, 2009, Mr. Villalobos and John Durham met with Mr. Hartman, Mr. Fancher, and David Lehmann from the Field Office. After the meeting, the meeting was memorialized in a June 16, 2009 letter from the Field Office. The joint stipulated facts provide: "In the June 16, 2009 letter, the Field Office directed Petro Mex to provide a 'written response to explain the paying status' of the lease within 15 days. The Field Office warned that 'failure to provide adequate justification will result in termination of the lease[].'" (alteration in original). Mr. Hartman testified that on July 16, 2009, well past the 15 days after Petro Mex received the June 16, 2009 letter, he drafted a memorandum which was a "recommendation to the state office to essentially terminate the lease. It explains what we did, when we did it, and who we notified. And based on the previous -- or our 60-day letter, no -- no valid response was received, and we recommended the lease be terminated." As noted above, Mr. Hartman and defendant's counsel had the following exchange:

> Q. And so you say at the end of that first paragraph, "To date no verbal or written intent to reestablish production on the lease has been received." Do you see that?
>
> A. Yes.
>
> Q. And so had you attempted to -- I mean, did you have an obligation to call Petro Mex, just to see what they wanted to do with the lease?
>
> A. No, I don't -- I didn't have any. I thought we had done what we could.

Finally, the amount of time that elapsed between the determination that the Garfield Lease was no longer capable of production on October 1, 2008 and the decision to terminate the Garfield Lease on August 26, 2009, was 143 days, which suggests that the BLM was not attempting to terminate the Lease immediately after the 60 days, but was willing to give Petro Mex time to attempt to demonstrate that the Lease was capable of production.

This is not to say that the BLM and Mr. Hartman handled everything perfectly in this case. As noted above, the court believes Mr. Hartman's correspondence with Petro

Mex should have referenced C.F.R. § 3107.2-3, instead of 43 C.F.R. § 3107.2-2. Defendant argues the distinction between the regulations

> splits hairs, as *both* of the regulations seek the end goal of the operator returning a lease to production in paying quantities within 60 days. See 43 C.F.R. §§ 3107.2-2, 3107.2-3. Moreover, Petro Mex's argument improperly seeks to inject a question of Mr. Hartman's subjective state of mind into the breach of contract analysis, suggesting the Field Office could somehow breach the lease even if it did everything right, but did so merely "accidentally."

(emphasis in original). Although not determinative in the above captioned case, the court believes it is important for agencies and agency representatives to use the correct regulations when communicating with public, especially in situations like in this case when the termination of the plaintiff's interest was at stake.

Furthermore, Mr. Hartman was not at all times a model of professionalism as it related to his working relationship with Petro Mex. During the trial, defendant counsel's had Mr. Hartman review an email with the subject line: "Petro Mess."

> [Q.] I do have to ask, the subject Says Petro Mess. Is there a reason why you put Petro Mess instead of Petro Mex?

> A. It's probably a sign of my frustration with dealing with Petro Mex at the time. Carol [Snyder] had been out. I believe she was responsible for Petro Mex at the time, and she was -- she was having -- she had some concerns about their responsiveness, I believe, and I think that's when we may have started the bond review, or just a review of the well status of their wells.

(alterations added). Mr. Hartman had the following exchange on cross-examination with plaintiff's counsel:

> [Q.] [Y]ou testified here, and you put in the subject line Petro Mess.

> A. Yes.

> Q. And I think you -- I think you told Ms. Westercamp [defendant's counsel of record] that that was not a typo, for lack of a better term.

> A. That's correct.

> Q. Were you already frustrated with Petro Mex at this point in time?

> A. I may have been frustrated. I think the inspectors were also frustrated.

> Q. Was Ms. Snyder expressing frustration to you with him -- with them?

A. If I remember correctly, yes, but it was my -- it was my deal there to call them.

Q. So it was kind of just a joke, or --

A. I considered it at the time funny, but not right now.

(alterations added).

Furthermore, defendant's counsel and Mr. Villalobos had the following exchange on cross-examination at trial regarding Mr. Hartman:

[Q]. [B]ut why did you get the impression that Mr. Hartman didn't like you?

A. Because the first thing, that since the day one, when I bought this property, I send men to do the paperwork, and he testified that Mr. -- one of the guys -- I can't say exactly which one it was, but I believe that it was Bob, he asked Linn if he was U.S. citizen. So I -- from that day one, I feel that I been discriminated until yesterday, because I -- I got a part owner right next to my property, and you know who that is, that's Walter Fees, and they never, never INC [incidents of noncompliance] him like they do to me. He is a white man. So I feel I been discriminated whole time.

(alterations added).

Although troubled by the email reference to "Petro Mess" and Mr. Villalobos' heartfelt testimony about his experience with Mr. Hartman, nevertheless, the court finds Mr. Hartman credible in his testimony that the BLM provided Petro Mex a lengthy amount of time to try and resolve all open issues with the Garfield Lease and, further, that Mr. Hartman and the BLM would have been willing to work with Petro Mex if Petro Mex had made any efforts to resolve the outstanding, identified problems that the government had observed with respect to the Garfield Lease. The identified violations during the time periods at issue on the Garfield Lease, both minor and major, were real as testified to at trial, and even some admitted to by Petro Mex personnel. In addition, the government's view of the violations at Petro Mex's wells were documented in the trial record. Moreover, the government identified the issues of production of the wells in correspondence with Petro Mex well in advance of the termination of the Garfield Lease. Based on the record before the court, including the testimony at trial, plaintiff has failed to demonstrate that Petro Mex did not receive reasonable allowances from the government, including a reasonable amount of time to resolve the issues with the Garfield Lease under the relevant statutes and regulations. In sum, the testimony and exhibits in the trial record, when read in conjunction with the operative statutes and regulations, do not demonstrate that the government breached plaintiff's Garfield Lease.

Prior Material Breach

Even if plaintiff could have demonstrated its claims were timely and could have demonstrated that the government had committed a breach, defendant alleges that "Petro Mex committed more than one prior material breach, which individually and collectively excused any subsequent breach by the United States." Specifically, defendant argues "Petro Mex materially breached the Lease by failing to report and pay royalties on production, and failing to pay the resulting civil penalty," "Petro Mex materially breached the Lease by refusing to increase its bond, as ordered," and "Petro Mex materially breached the Lease by removing hydrocarbons while the Lease was shut-in. . . ." Therefore, defendant argues, "[t]he Court should not consider this affirmative defense on the merits, but reject it as having been waived. See Strategic Housing Fin. Corp., 87 Fed. Cl. at 189." (alteration added). Plaintiff concedes:

> For the record, Petro Mex does not contest the Government's assertion that Petro Mex breached the lease by failing to report and pay royalties on production or pay the resulting civil penalty. Petro Mex also does not contest the Government's assertion that Petro Mex, at least initially, breached the lease by failing to increase its reclamation bond when demand was made.[30]

(footnote added).

Defendant also argues that plaintiff's claim of waiver is an affirmative defense, and "Petro Mex did not identify waiver as an affirmative defense until now, long after discovery has closed and the opportunity to elicit testimony at trial has passed." Defendant does note, however, that the issue of prior material breach was included in the parties' jointly submitted March 26, 2021 joint issues of fact and law filed close to the time of trial. In its post-trial brief, and in response to defendant's prior material breach arguments, plaintiff claims:

> Petro Mex asserts that any prior material breach of the Lease by Petro Mex did not excuse the Government from performing its own obligations under the Lease because the Government took no steps and made no effort to cancel the Lease for such breaches at the time, instead electing to continue the Lease. Pursuant to such election, the Government waived any right. . . .

Joint Issue of Law number 8 prepared for trial by plaintiff and defendant, stated in its entirety:

---

[30] In its post-trial brief, plaintiff contends: "Petro Mex does not concede that it breached the lease by removing hydrocarbons from the lease between August and October of 2008 for reasons already stated in its Post-Trial Brief and above. However, given the other two breaches, this particular breach is likely irrelevant to the Court's analysis of the prior material breach issue."

8. Whether Petro Mex's actions or omissions, alone or in combination, constituted a prior material breach of the Lease providing grounds to excuse any subsequent breach by the United States, including:

a. Whether Petro Mex's actions or omissions relating to production and royalty reporting, payment of royalties on production, or payment of a Civil Penalty breached § 2(d) of the Lease or any applicable statute, rule, or regulation.

b. Whether Petro Mex's actions or omissions relating to bonding requirements breached § 2(a) of the Lease or any applicable statute, rule, or regulation.

c. Whether Petro Mex's resumption of production in August 2008 or at any date thereafter breached the Lease or any applicable statute, rule, or regulation.

Regarding prior material breach, the United States Court of Appeals for the Federal Circuit stated:

We have held that "through its continued performance of the contract, the government [may waive] any claim for prior material breach." Barron [Bancshares, Inc. v. United States], 366 F.3d [1360], 1383 [(Fed. Cir. 2004)]; see also Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1360 (Fed. Cir. 2005) ("A party to a contract may waive the breach of an agreement by the continued acceptance of performance by the breaching party without reservation of rights."); cf. Old Stone Corp. v. United States, 450 F.3d 1360, 1371 n. 6 (Fed. Cir. 2006) (discussing differences between doctrines of waiver and election). We have also stated in this context that "[w]aiver is an affirmative defense, as to which the breaching party bears the burden of proof." Westfed, 407 F.3d at 1360.

Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1252 (Fed. Cir. 2007) (second, third, and fourth alterations added); see also Hahnenkamm, LLC v. United States, 147 Fed. Cl. 383, 389 (2020).

In its post-trial reply brief, plaintiff indicates:

Petro Mex agrees that, at least for the purpose of establishing what party has the burden of proof for establishing the waiver of possible claims for prior material breach, waiver is an affirmative defense. See Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1252 (Fed. Cir. 2007) ("We have also stated in this context that '[w]aiver is an affirmative defense, as to which the breaching party bears the burden of proof.'" (quoting Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1360 (Fed. Cir. 2005)). However, this does not mean that a party necessarily must specifically identify this particular affirmative defense to an affirmative defense at any particular point in a matter or deem the waiver argument waived, and the case cited by the Government for this proposition, Strategic Housing Fin. Corp., 87 Fed. Cl. 183, 189 (2009) does not state as much.

The court agrees with plaintiff that the holding in the Strategic Housing decision, cited in defendant's post-trial brief referenced above, does not provide that the failure to raise an affirmative defense at a particular time constitutes waiver. As indicated by a Judge of this court in Strategic Housing,

> plaintiff never presented its "black box" discussion during prior briefing and withheld doing so until after the court rendered a decision that was adverse to plaintiff. In fact, plaintiff concedes that it raises this "black box" discussion in its motion to amend for the first time. See Mot. 5 (indicating that this discussion constitutes "additional background"). "[A]n argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived and not preserved for appeal." Bluebonnet Sav. Bank, F. S.B. v. United States, 466 F.3d 1349, 1361 (Fed. Cir. 2006); see also United States v. Ford Motor Co., 463 F.3d 1267, 1277 (Fed. Cir. 2006) (explaining that "[a]rguments raised for the first time in a reply brief are not properly before this court" and that "[i]t is unfair to consider an argument to which the government has been given no opportunity to respond"); Norman v. United States, 429 F.3d 1081, 1091 n. 5 (Fed. Cir. 2005) (adhering to the rule that arguments raised for the first time in a reply brief are not properly before the court); Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (stating that raising an issue "for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief-they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration"); Goulding v. United States, 929 F.2d 329, 333 (7th Cir. 1991) (indicating that arguments presented post-trial and post-decisional briefing are deemed waived because they should have been made "at a much earlier stage in these proceedings"); Ironclad/EEI v. United States, 78 Fed. Cl. 351, 358 (2007) (noting that "under the law of this circuit, arguments not presented in a party's principal brief to the court are typically deemed to have been waived" and explaining that "courts are constrained to find, '[a]s a matter of litigation fairness and procedure,' that arguments not addressed in moving briefs have been waived" (quoting Novosteel SA, 284 F.3d at 1274 (alteration in original))). Furthermore, plaintiff has not indicated that any evidence that may support its "black box" discussion was unavailable to it at the time the parties engaged in briefing related to defendant's motion to dismiss. In fact, at no point in its motion to amend does plaintiff assert that previously unavailable evidence is now available. Just as a motion for reconsideration should not be based upon evidence that was readily available at the time the motion was heard, Seldovia Native Ass'n, 36 Fed. Cl. [593,] 594 [(1996)], so, too, should plaintiff not be permitted in a motion to amend to rely upon readily available evidence that it did not present previously. The court therefore declines to consider this discussion and any evidence in support thereof.

Strategic Hous. Fin. Corp. of Travis Cnty. v. United States, 87 Fed. Cl. 183, 189–90 (2009) (footnote omitted; emphasis in original; alterations added). As described by the Judge in

Strategic Housing, the Strategic Housing plaintiff did not raise its arguments during briefing and waited until an adverse ruling, and many of the cases cited in Strategic Housing focus on instances in which a party raised an issue in a reply brief and with no further opportunity to respond. As noted by plaintiff,

> [h]owever, such is not the case with Petro Mex's waiver argument in this matter. Petro Mex made this argument proactively in its Post-Trial Brief and prior to the Court making its decision and the Government has been given ample opportunity to respond. In addition, the waiver issue is not one where specific discovery on the question would have likely changed the argument.

(alteration added).

As reflected above, defendant was able to address plaintiff's waiver argument in its post-trial brief, and was able to speak to the waiver issue at the closing argument and in the defendant's supplemental brief filed after the closing argument. The court agrees with Petro Mex that plaintiff may address the defendant's waiver claims regarding prior material breach. As conceded by plaintiff, however, plaintiff bears the burden of proving its affirmative defense.

In plaintiff's post-trial brief, Petro Mex argues that defendant has waived any argument for prior material breach because of the government's failure to cancel the Garfield Lease at an earlier time. Plaintiff, quoting extensively from the 1976 case of Cities Services Helex, Inc. v. United States, 543 F.2d 1313, 211 Ct. Cl. 222 (1976), argues

> prior authority establishes that the doctrine only applies where the claiming party uses such a breach as grounds to end the contract in question. . . .
>
>> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

(quoting Cities Serv. Helex, Inc. v. United States, 543 F.2d at 1313, 211 Ct. Cl. at 234–35) (citations omitted; omission in original). In Cities Service Helex, Inc. v. United States, however, the United States Court of Claims conducted a fact based examination of the conduct of the parties after the breach and determined, "we have here much more than mere continuance of performance by the injured party, leaving it open to the defaulter whether or not to continue its own performance. Both plaintiffs set out to force the

126

Government to perform fully, and instituted suit in the District Court for that very purpose." Id. at 1316. The court determined that

> Plaintiffs' course of action in response to the Russell termination caused (i) the Government's continued performance of the contracts despite its own decision to terminate, (ii) the Government's payment of the full contract price for more than a year after the termination was to have taken effect, and (iii) the Government's repetition for the Morton termination of the steps needed to terminate the contract. The plaintiffs accepted the benefits accruing from their chosen course of action and did not suggest to the Government, until long after the Morton termination, that they would hold the Government liable to the end of the contract term for material breaches occurring prior to that termination. It would be inequitable to allow the plaintiffs to say now that the contracts were no longer in force in February-April 1973.

Cities Serv. Helex, Inc. v. United States, 543 F.2d at 1317, 211 Ct. Cl. at 240-41 (footnotes omitted). This court finds the facts developed at trial in the above captioned case are distinct from the facts presented in Cities Service Helex.

Petro Mex also cites to the United States Court of Appeals for the Federal Circuit's decision in Barron Bancshares, Inc. v. United States, 366 F.3d 1360 (Fed. Cir. 2004) and the United States Court of Federal Claims decision in First Heights Bank, FSB v. United States, 51 Fed. Cl. 659 (2001), aff'd, 422 F.3d 1311 (Fed. Cir. 2005) to claim:

> In a situation where the "injured party" elects to continue the contract in the face of a breach, or simply engages in "conduct indicating an intention to continue the contract" it waives the right to assert that such breach discharges any obligation to perform under the contract. First Heights Bank, FSB, 51 Fed. Cl. at 663. The Federal Circuit Court of Appeals applied this rule to a prior material breach claim by the Government in Barron Bancshares, Inc. v. U.S., 366 F.3d 1360, 1383 (Fed. Cir. 2004) where it stated that "in order to preserve its claim of a prior material breach giving rise to the right to terminate the contract, the government had to treat [plaintiff] as if it had breached the contract." Instead, the Court found that where the Government continued performance of the contract despite the apparent breach (in that case, by making agreed upon assistance payments), "the government waived its right to treat Barron's actions as having terminated the contract."

(alteration in plaintiff's brief). In Barron Bancshares, Inc. v. United States, the Federal Circuit noted, "[i]n this Winstar-related case,"

> Barron County Federal Savings & Loan ("Barron County"), an ailing thrift located in Barron, Wisconsin, reported insolvency on May 31, 1985. In response, the Chicago office of the FHLBB decided to recapitalize Barron County by converting it from a mutual association to a stock association and

by selling its stock. After soliciting bids, the Bank Board selected the Investors to acquire the stock of the reformed thrift, renamed Monycor. The transaction was recorded in five documents: three Bank Board Resolutions, an Assistance Agreement, and a Forbearance Letter.

Barron Bancshares, Inc. v. United States, 366 F.3d at 1365 (internal citations omitted). The Federal Circuit in Barron Bancshares further indicated that

> [i]n the Court of Federal Claims, the government argued that Plaintiffs were precluded from recovering damages based upon the doctrine of prior material breach. Barron Bancshares, 53 Fed. Cl. at 321. Under that doctrine, when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach. Coll. Point Boat Corp. v. United States, 267 U.S. 12, 15, 45 S. Ct. 199, 69 L. Ed. 490 (1925). Faced with two parties to a contract, each of whom claims breach by the other, courts will "often . . . impose liability on the party that committed the first material breach." E. Allen Farnsworth, Farnsworth on Contracts § 8.15, at 439 (1990); see also Christopher Vill., L.P. v. United States, 360 F.3d 1319, 1334 (Fed. Cir. 2004). According to the Restatement, the doctrine of prior material breach is
>
> > based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties . . . if there has already been an uncured material failure of performance by the other party.
>
> Restatement (Second) of Contracts § 237 cmt. b (1981); see also Christopher Vill., 360 F.3d at 1334. The government asserted in the Court of Federal Claims that the Investors committed a prior material breach of contract by failing to operate Monycor in the manner represented in the application they submitted for the thrift's acquisition. Barron Bancshares, 53 Fed. Cl. at 321.

Barron Bancshares, Inc. v. United States, 366 F.3d at 1380–81 (alteration added; omission in original). The Federal Circuit determined:

> On the one hand, the government claims that "investor plaintiffs almost immediately implemented a practice of reckless lending," Barron Bancshares, 53 Fed. Cl. at 321; yet on the other, it nevertheless continued to make its assistance payments for the full five years. In order to preserve its claim of a prior material breach giving rise to the right to terminate the contract, the government had to treat Barron as if it had breached the contract. See 14 Williston on Contracts § 43:15 (4th ed. 2000) (explaining that faced with a material breach by the other party to a contract, one has the choice "to continue to perform under the contract or to cease to perform,

128

and conduct indicating an intention to continue the contract . . . in effect waiv[es] the right to assert that the breach discharged any obligation to perform"); Cities Serv. Helex, 543 F.2d at 1313–14 (discussing four approaches to the question of whether a party's conduct precludes it from asserting prior material breach as a defense); First Heights Bank, FSB v. United States, 51 Fed. Cl. 659, 663–64 (2001) (explaining the rule set forth in Cities Serv. Helex). It did not do that. We conclude that the government waived its right to treat Barron's actions as having terminated the contract.

Barron Bancshares, Inc. v. United States, 366 F.3d at 1383 (alteration and omission in original).

　　　　Similarly, in First Heights Bank, FSB v. United States, a Judge of the United States Court of Federal Claims, noted, like the Federal Circuit in Barron Bancshares, "[p]ending in this Winstar-related case,"

plaintiffs here, First Heights Bank, FSB, Pulte Diversified Companies, Inc., and Pulte Corporation, (collectively "Pulte") allege having entered into an assistance agreement ("Assistance Agreement") with the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") in 1988 in connection with plaintiffs' acquisition of a package of several failing thrifts marketed by the FSLIC and the FHLBB as part of the FSLIC and FHLBB's Southwest Plan.

First Heights Bank, FSB v. United States, 51 Fed. Cl. at 661 (footnote omitted). The Judge indicated that

Pulte disagreed with the FSLIC and its successor, the Federal Deposit Insurance Corporation ("FDIC"), in regard to the sharing of covered asset loss benefits derived from adjustments to the bad debt reserve. Documentation submitted by the parties as attachments to supplement briefing on the Government's prior material breach argument indicates that this dispute became acute in mid–1993. Despite this dispute, however, on September 30, 1994, the FDIC, "in accordance with Section 32(a) of the [September 9, 1988] Assistance Agreement," loaned Pulte $127 million and that Pulte executed a note promising to repay the FDIC this amount plus interest.

First Heights Bank, FSB v. United States, 51 Fed. Cl. at 662 (footnote omitted; alteration in original). During the litigation in this court in First Heights Bank, the government asserted "that the doctrine of prior material breach bars plaintiffs from recovering on their claim that enactment of the Guarini legislation[31] constituted a breach of the Assistance Agreement." Id. at 663 (footnote added). The Judge in First Heights Bank explained:

---

[31] According to the Judge of the United States Court of Federal Claims in Centex Corp. v. United States:

> We return, therefore, to the four approaches outlined in Cities Service Helex. Under any of the four approaches, defendant is precluded from avoiding liability in this case under the prior material breach doctrine. Certainly, under the strict approach, the FDIC's willingness to extend a $127 million loan to plaintiffs in 1994 indicates an "intent to continue the contract." Additionally, there is no evidence indicating that the FDIC was "reserving" its right to claim a material breach and thereby end the contract; to the contrary, the 1994 loan is evidence that the FDIC, in fact, wanted the contract to continue. Consequently, under the modified approach, defendant is precluded from asserting prior material breach.

First Heights Bank, FSB v. United States, 51 Fed. Cl. at 665. Both Barron Bancshares, Inc. v. United States, and First Heights Bank, FSB v. United States adopt an approach similar to the approach taken by the Federal Circuit in Cities Services Helex, Inc. v. United States, as both cases developed a fact based examination of the conduct of the parties after the breach and in both instances the United States was the non-breaching party and the United States did not reserve the right to claim breach.

Defendant argues that the above captioned case "stands in stark contrast to the examples upon which Petro Mex relies," and contends that

> the [Grand Junction] Field Office repeatedly reserved its rights, warning Petro Mex of the consequences of continued failure to remedy its breaches; clearly signaled the materiality of Petro Mex's breaches by refusing to let Petro Mex perform unless and until it cured those breaches; *escalated* its responses to Petro Mex's breaches over time; and eventually discontinued performance altogether.

(emphasis in original; alteration added).

For example, defendant argues that "the Field Office did not waive but escalated, its response to Petro Mex's failure to report production and pay royalties." As described

---

> In February 1992, the House Ways and Means Committee reported out Representative Guarini's legislation eliminating the deduction for covered asset losses. The Committee Reports specifically mentioned the 1988 FSLIC [Federal Savings and Loan Insurance Corporation]-assisted transactions and pointed to the RTC [Resolution Trust Corporation] Report and the Treasury Report for support for their conclusions. Congress passed the Guarini legislation as § 13224 of the Omnibus Budget Reconciliation Act of 1993, which became law when the President signed it on August 10, 1993.

Centex Corp. v. United States, 49 Fed. Cl. 691, 706–07 (2001) (footnote omitted; alterations added); see also Temple-Inland, Inc. v. United States, 59 Fed. Cl. 550, 558 (2004).

above, beginning as far back as 2006, Mr. Fancher sent Petro Mex a letter on November 30, 2006, indicating that Petro Mex's "leases and wells have been selected by the Grand Junction Field Office (GJFO) for a production inspection." Addressing the November 30, 2006 letter to Petro Mex regarding a production inspection, defendant's counsel asked Mr. Fancher, "why did you decide to request these particular documents from Petro Mex?" Mr. Fancher testified:

> Well, I wanted to verify their -- their reporting. So the OGOR [Oil and Gas Operations Report] statements, I wanted a copy of those. I wanted a copy of their gas purchase statements, calibration reports, and I look through all these to ensure that the meters are being calibrated when they're supposed to be, the frequency they're calibrated, that the reporting is really flawless, you know, we want to make sure they're -- what they're producing is what they're reporting, and that would include, like to see the gas chromatography, we like to know that, too, for our calculations, and it's not too often anybody flares or vents gas. We don't really particularly care for that very much, but if they did, I wanted to verify all their records with that that I would get from MMS [Minerals Management Service].

(alterations added). On March 1, 2007, Mr. Fancher followed up with Mr. Wilson at Petro Mex about the November 30, 2006 letter and Mr. Fancher testified:

> I called him to find out the status of their audit that I requested for the 2007, and I -- I mentioned I gave an extension, but I still haven't received anything. So they had -- and we talked about -- I mentioned that the material -- he said that the material was in Trudy [Grubilnick]'s hands, that he'd call her, so kind of like basically saying he didn't really know what happened. Trudy was supposed to take care of all that.

(alteration added). Defendant's counsel subsequently asked Mr. Fancher: "So as of 7/3/2007, had Petro Mex provided the information that you had requested for the fiscal year 2007 production accountability inspection?" to which Mr. Fancher testified: "No."

Separately from Mr. Fancher, Mr. Hartman escalated the government's response to Petro Mex failure to report on production in a March 14, 2007 letter, which stated, in part:

> Please refer to our letter dated August 11, 2006 that requested information concerning wells operated by Petro-Mex. To date, none of the information requested has been received. Petro-mex's [sic] failure to provide this information is an Incident of Non Compliance.
>
> **The following is an order of the authorized officer.** In accordance with 43 CFR 3163.1(a), please submit the above indicated reports to this office no later than twenty (20) days from the receipt of this letter to correct the violations. If you fail to submit the required reports in the time specified, you

will be liable for an assessment of $250.00 under 43 CFR 3163.1(a)(2). For clarity we repeat our request for information in the following bolded italicized text.

***We are lacking several reports for wells operated by Petro-Mex Resources. The listed items cover different wells and areas of concern.***

***Lease COC088586, Well 1-15-8-101, NW¼, NW¼ Section 15, T8S, R101W***
***Lease COC0124705A, Well 6-9-8-101, SE¼ SW¼, Section 9, T8S, R101W***

***Form 3160-5, Spud Notification: two copies due of written confirmation of verbal spud notification. We have no record of the spudding of these wells.***

***Form 3160-4, Well Completion Report and Log: two copies due within 30 days after well is completed (Onshore Order No. 1, Section VIII).***

***Geologic Logs: two copies due within 30 days after well is completed. (43 CFR 3162.4-1b requires duplicate copies of all types of wire line logs, sample logs, drilling time logs and other well surveys).***

***Lease COC0124705A, Well 5, SW¼ SW¼, Section 9, T8S, R101W***

***First Production Notification: Notification to the BLM is required within 5 days of first production. The COGCC website indicates the subject well began producing in January 2006 after being shut in for several years.***

***Form 3160-4, Well Completion Report and Log: two copies due within 30 days after well is completed (Onshore Order No. 1, Section VIII). Please update status of recompletion as requested in your sundry of August 2004 which involved pulling the existing casing and running new strings.***

***Lease COC088586, Well 2, NW ¼ NW ¼, Section 15, T8S, R101W***

***First Production Notification: Notification to the BLM is required within 5 days of first production. The COGCC website indicates the subject well began producing in July 2004 after being shut in for several years.***

***The Minerals Management Service is responsible for the collection of production reports for all federal leases and agreements. Their database shows that Petro-Mex has not reported for several years.***

> *Please indicate in your response to this letter [sic] status in updating the production reporting for all of the wells listed in Attachment 1.*

(emphasis in original; alterations added).

Defendant's counsel asked Mr. Hartman about the March 14, 2007 letter at trial and he explained that

> A. I believe we did not have any record of that well being completed. Again, I'm not sure if Petro Mex was the -- drilled the well or not, but we didn't have a copy of it, so I was just asking for that. And that's due within 30 days of the well being completed.
>
> Q. And considering that there's a reference to a sundry[32] of August 2004, and now we know we're at least past August 2006, was that something that Petro Mex should have provided?
>
> A. Yes.

(footnote added). The government has demonstrated continued efforts to get the required production reports and royalties from Petro Mex. In the face of non-compliance, the government repeatedly requested the information, and failing that, informed Petro Mex of a timeline to fix the violations. Additionally, the government documented that if Petro Mex

---

[32] Mr. Villalobos discussed sundry with defendant's counsel during cross-examination:

> Q. Are you familiar with that term "sundry notices?"
>
> A. Yes. Yes.
>
> Q. And what is that?
>
> A. That's -- after we get the -- if it was a leak or was a well head leak or line blow up, after we finish, then we have to call -- you can call or you can -- if BLM send us a notice, then we have to send it back after we fix the INC.
>
> Q. Are sundry notices different than incidents of noncompliance?
>
> A. I believe it's different, yes.

On direct examination, Mr. Fancher explained that after operator drills a well,

> they have to give us a subsequent report. They call it a sundry notice. There is the depths and all the pertinent information that engineers like to look at. The cementing reports to make sure they use the right volumes so we could back calculate if we wasn't out there to find out if they did that procedure correctly.

did not provide the information or, at a minimum a timeframe to resolve the outstanding issues, assessments would be issued by the government.

Similarly, regarding defendant's argument that "the Field Office did not waive, but escalated, its response to Petro Mex's failure to increase its bond, the court indicated above that the parties stipulated:

> Prior to May 2008, Petro Mex's bond requirement was $25,000. In April 2008, the Field Office's field manager, Catherine Robertson, sent a memorandum to the Colorado BLM State Director requesting an increased bond from $25,000 to $100,000 for Petro Mex. Ms. Robertson stated that the reasons for the requested increase in bond coverage included: (1) Petro Mex's "history of failing to comply" with orders and Notices of Incidents of Noncompliance; and (2) the fact that Petro Mex was delinquent in its production reporting. Ms. Robertson stated that the increased bond was "required to reduce the liability" to the Government in the event the wells were plugged and abandoned because the estimated cost per well was $20,000.

(alteration added; internal references omitted). At trial, defendant's counsel and Mr. Hartman had the following exchange regarding a memorandum written by the Grand Junction Field Office's field manager, Catherine Robertson:

> [Q.] And then can you just generally explain what this memorandum is?

> A. It's a recommendation to the state director from the field office manager saying that an operator has particular issues and that we believe that a bond -- an increase to their bond should be required. And it lists our criteria of why we believe it should be increased.

> Q. Okay.

> A. Yes.

> Q. And then the first indent refers to -- and I think ties back to the spreadsheet we just looked at, but refers to seven wells and all of them are currently in a shut-in or unapproved temporarily abandoned status. And even if that were not true, would you have still made a recommendation to increase the bond?

> A. Whether they were shut in or not?

> Q. Yes.

> A. Being the criteria? Yes. Nonproduction is a concern. It's one of the criteria for a bond increase. Yes.

Q. And then there's a reference to the middle paragraph, which is the indented paragraph, refers to a history of failing to comply with orders of the authorized officer and incidents of noncompliance resulting in assessments being issued. Why was that a reason for asking for an increase in bond coverage?

A. It's one of the -- on the -- let's see, in the memo, the memo from Washington. It's one of the criteria that can be used to show a bond increase is needed.

Q. And then can you explain why you have that third indented paragraph and what the purpose of that was?

A. This is based on -- I believe it was based on conversations or emails from MMS between me and one of the -- some MMS representative that there were failures to pay royalty and failures to report production.

(alteration added).

Additionally, the court noted that the parties have stipulated:

On May 15, 2008, the Colorado BLM State Director approved the bond increase request and required Petro Mex to obtain a bond of $100,000. The State Director gave Petro Mex 60 days from receipt of her letter to comply. The State Director's decision was delivered to Petro Mex by certified mail. On August 25, 2008, Ms. Robertson notified Petro Mex that BLM had failed to receive any response to the State Director's order to increase its bond. Ms. Robertson directed Petro Mex to provide the requested additional bond amount within 30 days of receipt of her letter, and stated, "[t]his is an order of the authorized officer."

(internal references omitted). The August 25, 2008 letter from Ms. Robertson stated, in part:

Reference is to the attached letter from the Bureau of Land Management-Colorado State Office that requested you provide an increase in bonding amount for your oil and gas operations within Colorado. The letter requested a response by 60 days of receipt of the letter. To date no response has been received. As the May 15th letter indicates, this office has concerns on the amount of liability that exists on Petro Mex Resources operated properties. Your history of non compliance with on the ground operations and the apparent failure to report timely to the Minerals Management Service led this office to request this bond increase. Please provide the requested additional bond amount as requested in the May 15, 2008 within 30 days of receipt of this letter. This is an order of the authorized officer. If you fail to

submit the required reports in the time specified, you will be liable for an assessment of $250.00 under 43 CFR 3163.1(a)(2) and possible lease cancellation.

The government's response to plaintiff's failure to not increase Petro Mex's bond was not to ignore the issue or continue with contract performance with the same bond amount, but to increase the bond amount and set possible assessments for the failure to comply. In both instances, for the request for production and the bond issue, the government did not waive any rights to claim a breach, as the government continued to make clear that there would be consequences for failure to comply and then the government increased its efforts to ensure compliance from Petro Mex.

Petro Mex also contends,

[i]n this matter, it is clear that any prior material breach of the Lease by Petro Mex did not allow or justify the Government's breaches. To begin with, the Government's remedy for any prior material breach would have been to cancel the Lease pursuant to 43 C.F.R. § 3108.3(b), not to effectively invent or construct a termination scenario based on nonproduction. However, at no point in 2008 or 2009 did the Government ever serve notice on Petro Mex that it intended to initiate cancellation proceedings or actually initiate such proceedings.[33] And the Government's failure to do this indicates that, faced with the knowledge of Petro Mex's breaches, the Government elected to continue the Lease as opposed to exercise its right to seek cancellation. In electing to continue the Lease, the government waived its right to treat Petro Mex's actions as having terminated the contract.

(alterations added).

Plaintiff argues that "cancellation of a lease by the Government for non-compliance is governed by 30 U.S.C. § 188, and requires judicial proceedings where the lease contains a well capable of production of oil or gas in paying quantities." "Failure to comply with provisions of lease," 30 U.S.C. § 188 (2018), provides:

**(a) Forfeiture**
Except as otherwise herein provided, any lease issued under the provisions of this chapter may be forfeited and canceled by an appropriate proceeding

---

[33] The court notes cancellation is separate from termination. As indicated in the joint stipulated facts, and as referenced above:

In an August 26, 2009 decision, BLM's Colorado State Office terminated the Garfield Lease. As grounds for the termination, the State Office explained that "the Grand Junction Field Office has determined that this lease was no longer capable of producing oil and gas in paying quantities after October 1, 2008."

in the United States district court for the district in which the property, or some part thereof, is located whenever the lessee fails to comply with any of the provisions of this chapter, of the lease, or of the general regulations promulgated under this chapter and in force at the date of the lease; and the lease may provide for resort to appropriate methods for the settlement of disputes or for remedies for breach of specified conditions thereof.

**(b) Cancellation**

Any lease issued after August 21, 1935, under the provisions of section 226 of this title shall be subject to cancellation by the Secretary of the Interior after 30 days notice upon the failure of the lessee to comply with any of the provisions of the lease, unless or until the leasehold contains a well capable of production of oil or gas in paying quantities, or the lease is committed to an approved cooperative or unit plan or communitization agreement under section 226(m) of this title which contains a well capable of production of unitized substances in paying quantities. Such notice in advance of cancellation shall be sent the lease owner by registered letter directed to the lease owner's record post-office address, and in case such letter shall be returned as undelivered, such notice shall also be posted for a period of thirty days in the United States land office for the district in which the land covered by such lease is situated, or in the event that there is no district land office for such district, then in the post office nearest such land. Notwithstanding the provisions of this section, however, upon failure of a lessee to pay rental on or before the anniversary date of the lease, for any lease on which there is no well capable of producing oil or gas in paying quantities, the lease shall automatically terminate by operation of law: *Provided, however,* That when the time for payment falls upon any day in which the proper office for payment is not open, payment may be received the next official working day and shall be considered as timely made: *Provided,* That if the rental payment due under a lease is paid on or before the anniversary date but either (1) the amount of the payment has been or is hereafter deficient and the deficiency is nominal, as determined by the Secretary by regulation, or (2) the payment was calculated in accordance with the acreage figure stated in the lease, or in any decision affecting the lease, or made in accordance with a bill or decision which has been rendered by him and such figure, bill, or decision is found to be in error resulting in a deficiency, such lease shall not automatically terminate unless (1) a new lease had been issued prior to May 12, 1970, or (2) the lessee fails to pay the deficiency within the period prescribed in a notice of deficiency sent to him by the Secretary.

30 U.S.C. § 188 (emphasis in original). The regulation regarding cancellation of oil and gas leases, 43 C.F.R. § 3108.3, in effect at the time periods relevant to this case, indicates:

(a) Whenever the lessee fails to comply with any of the provisions of the law, the regulations issued thereunder, or the lease, the lease may be canceled by the Secretary, if the leasehold does not contain a well capable of production of oil or gas in paying quantities, or if the lease is not committed to an approved cooperative or unit plan or communitization agreement that contains a well capable of production of unitized substances in paying quantities. The lease may be canceled only after notice to the lessee in accordance with section 31(b) of the Act and only if default continues for the period prescribed in that section after service of 30 days notice of failure to comply.

(b) Whenever the lessee fails to comply with any of the provisions of the law, the regulations issued thereunder, or the lease, and if the leasehold contains a well capable of production of oil or gas in paying quantities, or if the lease is committed to an approved cooperative or unit plan or communitization agreement that contains a well capable of production of unitized substances in paying quantities, the lease may be canceled only by judicial proceedings in the manner provided by section 31(a) of the Act.

(c) If any interest in any lease is owned or controlled, directly or indirectly, by means of stock or otherwise, in violation of any of the provisions of the act, the lease may be canceled, or the interest so owned may be forfeited, or the person so owning or controlling the interest may be compelled to dispose of the interest, only by judicial proceedings in the manner provided by section 27(h)(1) of the Act.

(d) Leases shall be subject to cancellation if improperly issued.

43 C.F.R. § 3108.3. The plaintiff also points to the language of the Garfield Lease, which, as quoted above at Section 7, provides:

SEC. 7. *Proceedings in case of default.* — If the lessee shall not comply with any of the provisions of the act or the regulations thereunder or of the lease, or make default in the performance or observance of any of the terms hereof (except that of payment of annual rental which results in the automatic termination of the lease), and such default shall continue for a period of 30 days after service of written notice thereof by the lessor, this lease may be cancelled by the Secretary of the Interior in accordance with section 31 of the act, except that if this lease covers lands known to contain valuable deposits of oil or gas, the lease may be cancelled only by judicial proceedings in the manner provided in section 31 of the act, but this provision shall not be construed to prevent the exercise by the lessor of any legal or equitable remedy which the lessor might otherwise have. Upon cancellation of this lease, any casing material, or equipment determined by the lessor to be necessary for use in plugging or preserving any well drilled on the leased land shall become the property of the lessor. A waiver of any particular cause of forfeiture shall not prevent the cancellation and forfeiture of this lease for any other cause of forfeiture, or for the same cause occurring at any other time.

(capitalization and emphasis in original). Although allowing for judicial proceedings pursuant to 30 U.S.C. § 188, the Garfield Lease specifically provides that Section 7 of the Garfield Lease "shall not be construed to prevent the exercise by the lessor of any legal or equitable remedy which the lessor might otherwise have."

Plaintiff contends that "any prior material breach of the Lease by Petro Mex did not excuse the government's performance of its own obligations under the Lease because the government never moved to end the Lease as a result of such breach through cancellation proceedings." Defendant responds that "Federal Circuit precedent precludes Petro Mex's argument that because the Field Office could have instituted judicial proceedings to cancel the lease as a result of Petro Mex's breaches, cancellation was the exclusive remedy and the common law defense of prior material breach is unavailable." For support, defendant cites to Laguna Construction Co. v. Carter, 828 F.3d 1364 (Fed. Cir. 2016), in which the Federal Circuit held:

> Prior material breach is a federal common law defense asserted when a party breaches a contract after another party has already breached the same contract. Christopher Village [L.P. v. United States], 360 F.3d [1319,] 1334 [(Fed Cir. 2004)]. We have held that it can bar a contractor's breach claim against the government, even if the government's later-occurring breach happened without knowledge of the first breach. See id. In Christopher Village, as a result of a criminal investigation, a plea agreement was entered establishing that the contractor was involved in a fraudulent insurance scheme that resulted in false claims for rent being submitted to the government. Id. at 1325. Based on that admitted fraudulent conduct, the Court of Federal Claims granted summary judgment to the government, finding that Christopher Village had committed a prior material breach that excused the government's alleged subsequent breach. Id. at 1326.

> We affirmed, holding that when "a party to a contract . . . is sued for its breach [it] may ordinarily defend on the ground that there existed, at the time [of the breach], a legal excuse for nonperformance." Id. at 1334 (citing Coll. Point Boat Corp. v. United States, 267 U.S. 12, 15, 45 S. Ct. 199, 69 L. Ed. 490 (1925)); see also Joseph Morton, 757 F.2d at 1279; K&R Eng'g Co., Inc. v. United States, 616 F.2d 469, 475 (Ct. Cl. 1980). We found that Christopher Village had materially breached the contract by submitting false data and was under common control with the guilty affiliated company. 360 F.3d at 1334–36. Therefore, its prior breach excused the government's subsequent breach. Id. at 1336.

> Laguna attempts to distinguish Christopher Village by arguing that it did not involve a CDA [Contract Disputes Act] contract and that the CDA displaces the common law prior material breach rule. Nothing in the CDA suggests that Congress intended to displace this federal common law defense, nor is there any sound reason to do so.

Laguna Constr. Co. v. Carter, 828 F.3d at 1369 (first, second, third, and seventh alterations added). The Federal Circuit concluded that

> we do not find persuasive Laguna's invocation of the termination and Anti-Kickback clauses. These clauses provide alternatives to address Laguna's fraud, but, as we have concluded, they do not foreclose application of the common law defense of prior material breach. The government could have chosen to terminate the contract for default or sought remedies under the Anti-Kickback Act, but it was not required to do so. Rather, as we held in Christopher Village and J.E.T.S., the government may use the prior material breach doctrine to defeat a contractor's breach claim.

Laguna Constr. Co., Inc. v. Carter, 828 F.3d at 1371.

> Plaintiff responds that the Laguna Construction decision
>
> is distinguishable because the court did not, in the section of the case cited by the Government, address the possible issue of waiver. In fact, the court in Laguna Construction did address the possible waiver issue later in the opinion and only found that waiver did not apply in that particular case because the contractor was unable to show that the Government had actual knowledge of the prior breach and continued the contract. The clear implication of this analysis is that if it were in fact shown that the Government did have knowledge of a breach, it would likely have been precluded from then sitting on its hands and doing nothing about the breach and such action would have waived the prior material breach defense.

(internal reference omitted).[34] The court notes that the Federal Circuit, in turning to the waiver issue in Laguna Construction, explained:

---

[34] Petro Mex characterizes the government's position regarding prior material breach as "the Government can face no consequences if it does nothing in the face of a breach and simply wait for the contractor to finish performing, but then refuse to comply with its obligations. Such a result would clearly be inequitable." The court notes the United States Court of Federal Claims is a court of law, not a court of equity. See United States v. Tohono O'Odham Nation, 563 U.S. 307, 313, 131 S. Ct. 1723, 1729, 179 L. Ed. 2d 723 (2011) (The United States Court of Federal Claims "has no general power to provide equitable relief against the Government or its officers."); Massie v. United States, 226 F.3d 1318, 1321 (Fed. Cir. 2000) ("Except in strictly limited circumstances, see 28 U.S.C. § 1491(b)(2), there is no provision in the Tucker Act authorizing the Court of Federal Claims to order equitable relief" (citing United States v. King, 395 U.S. 1, 4 (1969) ("cases seeking relief other than money damages from the Court of Claims have never been 'within its jurisdiction'") and Placeway Construction Corp. v. United States, 920 F.2d 903, 906 (Fed. Cir. 1990))).

Laguna also contends that the government knew of the kickback scheme as early as January 2008, but continued to perform the contract until 2015, thereby waiving the prior material breach defense. This alleged "continued performance" included paying approximately $3.5 million in July 2012 for incurred costs and auditing Laguna's cost statements. In light of the facts of this case, we do not find these arguments persuasive. A waiver is "an intentional relinquishment or abandonment of a known right." Massie v. United States, 166 F.3d 1184, 1190 n.** [35] (Fed. Cir. 1999) (internal quotation marks and citation omitted). It was reasonable for the government to invoke the prior material breach rule after Mr. Christiansen entered a guilty plea in July 2013. Therefore, prior to this date, the government did not have a "known right" that would have invoked the prior material breach rule. In addition, after Laguna completed the physical work in 2010, the government's sole acts comprised conducting audits and making cost reimbursements. We disagree with Laguna's contention that it relied on these acts to its detriment by performing final accounting and audit tasks. It is clear that Laguna would have performed these tasks even if the government had terminated the contract. Therefore, the government did not waive its right to invoke the prior material breach rule.

Laguna Constr. Co., Inc. v. Carter, 828 F.3d at 1372 (internal reference omitted; alteration added). Although Petro Mex claims "if it were in fact shown that the Government did have knowledge of a breach, it would likely have been precluded from then sitting on its hands and doing nothing about the breach and such action would have waived the prior material breach defense," defendant argues "because Petro Mex did not report or pay royalties on its production during the shut-in, Interior did not discover that Petro Mex had violated the shut-in order until more than six months later, on March 30, 2009." Additionally, the court notes, as indicated above, Mr. Fancher testified at trial: regarding the October 2008 timeframe with defendant's counsel:

A. I discovered that Petro Mex had sold gas during -- like right after the shut-in and so then that became something we had to deal with.

Q. The last sentence of your entry here says, "This is on our plate." Do you see that?

A. I see that. I mean, that's something that we had to deal with, yes, ma'am.

Q. Okay. And you may have just anticipated my question there, but what did you mean by that?

A. I meant that we had to research that and find out why they did that, why they started production without -- without notifying us.

---

[35] Asterisks appear as quoted in the Federal Circuit's decision in Laguna Construction.

Q. And on what date was this?

A. This was on March 30th, 2009.

Q. Was this the first time that you learned that Petro Mex had produced during the shut-in?

A. Yes, I think it is.

Q. Did you know in August 2008, at that time, did you have any knowledge that Petro Mex was producing?

A. I don't remember any knowledge of that. I'd have to look and see if I made any notes anywhere.

Q. Okay. Do you know whether in September 2008 you had any knowledge that Petro Mex was producing?

A. No, no, ma'am.

Q. Did you have any knowledge in October 2008 that Petro Mex was producing from the Garfield lease during the shut-in?

A. No, ma'am.

Turning to the language of the Garfield Lease at Section 7 which set the terms of default provides in relevant part:

> If the lessee shall not comply with any of the provisions of the act or the regulations thereunder or of the lease, or make default in the performance or observance of any of the terms hereof (except that of payment of annual rental which results in the automatic termination of the lease), and such default shall continue for a period of 30 days after service of written notice thereof by the lessor, this lease may be cancelled by the Secretary of the Interior in accordance with section 31 of the act, except that if this lease covers lands known to contain valuable deposits of oil or gas, the lease may be cancelled only by judicial proceedings in the manner provided in section 31 of the act, but this provision shall not be construed to prevent the exercise by the lessor of any legal or equitable remedy which the lessor might otherwise have.

As explained above, although providing for judicial proceedings pursuant to 30 U.S.C. § 188, the Garfield Lease specifically provides that Section 7 of the Garfield Lease "shall not be construed to prevent the exercise by the lessor of any legal or equitable remedy which the lessor might otherwise have." The court agrees with defendant that the BLM "could have chosen to cancel Petro Mex's lease, but it was not required to do so," echoing

the holding of <u>Laguna Construction</u> under the facts of this case.

Therefore, Petro Mex has not met its burden to prove that the government waived any prior material breaches. As plaintiff has already conceded, "Petro Mex breached the lease by failing to report and pay royalties on production or pay the resulting civil penalty," and that Petro Mex "breached the lease by failing to increase its reclamation bond when demand was made." Even if defendant breached the Garfield Lease, which the court does not conclude, defendant's breach would be excused by Petro Mex's prior material breaches.

As determined above, was on notice that its claim had accrued prior to August 2008, and outside the six year statute of limitations. In addition, plaintiff did not meet its burden to prove a breach of the Garfield Lease by the government, and, furthermore, plaintiff did not demonstrate that the termination of the Garfield Lease was not permitted by the applicable legal authorities or that plaintiff was not afforded a reasonable amount of time in which to resume production before termination.

<u>Offset</u>

As indicated in defendant's amended answer, defendant raised a claim for offset, which alleges that, "as of September 14, 2020, Petro Mex owes $330,205.58 to the United States for unpaid royalties, civil penalties, interest, administrative fees, and Treasury collection fees." Defendant alleges that "[t]he Court has jurisdiction over this offset pursuant to 28 U.S.C. §§ 1503 and 2508."

Under existing United States Court of Appeals for the Federal Circuit precedent

28 U.S.C. §§ 1503 and 2508 provide the court with jurisdiction if the government brings such a claim as a counterclaim. 28 U.S.C. §§ 1503, 2508 (1994); <u>Cont'l Mgmt., Inc. v. United States</u>, 208 Ct. Cl. 501, 527 F.2d 613, 616 n. 2 (1975) (stating that under § 1503 "the Government may set up a counterclaim even though . . . it states a claim of a type (e.g. tort) of which [the Court of Claims] would not have jurisdiction if sought to be maintained by a plaintiff") (citing <u>Cherry Cotton Mills, Inc. v. United States</u>, 327 U.S. 536, 105 Ct. Cl. 824, 66 S. Ct. 729, 90 L. Ed. 835 (1946)); <u>Cherry Cotton Mills</u>, 327 U.S. at 539, 66 S. Ct. 729 (stating that the purpose of the predecessor to § 1503 "was to permit the government, when sued in the Court of Claims, to have determined in a single suit all questions which involved mutual obligations between the government and a claimant against it"); <u>Daff v. United States</u>, 78 F.3d 1566, 1570 & n. 5 (Fed. Cir. 1996) (allowing the government to counterclaim under §§ 1503 and 2508 for unliquidated progress payments); <u>see</u> <u>also</u> <u>BLH, Inc. v. United States</u>, 13 Cl. Ct. 265, 275 (1987) ("Although [the Claims Court] does not generally have jurisdiction over implied-in-law contracts, an exception exists for counterclaims for money damages asserted by the government." (citing § 1503 and <u>Cherry Cotton Mills</u>) (internal citation omitted)). Thus, the Court

of Federal Claims did have jurisdiction to hear the government's counterclaims.

Barrett Ref. Corp. v. United States, 242 F.3d 1055, 1062–63 (Fed. Cir. 2001). Therefore, the court has jurisdiction pursuant to 28 U.S.C. § 1503 (2018) and 28 U.S.C. § 2508 (2018) to consider defendant's claim for offset. Based on the above determination that plaintiff's claims are barred by the statute of limitations and the conclusion that plaintiff has not demonstrated breach, plaintiff has not demonstrated liability, and consequently, plaintiff has not demonstrated an entitlement to damages in this case. As noted 31 U.S.C. § 3728(a) (2018): "The Secretary of the Treasury shall withhold paying that part of a judgment against the United States Government presented to the Secretary that is equal to a debt the plaintiff owes the Government." As there is no judgement against the United States as a result of plaintiff's lawsuit, there is no amount for the Treasury to offset. Therefore, as there is no award to plaintiff that is subject to an offset, defendant's claim for offset is **MOOT**.

## CONCLUSION

As determined above, under the objective standard for notice of the accrual of claims, plaintiff was on notice that any claims accrued prior to August 2008, thus plaintiff's claims are outside the applicable six year statute of limitations which barred plaintiff from proceeding with its claims this court. Furthermore, plaintiff failed to demonstrate that Petro Mex did not receive a reasonable amount of time to resolve the issues with the Garfield Lease under the relevant statutes and regulations. Plaintiff has failed to prove that the government breached plaintiff's Garfield Lease. Additionally, plaintiff did not establish that the government had committed a prior material breach of the Garfield Lease. Because plaintiff did not recover damages in the above captioned case, defendant's claim for offset is moot. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**